UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | 16-cr-281-2 (PGG) |
| vs. | : | |
| BRANDON GREEN, *et al*. | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BRANDON GREEN'S MOTION TO SUPPRESS THE FRUITS OF A WARRANTLESS SEARCH**

Eric R. Breslin, Esq.
Melissa S. Geller, Esq.
DUANE MORRIS LLP
1037 Raymond Blvd., Suite, 1800
Newark, NJ 07102
P: 973-424-2000
F: 973-424-2001
Email: erbreslin@duanemorris.com
Email: msgeller@duanemorris.com
*Attorneys for Defendant Brandon Green*

**Table of Contents**

**FACTUAL STATEMENT** ...................................................................................................... 1

**ARGUMENT** ............................................................................................................................. 4

I.     **Government Agents Obtained Consent to Search the Property Using Coercion and Threats, Rendering the Search Invalid.** ........................................... 4

    A.     **Ms. Turcios did not give consent to search when first pulled over.** ................ 5

    B.     **Ms. Turcios did not voluntarily sign the consent to search form.** .................. 7

II.     **Government Agents Obtained Consent for a Search After the Search Began and After the Guns Were Located.** ............................................................................ 8

III.     **Ms. Turcios Lacked Authority to Consent to a Search of the Louis Vuitton Bag and the Firearms Should be Suppressed.** .............................................................. 9

**CONCLUSION** ....................................................................................................................... 11

# **TABLE OF AUTHORITIES**

**Cases**

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)..................................................................4

*United States v. Ali*, 86 F. 3d 275 (2d Cir. 1996)....................................................................6

*United States v. Bohannon*, No. 13-cr-229, 2017 WL 1536391 (D. Conn. Apr. 28, 2017) .........................................................................................................................5

*United States v. Bushay*, 859 F. Supp. 2d 1335 (N.D. Ga. 2012) .......................................8

*United States v. Chisholm*, No. 07-cr-795, 2009 WL 29313 (E.D.N.Y. Jan. 5, 2009) ......................................................................................................................10

*United States v. Faruolo*, 506 F.2d 490, 494 (2d Cir. 1974) ..............................................6

*United States v. Guzman*, 724 F. Supp. 2d 434 (S.D.N.Y. 2010 ) .................................7-8

*United States v. Isiofia*, 370 F.3d 226 (2d Cir. 2004) ......................................................4-5

*United States v. Jackson*, 588 F.2d 1046 (5th Cir. 1979) ...................................................4

*United States v. Karo*, 468 U.S. 705 (1984) ........................................................................9

*United States v. Lopez*, 817 F. Supp. 2d 918 (E.D. Miss. 2011)....................................6, 8

*United States v. Mapp*, 476 F.2d 67 (2d Cir. 1973) ..................................................... 4, 6-7

*United States v. Matlock*, 415 U.S. 164 (1974) ..................................................................9

*United States v. Munoz*, 987 F. Supp. 2d 438 (S.D.N.Y. 2013) ....................................4-5

*United States v. Ocheltree*, 622 F.2d 922 (9th Cir. 1980) ..................................................8

*United States v. Orejuela-Guevara*, 659 F. Supp. 882 (E.D.N.Y. 1987)........................10

*United States v. Turner*, 23 F. Supp. 3d 290 (S.D.N.Y. 2014) ............................... 8, 10-11

*United States v. Wilson*, 11 F.3d 346 (2d Cir. 1993) ..........................................................4

*United States v. Whiteside,* No. 13-cr-576, 2015 WL 3953477 (Jun. 29, 2015) ............10

*See Wong Sun v. United States*, 371 U.S. 471, 484 (1963) .............................................11

Defendant Brandon Green submits this memorandum of law in support of his motion to suppress firearms, cellular telephones, paperwork, and other material discovered during a warrantless search of the home he shared with his girlfriend.

On May 16, 2017, government agents entered Mr. Green's home without a warrant and arrested him.  Following his arrest, agents searched the apartment, finding firearms, cellular telephones, and documents, among other things.  The government did not have a warrant to conduct this search, rather it will likely seek to rely on purported consent to search extracted from Mr. Green's girlfriend, Jennifer Turcios.  Ms. Turcios signed the consent to search form after, it appears, the search had nearly been completed.  When she did sign the form, she did so under extremely coercive conditions, including the threat of arrest should she withhold her signature.  These coercive conditions rendered her consent null and void and the accompanying search involuntary.  Ms. Turcios also lacked actual or apparent authority to consent to the search of a locked bag found at the back of Mr. Green's closet, under a pile of Mr. Green's clothes.  Rather than obtain a warrant to search the premises, the government coerced consent from a terrorized citizen whose only connection to this case is that she was the defendant's girlfriend.  The government lacked authority to conduct this warrantless search.  The Court should suppress the fruits of this unconstitutional search.

## FACTUAL STATEMENT

On May 16, 2017, Ms. Turcios was living at 3370 Madison Avenue, Bridgeport, Connecticut with her boyfriend, Defendant Brandon Green.  That morning, as Ms. Turcios was driving to work, she noticed a car coming up behind her, going very fast.  Declaration of Jennifer Turcios ("Turcios Decl."), ¶ 2.  Police lights came on, and she pulled over.  *Id.*  Two men approached her car.  *Id.*  Neither identified themselves as agents of the federal government; they

simply demanded identification. *Id.* at ¶ 3. Ms. Turcios did not learn until later that they were agents of the United States Marshal's Service. *Id.* at ¶ 2. As Ms. Turcios handed over her identification, she asked why they pulled her over. *Id.* at ¶ 3. The men did not answer, but instead began asking questions about her boyfriend. *Id*. They told her to call her supervisor and say that she would be late to work. *Id.* at ¶ 4. The agents then asked for permission to search her apartment. *Id.* at ¶ 5. Before she could respond, one of the agents said "we are going to get in one way or the other." *Id.* Ms. Turcios did not give consent. At that point, the agent reached through the window, across her body, and grabbed the house keys that had been sitting in her open purse on the passenger side. *Id.* at ¶ 6.

Ms. Turcios still had her cellular telephone in her hand. One of the agents took the phone out of her hand and looked through it, presumably searching for pictures of her boyfriend. *Id.* at ¶ 7. Then, the agent told her not to leave, took her house keys and her ID, and left on foot with other agents. *Id.* at ¶ 8. The agents left behind the car that had initially stopped her, with another agent in the car. It can be assumed that this was done in order to keep track of her and limit of her freedom of movement. *Id.* at ¶ 9.

Back at the apartment, Mr. Green, watching TV on the first floor, heard someone enter the apartment. Affidavit of Brandon Green ("Green Aff."), ¶ 6. Agents entered with a key and guns drawn. *Id.* He was arrested, handcuffed, and placed on the couch. *Id.* at ¶ 9. The agents then began to search the apartment. Eventually, the officers located a Louis Vuitton bag containing firearms. *See* Declaration of Eric R. Breslin ("Breslin Decl."), ¶ 3.

About ten minutes later, the agents returned to Ms. Turcios' car. *Id.* at ¶ 10. One of them instructed Ms. Turcios to call and report she would miss work that day. *Id.* She did as instructed. An agent then got into the passenger side of Ms. Turcios' car and told her to drive

2

home. *Id.* She again did as instructed. *Id.* Upon arriving at the apartment, the agents took Ms. Turcios inside. *Id.* The apartment had clearly already been searched, with the contents of the downstairs closets out on the floor. *Id.* at ¶ 11.

An agent then handed her a consent to search form. *Id.* at ¶ 12. He told Ms. Turcios to sign the form or she would be arrested. *Id.* Ms. Turcios asked on what grounds she would be arrested. *Id.* at ¶ 13. The agent refused to say, stating that he would take her upstairs and show her, but she had to sign the form first. *Id.* at ¶ 13. Ms. Turcios signed the form without reading it. *Id.* The agent then took Ms. Turcios upstairs, where at least part of the search had already been conducted, as several guns were laid out neatly on the floor, including a pink handgun. *Id.* at ¶ 15. Mr. Turcios was never told what the government proposed to arrest her for. But, while she was standing upstairs, one of the agents pointed to the pink gun, and then pointed to her, and asked if they should "put that on her." *Id.* at ¶ 15. Presumably, the agent proposed to arrest Ms. Turcios for weapons possession because the gun was pink, and she was a female. She was not arrested and charged.

Near the guns, on the floor in the hall was the Louis Vuitton bag, with the lock broken. *Id.* at ¶¶ 15-16. This was a bag with a lock that Ms. Turcios had given to Mr. Green. *Id.* at ¶ 16. Mr. Green kept the bag in the back of a closet, underneath a pile of his clothes. Supplemental Declaration of Brandon Green ("Supp. Green Decl."), at ¶ 3. This closet was clearly Mr. Green's closet, containing his belongings. *Id.* at ¶ 3; Turcios Decl., at ¶ 16. The only possessions of Ms. Turcios' in that closet were some winter coats, kept there for storage. Supp. Green Decl., at ¶ 3; Turcios Decl., at ¶ 16. Ms. Turcios did not have a key to the bag. Supp. Green Decl., at ¶ 4; Turcios Decl., at ¶ 17.

3

The government obtained the following from the search of Mr. Green and Ms. Turcios' home: five cellular telephones, $2,453 in cash, a black and tan Louis Vuitton bag, five firearms, assorted ammunition, a Pennsylvania drivers' license in the name of Jonathan Brown, and various legal paperwork, a coffee grinder, a strainer, and brown wrappers.  Breslin Decl., ¶ 3.  This evidence should be suppressed, as the government obtained this evidence through a warrantless search of Mr. Green's home, without timely or valid consent.

## ARGUMENT

"[T]he concept of the sanctity and inviobility of the home stands at the very core of the protections afforded by the Fourth Amendment."  *United States v. Jackson*, 588 F.2d 1046, 1052 (5th Cir. 1979).  The Fourth Amendment guarantees protection against the warrantless search of the home absent "the most 'jealously and carefully drawn" situations.  *United States v. Mapp*, 476 F.2d 67, 74 (2d Cir. 1973) (internal quotations omitted).  When relying on consent, instead of a warrant, the government must establish the reasonableness of the search.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).  Since the evidence seized from the apartment was obtained as the result of an unconstitutional search, the evidence should be suppressed.

**I.   Government Agents Obtained Consent to Search the Property Using Coercion and Threats, Rendering the Search Invalid.**

The consent to search obtained from Ms. Turcios was not "a product of [her] free and unconstrained choice."  *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993).  Rather, it was only the "'acquiescence in a show of authority," obtained using explicit and implicit coercive tactics.  *United States v. Munoz*, 987 F. Supp. 2d 438, 444 (S.D.N.Y. 2013) (Kaplan, D.J.).  The coercive situation rendered the consent involuntary, and therefore invalid.  *Id.*

In evaluating the voluntary of consent, the Court must consider the totality of the circumstances.  *United States v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004).  The Court must

4

ultimately determine whether the agent "had a reasonable basis for believing there had been a consent to search." *Id.* While "objective reasonableness" is the standard, the Court must still take into account "the possibly vulnerable subjective state of the person who consents." *Munoz*, 987 F. Supp. 2d at 444. Thus, the existence of a consent to search form does not automatically render the search voluntary if other coercive factors are present. *See, e.g., Isiofia*, 370 F.3d at 231 (upholding district court finding that consent was involuntary despite existence of consent to search form).[1]

### A.     Ms. Turcios did not give consent to search when first pulled over.

Government agents did not obtain a written consent to search when they first pulled Ms. Turcios over. Nor can they point to any statement of hers indicating consent to search. When asked if she would consent to a search, she did not say yes. Clear evidence of this lack of consent is the fact that the agent reached into her car, into her personal space, and took her keys out of her purse. If she had given consent, he would have simply asked for them.

Any consent under these circumstances would be involuntary in any event, as agents (1) obtained consent while Ms. Turcios was, in effect, in custody, creating a highly coercive environment, (2) would have been obtained by implying that, whether she consented or not, agents would search the apartment, and (3) because the agents failed to advise her of her right to refuse consent.

First, no reasonable person in Ms. Turcios' situation would have felt free to leave. Agents stopped her on the street, refused to identify themselves, instructed her to call in late to

---

[1] Some of the common factors considered by courts when evaluating voluntariness include: "(1) the age of the consenter; (2) her educational background; (3) her intelligence; (4) the use of physical punishments or deprivations; (5) whether she was advised of her constitutional rights; (6) whether the consenter was in custody; (7) whether guns were drawn; (8) whether the consenter was frisked; (9) whether the consenter was threatened; (10) whether she was in a public area; and (11) whether she was informed that she had the option of refusing consent." *United States v. Bohannon*, No. 13-cr-229, 2017 WL 1536391, *9 (D. Conn. Apr. 28, 2017) (quoting earlier suppression ruling)

work, deprived of her ID and her house keys, and ordered her to stay put when they left. She was, for all intents and purposes, in custody. *See United States v. Lopez*, 817 F. Supp. 2d 918, 928-29 (E.D. Miss. 2011) (holding consent involuntary, in part, because although the defendant was not formally under arrest, "a reasonable person. . .would have perceived the degree of restraint associated with formal arrest," where traffic stop lasted over twenty minutes without a citation, and the officer retained the defendant's driver's license); *see also United States v. Ali*, 86 F. 3d 275, 276 (2d Cir. 1996) (stating "[a]n accused is in 'custody' when, in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave" (quoting *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995)). The custodial nature of this stop created a highly coercive situation. *See Mapp*, 476 F.2d at 78 (noting that "[a]rrest carries its own aura of coercion [and] the burden upon the government to show voluntary consent is 'particularly heavy'" (second alteration in original) (quoting *Gorman v. United States*, 380 F.2d 158, 163 (1st Cir. 1973)). This is particularly so when coupled with the agents other behavior, including reaching into the car to take Ms. Turcios' keys without permission and taking her phone and searching it.

Additionally, government agents indicated that they would gain entry to the apartment one way or the other, suggesting that agents "intended to search the apartment whether they had permission to do so or not." *Mapp*, 476 F.2d at 78. Such a suggestion, particularly in the context of the facts of this case, render any consent not voluntary, but "mere acquiescence in and submission to lawful authority." *Id.*[2] Finally, agents did not advise Ms. Turcios of her right to

---

[2] A line of cases holds that the truthful representation that, in the absence of consent, law enforcement can obtain a search warrant does not amount to coercion. *See, e.g., United States v. Faruolo*, 506 F.2d 490, 494 (2d Cir. 1974). The agents never stated that they could or would obtain a search warrant, making it more like *Mapp* than *Faruolo*.

refuse consent. *Id.* (noting that whether an individual is notified of their right to refuse to consent to a search is a factor to be considered in determining voluntariness).

    **B.**  **Ms. Turcios did not voluntarily sign the consent to search form.**

  Once at Ms. Turcios and Mr. Green's apartment, the agents obtained a written consent to search form from Ms. Turcios under express threat, in extremely coercive surroundings, rendering the consent to search invalid. First, Ms. Turcios was still in custody at the time. Second, agents obtained the consent in an extremely coercive environment. Finally, agents obtained the consent only by threatening Ms. Turcios with formal arrest.

  After the agents returned to the vehicle, Ms. Turcios would have felt even less freedom to leave. One of the agents actually got into the vehicle with her and told her to call out of work for the day. Turcios Decl., ¶ 10. Additionally, the scene at the apartment was chaos, with armed agents everywhere, her boyfriend on the couch in handcuffs, and her belongings strewn about the floor. *See United States v. Guzman*, 724 F. Supp. 2d 434, 442 (S.D.N.Y. 2010 ) (Kaplan, D.J.) (holding consent to search involuntary, in part, because of the "objectively coercive" atmosphere in the defendant's apartment, caused by the presence of law enforcement, family members, and at least one visible firearm). None of the agents took "even minimal steps to establish an atmosphere of relative calm somewhat more conducive to the making of a knowing and intelligent decision." *Mapp*, 476 F.2d at 78.

  By far the most egregious action taken by authorities was to threaten Ms. Turcios with arrest should she refuse to consent to the search. It is not even clear that there was probable cause to arrest her for anything. The agents likely knew this since, when Ms. Turcios asked on what charge she would be arrested, the agent refused to answer. As one agent phrased it, he would tell her when they got upstairs. This was an explicit threat that had far-reaching consequences for Ms. Turcios' job, well-being and ultimate freedom.

7

The use of an explicit threat of arrest rendered her consent to search involuntary. *United States v. Ocheltree*, 622 F.2d 922, 994 (9th Cir. 1980) (holding that consent obtained under threat of unlawful arrest renders statement involuntary); *Lopez*, 817 F. Supp. 2d at 929 (holding that a subtle hint that consent to search would dispose of the threat of formal arrest was coercive); *see also Guzman*, 724 F. Supp. 2d at 443 (holding that threats to arrest family members if consent not given contributed to coercive circumstances); *United States v. Turner*, 23 F. Supp. 3d 290, 308 (S.D.N.Y. 2014) (Ramos, D.J.) (holding that consent was involuntary because it was obtained only on threat of telling consenter's employer about illegal tenants, which would result in loss of home and job).

The totality of the circumstances shows that the agents obtained consent to search Mr. Green's home from Ms. Turcios using express and implied threats issued in a chaotic, coercive atmosphere. The consent to search is therefore invalid.

**II.   Government Agents Obtained Consent for a Search After the Search Began and After the Guns Were Located.**

Even if Ms. Turcios had voluntarily given consent when she signed the consent to search form, that consent was obtained belatedly, after law enforcement searched the apartment.

By the time Ms. Turcios signed the consent to search form, government agents had already searched the closet and located the guns. The government may not cure a warrantless search by obtaining a post-hoc consent to search. *See United States v. Bushay*, 859 F. Supp. 2d 1335, 1369 (N.D. Ga. 2012) (holding that an "after-the-fact written consent is akin to a mere submission to official authority," absent facts supporting a finding that the written consent was a voluntary ratification of a prior consent).

By the time the Marshals brought Ms. Turcios to the apartment, the agents had clearly already conducted a search and located the Louis Vuitton bag. The agents threatened her with

8

arrest of something they found upstairs, presumably the guns. Turcios Decl., ¶ 13. When Ms. Turcios signed the form, the agents took her upstairs, where the guns had already been located and laid out in the hallway. *Id.* at ¶ 15. It is apparent, therefore, that the agents had already located the bag with the guns, and conducted a thorough search of the upstairs area of the premises, by the time Ms. Turcios signed the consent to search form. Nothing in the record suggests that this belated form was signed as a ratification to a previously voluntarily given consent to search.[3]

### III. Ms. Turcios Lacked Authority to Consent to a Search of the Louis Vuitton Bag and the Firearms Should be Suppressed.

Even if the Court finds that the government had consent to search the premises, it did not have consent to search the Louis Vuitton bag. The bag was stored under a pile of Mr. Green's clothes, in the back of a closet used exclusively by Mr. Green, with the exception of some limited winter storage by Ms. Turcios. Supp. Green Decl., ¶ 3. Law enforcement had no reason to think that Ms. Turcios had common authority over that closed and locked item, such that she could give consent for its search. The search of the Louis Vuitton bag is therefore invalid.

Third party consent to search extends only to those areas and effects where that third party has common authority. *United States v. Matlock*, 415 U.S. 164, 171 (1974). "A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home." *United States v. Karo*, 468 U.S. 705, 725 (1984) (O'Connor, J. concurring). The focus of a defendant's expectation of privacy is "in *the object* apart from his expectation of privacy in the home." *Turner*, 23 F. Supp. 3d at 310 (emphasis in original)

---

[3] If law enforcement were able to cure a defective search by obtaining a post-hoc consent to search, they could conduct a warrantless search, locate incriminating evidence, and then use that incriminating evidence to force a homeowner to consent to search. Indeed, that does appear to be what happened here.

(quoting *United States v. Haqq*, 278 F.3d 44, 50 (2d Cir. 2002). Joint access to a bedroom, or even a closet, does not confer automatic authority to access every closed container in the room. *United States v. Chisholm*, No. 07-cr-795, 2009 WL 29313, *8 (E.D.N.Y. Jan. 5, 2009). Rather, the relevant question is whether Mr. Green had "an independent, reasonable expectation of privacy" in the Louis Vuitton bag. *United States v. Orejuela-Guevara*, 659 F. Supp. 882, 888 (E.D.N.Y. 1987). The onus rests on law enforcement to resolve any ambiguity. *See United States v. Whiteside*, No. 13-cr-576, 2015 WL 3953477 (S.D.N.Y. Jun. 29, 2015) (Crotty, D.J.).

A good example of this precept is found in *Whiteside,* decided by Judge Crotty in 2015. In *Whiteside*, officers observed the suspect in a murder driving a white Mercedes. *Id.* at *1. Officers later located the car in a parking lot. *Id.* A woman standing next to the car identified herself as the owner, gave consent to search the car, and handed the keys to the officers. *Id.* In searching the car, officers located a digital camera in the pocket of the front driver's side door. *Id.* at *2. Judge Crotty held that the officers did not have consent to search the contents of the digital camera. *Id.* at *3. The fact that the camera was turned off and out of plain sight, and the fact that the officers were aware that the defendant had been driving the vehicle, required follow up from the police. *Id.* at *3 (citing *Turner*, 23 F. Supp. 3d at 311 (holding that consent did not extend to a backpack in the closet where police were on notice that the backpack belonged to the defendant, and the consenter was not asked any questions about her ownership, use, or control of the backpack); *Chisholm*, 2009 WL 29313, *8 (holding that grandmother with access to defendant's closet did could not consent to a search of clothing pockets and closed containers in the closet).

Here, the Louis Vuitton bag was contained in a closet used almost exclusively by Mr. Green. Ms. Turcios' only use of the closet was for winter coat storage. The bag was located in

10

the back of the closet, under a pile of Mr. Green's clothes.  It was locked.  These circumstances were sufficient to put government agents on notice that Ms. Turcios may not have had common authority to consent to a search of that bag.  These circumstances "cr[ied] out for further inquiry."  *Turner*, 23 F. Supp. 3d at 312 (quoting *United States v. Gonzalez Atehorta*, 729 F. Supp. 248, 257 (E.D.N.Y. 1990)).  Ms. Turcios' consent to search the apartment, even if valid, did not extend to the Louis Vuitton bag.  The contents of that search should be suppressed.

## CONCLUSION

The government collected guns, paperwork, and other material from Ms. Turcios' residence without a warrant, and without valid consent to search.  Any consent to search given by Ms. Turcios was not freely given, was given after the search, and did not extend to the bag in Mr. Green's closet.  Mr. Green respectfully requests that the Court suppress the fruits of the search of the apartment, or, in the alternative, hold a hearing as to the voluntariness of the consent to search.  *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (reiterating "that evidence seized during an unlawful search could not constitute proof against the victim of the search").

Dated:  Newark, New Jersey
           February 19, 2018

                                             */s/ Eric R. Breslin*
                                          Eric R. Breslin, Esq.
                                          Melissa S. Geller, Esq.
                                          **DUANE MORRIS LLP**
                                          One Riverfront Plaza
                                          1037 Raymond Blvd., Suite 1800
                                          Newark, New Jersey 07102
                                          Telephone: 973.424.2000
                                          Facsimile: 973.424.2001
                                          *Attorneys for Defendant Brandon Green*