UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/6/18

UNITED STATES OF AMERICA,

　　　　　- against -

BRANDON GREEN,

　　　　　　　　　　Defendant.

**MEMORANDUM
OPINION & ORDER**

(S5) 16 Cr. 281 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

　　　　　Defendant Brandon Green is charged with (1) RICO conspiracy, in violation of 18 U.S.C. § 1962(d); (2) narcotics conspiracy, in violation of 21 U.S.C. § 846; and (3) use of a firearm in connection with these crimes, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (ii) and (iii). (S5 Indictment (Dkt. No. 417-1) Counts One, Four, and Five)

　　　　　The Indictment charges that Green and a dozen other defendants are members of a criminal gang known as the "Blood Hound Brims" that operates in New York City, Westchester County, Elmira, Syracuse, and Binghamton, New York, and in parts of Pennsylvania. The Government alleges that the Blood Hound Brims gang is a faction of the nationwide "Bloods" street gang. The Government claims that the Blood Hound Brims have a complex and highly organized leadership structure, are engaged in large-scale distribution of heroin, powder cocaine, crack cocaine, and marijuana, and engage in acts of violence, including attempted murder, conspiracies to commit murder, assaults, and robberies. Defendant Green is alleged to have conspired to murder another alleged gang member, co-defendant David Cherry, during a power struggle within the gang. (S5 Indictment (Dkt. No. 417-1) Count One) Green – who was in custody in connection with a federal drug trafficking conviction from 2004 until October 2010

(Green Aff. (Dkt. No. 244-2)) – is alleged to have played a leadership role in the Blood Hound Brims. (S5 Indictment (Dkt. No. 417-1) ¶ 4)

Green has moved to suppress physical evidence recovered from his residence at 3370 Madison Avenue, Bridgeport, Connecticut. (Mot. (Dkt. No. 243)) For the reasons stated below, Green's motion will be denied.

## BACKGROUND

## I.  GREEN'S PRE-HEARING SUBMISSIONS

In support of his motion to suppress, Green has submitted his own affidavit and declaration, as well as a declaration from his girlfriend, Jennifer Turcios. Green's submissions set forth the following version of events:

In May 2017, Turcios and Green lived in a low-rise apartment building located at 3370 Madison Avenue, Bridgeport, Connecticut. (See GX 24) The two shared Apartment 19B, a duplex apartment. (Turcios Decl. (Dkt. No. 244-4) ¶¶ 1, 11; Green Aff. (Dkt. No. 244-2) ¶ 5) On May 16, 2017 – at approximately 6:00 a.m. – Turcios left her apartment and began driving to work. She noticed a vehicle pull up quickly behind her. (Turcios Decl. (Dkt. No. 244-4) ¶ 2) The vehicle had flashing lights, and Turcios pulled over to the side of the road. (See id.) Two individuals approached Turcios' car window. (Id.) They did not identify themselves as police, and Turcios did not learn until later that they were from the United States Marshal's Service. (Id.)

One of the marshals asked for Turcios' identification, which she provided. (Id. ¶ 3) When Turcios asked why she had been pulled over, the marshal did not respond. (Id.) Instead, the marshal showed Turcios a photograph of a man, and asked her if the man shown was her boyfriend. (Id.) Turcios testified that the photograph was not of good quality and that the

2

man shown did not look like Green, so she told the marshal that she did not know. (Id.) The marshals then instructed Turcios to call her supervisor and inform her that she would be late to work. (Id. ¶ 4) Turcios complied. (Id.)

One of the marshals asked Turcios if they could search her apartment. (Id. ¶ 5) Before Turcios responded, the marshal said, "we are going to get in one way or the other." (Id.) Turcios did not consent. (Id.) At this point, one of the marshals reached through the driver's side window – across Turcios' body – and took her house keys from her purse, which was open and sitting on the passenger seat. (Id. ¶ 6)

One of the marshals asked Turcios if she had any photographs of her boyfriend. (Id. ¶ 7) Turcios said that she did not. (Id.) The marshal then took her phone out of her hand. The phone was not password protected, and the marshal began scrolling through material stored on the phone. (Id.) Turcios did not consent to the marshal seizing and searching her phone. (Id.)

The marshal then instructed Turcios to "wait there," and he left with her house keys and her identification. (Id. ¶ 8) One of the marshals stayed behind, sitting in the vehicle that had initially pulled up behind Turcios. (Id. ¶ 9) Turcios "did not feel free to leave, [because the marshals] had taken [her] ID and [her] house keys, and there was another [marshal] in the car behind [her]." (Id. ¶ 9)

Back at their apartment, Green was watching television downstairs. A marshal used a key to gain entry to the apartment. (Green Aff. (Dkt. No. 244-2) ¶¶ 6-7) The marshals entered with their guns drawn, and ordered Green to turn around and raise his hands in the air. (Id. ¶ 7) Green was then handcuffed and placed on a couch. (Id. ¶ 9) Green did not consent to the entry or any search of the premises. (Id. ¶ 8)

3

After handcuffing Green, the marshals searched the entire apartment. (Id. ¶ 14) They seized, among other things, phones, cash, and six firearms. (Green Supp. Decl. (Dkt. No. 244-3) ¶ 2; Breslin Decl. (Dkt. No. 244-1) ¶ 3)

According to Green, none of the items seized were in plain view. (Green Aff. (Dkt. No. 244-2) ¶¶ 12-13) The phones and cash were hidden inside drawers, closets, and boxes in an upstairs bedroom. (Id. ¶ 11) The firearms had been stored in a locked Louis Vuitton handbag that was hidden under a pile of laundry in the back of Green's bedroom closet. (Green Supp. Decl. (Dkt. No. 244-3) ¶ 3; Breslin Decl. (Dkt. No. 244-1) ¶ 3)

Marshals returned to Turcios' vehicle about ten minutes after they had left to arrest Green. (See Turcios Decl. (Dkt. No. 244-4) ¶ 10; Green Aff. (Dkt. No. 244-2) ¶ 15) One of the marshals instructed Turcios to call her supervisor and say that she would not be coming into work that day. (Turcios Decl. (Dkt. No. 244-4) ¶ 10) A marshal then entered the passenger side of Turcios' car and directed her to drive to her apartment. (Id.)

Upon arriving at the apartment, the marshals took Turcios inside. (Id.) Turcios observed Green in handcuffs, sitting on a couch on the first floor. (Id. ¶ 11) The contents of the downstairs closets were strewn on the floor. (Id.)

A marshal handed Turcios a consent to search form, and instructed her to sign it. (Id. ¶ 12) The marshal told Turcios that if she did not sign the form, she would be arrested. (Id.) Turcios asked the marshal on what grounds she would be arrested. The marshal responded that he would show her when they went upstairs, but that she first had to sign the consent to search form. (Id. ¶ 13) Turcios testified that she was "absolutely terrified" and believed that the marshals were going to arrest her, so she signed the form. (Id.) "In that moment, having been

4

forced to return to the apartment, with the agent standing over [her], threatening to arrest [her] if [she] did not sign the form, [Turcios] . . . did not feel that [she] had the right to refuse." (Id.)

Once Turcios signed the consent to search form, the marshals conducted a comprehensive search of the apartment, flipping over mattresses and emptying drawers. (Id. ¶ 14) During the search, the marshals kept shouting at Turcios to "tell them where the money [is]," stating that they knew Green had money. (Id. ¶ 18) A marshal took Turcios upstairs and showed her several firearms. (Id. ¶ 15) One of the firearms was pink. A marshal gestured towards this weapon and then pointed at Turcios, asking "if they should 'put that on her.'" (Id.) Turcios observed a Louis Vuitton bag "torn open on the floor." (Id. ¶ 16)

Turcios states that she had given Green the Louis Vuitton bag "for him to keep his cash and valuables in[,] because it had a lock." (Id.) Only Green had a key to the lock on the bag, and Turcios "did not know where he kept the key, what he stored in the bag, or where in the [bedroom] closet he kept it." (Id. ¶ 17; Green Supp. Decl (Dkt. No. 244-3) ¶ 3; Turcios Decl. (Dkt. No. 244-4) ¶ 16)

## II.   SUPPRESSION HEARING

On June 18 and June 19, 2018, this Court conducted an evidentiary hearing concerning Green's motion to suppress. The Government called Deputy U.S. Marshal Kevin Kamrowski; Senior Inspector Nicholas Ricigliano of the U.S. Marshal Service; Officer Steven Luciano of the Norwalk Police Department; Deputy U.S. Marshal Eric Kushi; Senior Inspector James Masterson of the Marshal Service; and Deputy U.S. Marshal Tracy Amaladas. (See June

18, 2018 Hearing Tr. (Dkt. No. 338) at 85, 123, 160, 195; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 243-44, 272-73)[1]

Jennifer Turcios testified on behalf of Green. (See id. at 6)

## A.    The Government's Evidence

### 1.    Pre-Arrest Planning and Surveillance

On May 16, 2017, at about 6:00 a.m., a team composed of approximately ten law enforcement officers – including Deputy Marshal Kamrowski, Inspector Ricigliano, Officer Luciano, Deputy Marshal Kushi, Inspector Masterson, and Deputy Marshal Amaladas – met at the Bridgeport Police Department. (See June 18, 2018 Hearing Tr. (Dkt. No. 338) at 87-88, 125-26, 162-63, 197-98; June 19, 2018 (Dkt. No. 340) at 247-48, 273) Deputy Kamrowski has worked for the Marshal Service for eleven years, and has been a member of the Warrant Squad for approximately five years. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 85) Inspector Ricigliano has worked for the Marshal Service for approximately 22 years, and is currently assigned to the New York/New Jersey Regional Fugitive Task Force (the "Task Force"). (Id. at 123) Officer Luciano has worked for the Norwalk Police Department for approximately eight years, and was a member of the Task Force for approximately three and a half years. (Id. at 160-61) Deputy Kushi has worked for the Marshal Service for approximately nine years, and is likewise assigned to the Task Force. (Id. at 195) Inspector Masterson has worked for the Marshal Service for approximately 22 years, and is a member of the District of Connecticut's Violent Fugitive Task Force. (June 19, 2018 Hearing Tr. (Dkt. No. 340) at 243-44) Deputy

---

[1] Except as to the transcripts of the suppression hearing, the page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system. Citations to the hearing transcripts correspond to the transcript page numbers.

6

Amaladas has worked for the Marshal Service for eight and a half years, and is currently assigned to the Task Force. (Id. at 273)

The officers' assignment on May 16, 2017, was to execute an arrest warrant for Green. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 196-97; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 247-48) Green was one of thirteen defendants charged in an indictment that was unsealed on January 4, 2017,[2] and was the only defendant not yet apprehended. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 87-88) Using cellphone GPS data obtained pursuant to a warrant, the Marshal Service had determined that Green was located in one of three or four apartments in a complex located at 3370 Madison Avenue, Bridgeport, Connecticut. (Id. at 127, 198-99; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 248-50)

During the meeting at the Bridgeport Police Department, the officers discussed Green, the nature of the charges against him, his criminal history, his suspected location, and team assignments. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 87-88, 125-26, 162-63, 197-98) The officers discussed the fact that Green was alleged to be part of a criminal gang engaged in acts of violence; that Green himself "was wanted for a violent offense"; and that Green was charged with narcotics and firearms offenses. The officers also discussed the fact that Green was a convicted felon, and had a history of drug trafficking and involvement with gangs and firearms. (Id. at 125-26, 163)

At approximately 6:15 a.m., the officers assumed positions in the vicinity of Green's apartment complex. (See id. at 90, 127-28; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 250-51) Because the officers were not certain which apartment Green was in, they conducted

---

[2] The (S1) Indictment was issued on December 21, 2016, but remained sealed until January 4, 2017. (See Dkt. No. 27) The S1 Indictment is referred to in this opinion as the "January 2017 indictment.")

surveillance of the several apartments associated with the GPS data.[3] (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 90, 127-28; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 250-51) The officers took note of vehicles in the parking lot that had New York and New Jersey license plates, because they knew that Green was from New York. (June 19, 2018 Hearing Tr. (Dkt. No. 340) at 251-52)

About an hour after surveillance had been initiated, officers observed a young woman – later identified as Turcios – walk out of one of the target apartments. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 128; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 252) Turcios got into a vehicle bearing New Jersey license plates and drove about twenty yards to the front door of her apartment. She then parked and re-entered her apartment. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 92, 128; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 252) Turcios then returned to her vehicle, and drove away from the apartment complex. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 92, 128)

The officers conducting surveillance found it suspicious that Turcios re-entered her apartment and emerged a short time later. Turcios had looked "very hard" at a vehicle in which the officers were conducting surveillance. (Id. at 128-29, 200, 235) The officers became concerned that she may have observed them conducting surveillance and re-entered the apartment to warn Green. (Id. at 158)

Inspector Ricigliano and Deputy Marshal Kamrowski suspected that Turcios might be Green's girlfriend, or a relative of Green's. (Id. at 92, 129) Given the location of her

---

[3] Inspector Masterson testified that those conducting surveillance of the apartment complex were "looking at the front doors of those two or three units." (June 19, 2018 Hearing Tr. (Dkt. No. 340) at 250)

8

apartment, Inspector Ricigliano and Deputy Marshal Kamrowski both believed that even if Turcios was not Green's girlfriend or a relative, she would likely know whether Green lived in a nearby apartment. (Id. at 93, 130) The marshals decided to stop Turcios' vehicle and question her. (See id. at 92-93, 130; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 252-53)

## 2. The Traffic Stop of Turcios

Inspector Ricigliano, Deputy Marshal Kamrowski, and another deputy – Steven Karoly – approached Turcios' vehicle. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 93-94, 130-31) The marshals activated their unmarked vehicle's emergency lights, and Turcios pulled over to the side of the road. Turcios was then only a short distance from her apartment, but far enough away so that someone watching from the apartment would not see that the officers had stopped her car. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 93-94, 118, 130-31)

The marshals were dressed in plainclothes, but they were wearing vests that identified them as law enforcement officers. Each marshal was armed. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 87, 114, 125, 131, 151, 162, 197; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 247) Deputy Marshal Kamrowski testified that he told Turcios that they were United States Marshals and that they were conducting an investigation. (See June 18, 2018 Hearing Tr. (Dkt. No. 338) at 95) Inspector Ricigliano testified that he was wearing a vest that identified him as a law enforcement officer, and that he took out his badge and photo identification and showed it to Turcios. (Id. at 131-32)

Inspector Ricigliano and Deputy Marshal Kamrowski asked Turcios for her identification, which she provided, and asked her where she was coming from. (Id. at 95, 132) Turcios said that she lived around the corner in an apartment with her boyfriend, and that she was on her way to work. (Id. at 95) Turcios identified her boyfriend as "Jonathan," and said that

9

he was in her apartment. (Id. at 96-97, 155) Inspector Ricigliano asked Turcios if anyone else was present in the apartment, and "[s]he said no." (Id. at 155)

Inspector Ricigliano then showed Turcios a photograph of Green. (Id. at 133) According to Inspector Ricigliano and Deputy Marshal Kamrowski, Turcios identified the man in the photograph as her boyfriend. (Id. at 97-98, 133) Inspector Ricigliano asked whether her boyfriend was then in the apartment, and Turcios stated that he was. (Id. at 133)

Deputy Marshal Kamrowski then asked Turcios for her cellphone. (Id. at 96-97, 134) Kamrowski testified that he asked Turcios for her cellphone because he "didn't want her to try to send a text" or call Green to warn him that the marshals were outside. (Id. at 96-97) Turcios handed her phone to Kamrowski. (Id. at 97, 134) Deputy Marshal Kamrowski observed a photograph of Green on Turcios' phone. (Id. at 97, 135) Kamrowski asked Turcios who was depicted in the photograph on her phone. She identified this individual as her boyfriend "Jonathan," and stated that he was inside her apartment. (Id. at 97) The marshals told her they would have to go to her apartment, because her boyfriend was the person they were looking for. (Id. at 98)

Inspector Ricigliano then asked Turcios for her house keys, and Turcios provided them. (Id. at 99, 133) Although Turcios "seemed a little nervous" (id. at 98-99), both Inspector Ricigliano and Deputy Marshal Kamrowski testified that she was polite and cooperative. (Id. at 98-99, 133)

Inspector Ricigliano and Deputy Marshal Kamrowski then left with Turcios' keys to make entry into Green and Turcios' apartment. (Id. at 99, 135-36) Deputy Marshal Karoly stayed behind with Turcios. (Id. at 99, 136-37)

10

### 3.    Green's Arrest and the Initial Sweep of the Apartment

Outside the couple's apartment at 3370 Madison Avenue, five to seven officers established a perimeter and formulated a plan of entry. (Id. at 201-02; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 254) The officers formed a straight line – referred to as a "stack" – and walked up the stairs to Apartment 19B. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 100, 136, 165, 202; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 254) Inspector Ricigliano was at the front of the line, and was followed by Inspector Masterson, Officer Luciano, Deputy Marshal Kamrowski, and Deputy Marshal Kushi. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 100, 136, 165, 202; June 19, 2018 (Dkt. No. 340) at 254).

Apartment 19B is a small loft-style, duplex, one-bedroom apartment. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 17, 101, 138; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 259-60 (Inspector Masterson testifying that it was "a pretty small apartment"); see also DX 3, 8, 13-14 (Photos of Apmt.)) The apartment consists of two small rooms:  the front door opens to a living room/kitchen area.  A small stairway with about ten steps is on the right side, and leads to a hallway and bedroom on the second floor. (See DX 3, 10-12 (Photos of Apmt.); June 18, 2018 Hearing Tr. (Dkt. No. 338) at 12-13) The bedroom contains two closets, a bathroom, and a door to an exterior balcony that extends over the front door of the apartment. (See DX 13-14, 16, 18 (Photos of Apmt.); June 18, 2018 Hearing Tr. (Dkt. No. 338) at 13, 20, 136) The upstairs bedroom contains a ledge overlooking the living room/kitchen area. (See June 18, 2018 Hearing Tr. (Dkt. No. 338) at 43, 50-51 (Turcios testifying that one can look over the ledge in the bedroom and observe the living room area downstairs); id. at 101 (Deputy Marshal Kamrowski testifying that when he walked into the apartment, Green was "right above [him], and [Kamrowski] looked up and . . . saw it was a loft, so it was kind of open where [he] was"); id. at

11

237 (Deputy Marshal Kushi agreeing that "part of the upstairs of the apartment [is] open to downstairs," and that "some portion of the upstairs [is visible] from the downstairs entrance"); June 19, 2018 Hearing Tr. (Dkt. No. 340) at 258 (Inspector Masterson testifying that due to the layout of the apartment, the living room area is exposed "to possible fire from someone above" looking down from the ledge in the bedroom)); DX 13-15)

The officers knocked, announced themselves as law enforcement, and used Turcios' keys to open the front door. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 101, 202; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 254) As Inspector Ricigliano was opening the front door, he heard officers in the parking lot yell something to the effect of "police, show me your hands, don't move." (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 136) Inspector Ricigliano looked up and saw Green standing on the balcony above the front door. Green then darted back into the apartment. (Id.) Deputy Marshal Kamrowski testified that he heard Green yell something like "I give up" or "I don't want any problems." (Id. at 101)

After Inspector Ricigliano opened the front door, several of the officers in the "stack" made their way into the apartment. (Id. at 101-02, 136, 202, 232) Deputy Marshal Kamrowski testified that when he first entered the apartment, he saw Green standing upstairs in the area that overlooked the living room/kitchen area. (See id. at 101)

The officers instructed Green to come downstairs and surrender. (Id. at 136) Due to the "open" nature of the ceiling near the entrance to the apartment, Deputy Marshal Kamrowski secured that area while other officers made their way into the apartment, towards the

stairway. (Id. at 101) Green came downstairs, and the other officers handcuffed him either while he was on the stairs or at the base of the stairway.[4] (Id. at 102, 147, 179)

Immediately after handcuffing Green, the officers conducted a protective sweep of the apartment.[5] (See id. at 102, 168, 179-80, 203) Officer Luciano went upstairs and conducted a protective sweep of the bedroom, including the bedroom closets. (Id. at 168)[6] In one of the closets, Officer Luciano observed female clothing. That "closet had a deeper recess" in which a person could hide. (Id. at 168; DX 16, 18; GX 1) In order to ensure that no one was hiding in the "rear of the closet," Officer Luciano pushed aside the female clothing hanging in the closet and looked into the back of the closet. (See June 18, 2018 Hearing Tr. (Dkt. No. 338) at 168-69, 183, 185-86) Officer Luciano then observed an open Louis Vuitton bag atop a "little bench" in the closet. (Id. at 168-69) Several handguns – one of which was bright pink – and a

---

[4] Deputy Marshal Kamrowski testified that the officers met and arrested Green on the stairway. (Id. at 102) Inspector Ricigliano testified that the officers met Green either on the stairs or at the base of the stairway. (Id. at 147) Inspector Masterson -- who assisted in handcuffing Green -- testified that the officers arrested Green near the base of the stairway after he walked down the steps. (See June 19, 2018 (Dkt. No. 340) at 256 (testifying that once Green descended the steps, he moved towards the officers and the officers effected the arrest)) Officer Luciano -- who also assisted in handcuffing Green -- testified that the officers handcuffed Green once he came down the stairs. (See June 18, 2018 Hearing Tr. (Dkt. No. 338) at 166, 179) Although Deputy Marshal Kushi testified that the officers met Green at a "halfway point between the front entrance door and the stairwell" (id. at 233), Kushi was in the "middle end" of the stack and did not participate in handcuffing Green. (See id. at 202-03)

[5] Deputy Marshal Kushi testified that the officers conducted a protective sweep of the apartment for safety reasons, given the nature of the charges against Green. (Id. at 206) Officer Luciano testified that when police are entering an unknown area to execute an arrest warrant, a protective sweep must be conducted to ensure safety. (Id. at 166-67) Inspector Ricigliano likewise testified that, for safety reasons, it is necessary to sweep all areas of an apartment that are accessible to the location of an arrest. (Id. at 138-39)

[6] Officer Luciano testified that it is his practice – in conducting protective sweeps – to search closets that are large enough for someone to hide in. (See id. at 167) Deputy Marshal Kushi likewise testified that because the purpose of a protective sweep is to ensure the safety of the officers, officers typically search any place where a person could be hiding, including "closets, underneath beds, [and] inside attics." (Id. at 204-05)

13

handgun magazine were visible in the handbag. (Id. at 168-69, 185; GX 1-4) Officer Luciano immediately informed the other officers that he had found firearms. Consistent with his training, and in order to preserve any DNA evidence, Luciano did not touch the bag. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 105, 172-73, 206) Officer Luciano's discovery of the firearms occurred within five to ten minutes after the officers had handcuffed Green. (June 19, 2018 Hearing Tr. (Dkt. No. 340) at 260, 269)

After discovering the firearms, the officers discussed obtaining consent to search the apartment, or – in the event consent was refused – obtaining a search warrant. (Id. at 271) Shortly after the protective sweep was completed, the officers retrieved Turcios and brought her into the apartment. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 207-08)

### 4. Consent to Search

Turcios was angry when she first arrived at the apartment. She complained to one of the marshals that she hadn't known Green's real name and she hadn't "know[n] he was wanted." (June 19, 2018 Hearing Tr. (Dkt. No. 340) at 274-75) She did not appear to be intimidated by the marshals. (Id. at 276)

Deputy Marshal Kushi met with Kushi as soon as she returned to the apartment. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 208) They spoke on the landing outside the apartment's front door. (Id. at 209-10) Turcios had not yet entered the apartment and thus had not seen Green in handcuffs. (Id.) Kushi explained who he was, and told Turcios that "illegal items" had been found in the apartment, and that the marshals "would like permission to search the residence for any other illegal items that might be in here." (Id. at 208) Kushi did not tell Turcios what "illegal items" had been found in the apartment and did not threaten to arrest Turcios. (Id. at 208-09) Kushi testified that Turcios provided oral consent to search at that time.

14

While Turcios appeared "very concerned and wanted to know exactly what was going on," she "did not seem resistant to the request and was very cooperative." (Id. at 208-09, 213) Indeed, Turcios "instantly told [Kushi] that she didn't have a problem with [providing consent to search]." (Id. at 209, 225) Once Kushi obtained oral consent, he relayed that information to the other marshals in the apartment, and their search pursuant to that consent commenced immediately. (Id. at 237)

Kushi and Turcios then entered the apartment. Once inside the apartment, Green – who was still inside the apartment – told Turcios to "sign the consent form, let them search." (June 19, 2018 (Dkt. No. 340) at 278)[7]

---

[7] The evidence concerning Green's location when he made statements to Turcios is inconsistent, both as to the Government's witnesses, and as between the Defendant's evidence and the marshals' testimony. In her declaration and testimony, Turcios states that when she returned to the apartment Green was "sitting, handcuffed, on the couch on the first floor." (Turcios Decl. (Dkt. No. 244-4) ¶ 11; see also June 18, 2018 Hearing Tr. (Dkt. No. 338) at 35, 37 (Turcios testifying that when she entered the apartment, Green was on the sectional, "sitting there with the officer shackled.")) Similarly, Green's declaration states that after his arrest he was "handcuffed and placed on the couch." (Green Decl. (Dkt. No. 244-2) ¶ 9)

However, two Government witnesses testified that Green had already been taken out of the apartment, or was in the process of being removed, when Turcios was brought into the apartment. Deputy Marshal Kamrowski testified that "[t]here was a period where she had been brought back into the apartment. . . . There was a point where they had crossed paths. I believe it was outside when he was in the car. . . . They were crossing paths, like he was in the car and she was making her way up, and he had yelled to her not to say anything. . . . He had told her not to say anything. And then he had began to say, whatever is in the apartment is mine, it's not hers.") (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 106) Inspector Ricigliano testified: "[I]f I remember correctly . . . the defendant was removed from the apartment and placed in a transport vehicle before she was brought back in, if my memory serves me correct." (Id. at 149)

Other testimony from Government witnesses indicates that Green was still inside the apartment when Turcios was speaking with Deputy Kushi on the landing. For example, when Kushi was asked whether he heard Green "make any statements" while Kushi was talking to Turcios, Kushi testified that "I heard something being uttered in the background. I didn't know exactly what was being uttered." (Id. at 210; see also id. at 234 (Kushi testifying that Green was not taken out of the apartment after his arrest but was instead "moved to near the front door of the apartment")) Officer Luciano testified that he went downstairs after the guns were recovered and

15

Kushi then took Turcios upstairs to the second floor; Kushi testified that he did so "immediately" after she gave oral consent. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 223, 225) Kushi testified that he wanted Turcios to be present for the search. When asked at the hearing why he wanted Turcios to be present for the search, Kushi testified as follows:

> Just because at the time she was being very cooperative and understanding of our request to search the apartment, and I just wanted to make sure that because as I was informed that illegal items were found upstairs that I knew that eventually we would be taking those items out of the residence, and I wanted to ensure to her, because, as I just stated, she was being very cooperative, that she saw exactly what was being taken out of the house, I also wanted to ensure to her that we weren't destroying her property or going into locations that we really had no business going into without her permission. . . . [B]ecause she was being cooperative, I felt like she could be of assistance to this search. So we didn't go through and kind of like destroy areas of her apartment, and she could maybe point us to the direction to find items that we were ultimately looking for.

(Id. at 210-12; see also id. at 228))

`    ` When Kushi and Turcios arrived on the second floor, Kushi testified, a number of handguns had been laid out on the ledge. (Id. at 226; GX 7-13) There were four or five officers on the second floor, all wearing bulletproof vests and carrying firearms. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 226) Inspector Masterson overheard Kushi and Inspector Ricigliano "ask[] [Turcios] about the firearms, if she owned any firearms, about knowing about the presence of them [in the apartment]." (June 19, 2018 (Dkt. No. 340) at 263)

After Kushi brought Turcios upstairs to "let her see what was going on," he quickly retrieved a consent to search form and presented it to Turcios. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 211, 214, 229) Kushi "went over" the consent to search form with Turcios,

---

overheard Green saying "something to the effect of, that's not on her, everything in the house is mine." (Id. at 173-74) And Deputy Amaladas testified, as quoted here, that "[w]hen [Turcios] walked in [to the apartment], Brandon Green said, let's sign the consent form, let them search." (June 19, 2018 (Dkt. No. 340) at 278; see also id. at 269 (Masterson testifying that he was guarding Green "downstairs" when the guns were discovered))

explaining "that this document is just the same thing that we talked about downstairs, but I just wanted to formalize it with her so that there was a paper trail of what was going on." (Id. at 212; see id. at 229) Kushi explained to Turcios that the purpose of the form was to provide the officers with consent to search the premises for illegal items. (Id. at 212-14, 229) Turcios "didn't ask any questions about the document" and "didn't seem to have any problem with the document." Kushi "asked her if she could sign it, and she did." (Id. at 214; see id. at 231)

Kushi did not tell Turcios that she had to sign the consent to search form, and did not threaten to arrest Turcios if she did not sign the consent to search form. (Id. at 214) He did not tell her that she had the right to refuse consent. (Id. at 229)

When asked at the hearing why he had sought written consent, Kushi testified as follows:

> I realized ultimately we would probably be back in a setting like this and it's good to have a fail safe versus just word of mouth saying like, I retrieved consent, and I felt like getting written consent is just a further fail safe to kind of show that consent was given in a cooperative manner.

(Id. at 212; see id. at 229)

The consent-to-search form states:

> I, Jennifer Turcios having been informed of my constitutional right not to have a search made of my premises hereinafter mentioned without a warrant and of my right to refuse to consent to such a search, hereby authorize Eric Kushi and others . . ., Deputies of the United States Marshals Service, United States Department of Justice, to conduct a complete search of my premises located at 3370 Madison Ave, Bridgeport, Ct.
>
> These Deputies are authorized by me to take from my premises any letters, papers, materials or other property which they may desire.
>
> This written permission is being given by me to the above-named person(s) voluntarily and without any threats or promises of any kind.

(DX 21 (Consent-to-Search Form)) The form contains the signatures of Turcios and Deputy Marshals Kushi and Masterson. (Id.) Deputy Marshal Kushi could not recall whether he read

the form to Turcios. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 214) Kushi filled out the blanks in the form, and Turcios signed it. (Id.)

During the search of the apartment, the marshals recovered items that "could be used for drug packaging or drug manufacturing," including a coffee grinder, a sifter, and a box of glassine envelopes, which are commonly used to package drugs. (Id. at 216-17; GX 15-17 (photographs of evidence recovered from kitchen cabinet))

## B. Defendant's Evidence

On the morning of May 16, 2017, Turcios left her apartment, got into her car, and began to drive to her job as an administrative assistant at Mt. Sinai Hospital in Manhattan, where she had worked since March 2015. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 6-7, 15-16, 54) She realized that she had forgotten her lunch, however, so she parked her car and re-entered her apartment in order to retrieve it. (Id. at 16-17) She then returned to her vehicle, and drove away from the apartment complex. (Id. at 17) As Turcios was driving to the highway, she noticed "a car coming behind [her] at full speed"; its occupants were "flashing their lights," so she pulled over. (Id. at 24) Three men in plainclothes approached Turcios' vehicle. (Id. at 25) The marshals did not identify themselves as law enforcement agents. (See id. at 25)

Green was inside Turcios' apartment when she left that morning. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 155) At that time, Turcios knew Green as "Jonathan Brown," and did not know his full true name. (Id. at 8) Turcios was aware, however, that others knew Green as "Brandon." (Id. at 65) Turcios testified that she did not ask Green why some people knew him as "Brandon." (Id.)

Turcios likewise testified that she was not aware that Green had been indicted in January 2017, and was a fugitive. (Id. at 54-55, 77) In February 2017 – shortly after Green and

18

twelve other alleged Blood Hound Brims had been indicted (see Dkt. No. 27) – she and Green decided to move from the Bronx to Bridgeport, Connecticut. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 54-55, 66) Turcios testified that the move from the Bronx to Bridgeport was designed "to help [their] relationship" and to "keep [Green] out of the streets," because "he loves women." (Id. at 56-57) She believed that moving to Bridgeport would allow them to focus on building their relationship. (Id. at 57) Turcios' understanding was that Green was involved in the music industry and managed rap artists. (Id.)

Turcios testified that one of the marshals asked her for identification, which she provided. (Id. at 26) The same officer then showed her a photograph of a man and asked whether she recognized him. She told the officers that she did not recognize the person in the photograph. (Id. at 26, 64) At the hearing, Turcios explained that she did not recognize the person in the photograph as Green, because the man in the photograph "looked very skinny" and did not have a beard or glasses. (Id. at 26-27) Turcios also testified that she was "terrified" and "nervous" at this time. (Id. at 25)

The officer asked Turcios who she lived with, and she stated that she lived with her boyfriend. (Id. at 26) One of the officers said that the marshals believed she was living with a fugitive, and "said something to the extent, we are going to get in there one way or the other." (Id. at 27)

One of the officers asked Turcios if she had any pictures on her phone. She said "no," and the officer then "snatched [Turcios'] phone from [her] hands" and began "swiping through [her] phone." (Id. at 30) At about this time, an officer grabbed Turcios' keys out of her open handbag, which was on the passenger seat next to her. (Id. at 29) He told her that the officers were going to go to her apartment – which she had identified – to see if the person they

were looking for was in her apartment. The officer said that he would then "bring you your keys and your ID back and you are good to go." (Id. at 30; 69) The officers returned her phone, and two of them walked towards the apartment complex, leaving the third officer behind. (Id. at 31) After they left, Turcios was "a nervous wreck. I didn't know what was going on, who was the person they were looking for. I was scared out of my life." (Id.)

About ten to fifteen minutes later, several officers returned to Turcios' location. (Id. at 32) One of the officers opened the passenger side door and sat in the passenger's seat. This officer told Turcios that "it looks like you are not going to be going into work today," and told Turcios to drive back to her apartment. (See id.; Turcios Decl. (Dkt. No. 244-4) ¶ 10) The officer sitting in the passenger seat was carrying a weapon, which was visible. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 32) Turcios was not handcuffed and was not told that she was under arrest. (Id. at 70)

After Turcios arrived at the parking lot for her apartment complex, she observed "officers everywhere," carrying shields and other equipment. (Id. at 33) Approximately 15 to 20 officers were present in the parking lot, along with "two black big vans." (Id.) The officer in the passenger's seat asked Turcios to step out of the car, and told her that "he was going to bring [her] upstairs." (Id. at 34) Two officers then escorted Turcios into the apartment. (Id.)

Once inside the apartment, Turcios observed four to six officers and Green, who was "[s]hackled from his hands and his feet" in the living room. (Id. at 34, 36) The officers were "[c]rowding behind [her]." (Id. at 34) Many of the officers were wearing bulletproof vests, and all of the officers were armed. (Id. at 223) The door to the living room closet was open, and some of her belongings were scattered on the floor. (Id. at 36) The kitchen cabinets were also open. (Id. at 37) Turcios testified that, at this point, she felt "scared," "nervous," "afraid," and

"shocked"; she was also "mad at [Green]." (Id. at 34-35, 37, 77) She "didn't know what was going on, what was going to happen, and nobody was giving me answers." Turcios conceded that she did not ask the marshals any questions at this point, however. (Id. at 37)

At the hearing, neither side questioned Turcios as to whether she had provided oral consent outside her apartment, as Deputy Marshal Kushi maintains. As to written consent, Turcios testified that while she was downstairs one of the officers handed her a written consent to search form and told her that she "needed to sign this." (Id. at 38) Turcios asked him why she had to sign it, and the marshal said that "we will show you once it's signed." (Id.) Turcios was "nervous" and "didn't know what [she] was signing." The marshal then said, "if you don't sign it, you can get arrested." (Id.) Turcios then asked, "why would I be arrested[?]" The marshal said that "once this is done, I'll take you upstairs and I'll show you." (Id. at 39)

When asked about her emotional state at the time, Turcios testified that she was "shaking, crying" and "felt like [she] was going to die." (Id. at 40) She did not read the consent to search form. She was not told that she had a right to refuse to sign the form, and did not sign the form of her own free will. (Id.) When asked why she signed the form, she testified as follows:

> I signed it once they was threatening to arrest me. I had no choice but to sign it. I had a
> choice, but I wasn't going to be arrested for something that I have no acknowledgement
> of.

(Id. at 40)

After Turcios signed the form, officers "escorted [her] upstairs." (Id.) Once upstairs, Turcios observed the "Louis Vuitton bag ripped open on the floor." (Id. at 42) Turcios testified that she had given this bag to Green to store his personal belongings and papers. (Id. at 51) She and Green purchased a lock for the bag. (Id.) Turcios asked Green why he needed a

21

lock for the bag, and he said that he wanted to keep his personal belongings secure. (Id. at 51-52) Turcios testified that after she gave the Louis Vuitton bag to Green in February 2017, she never saw the bag again. (Id. at 75) In a declaration, Green asserts that the Louis Vuitton bag was locked at the time of his arrest. (Green Supp. Decl. (Dkt. No. 244-3) ¶ 3)

Turcios also observed a number of handguns upstairs. The firearms had been lined up on the ledge in the bedroom, alongside a quantity of cash. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 42, 45) While Turcios was upstairs, one of the officers picked up a pink handgun and said, "we should pin this on her since it's pink." (Id. at 43) Another officer responded, "no way[,] [she] is not who we want." (Id.)

As to the cash displayed next to the handguns, Turcios testified that there was $2500 to $3000 in cash in the apartment that day, which she had stored in a bedroom drawer. (Id. at 44-45) Turcios testified that the cash was for the rent. (Id. at 45) She later testified that the monthly rent was only $1150, however. (Id. at 46) When asked why she had the rent money in cash, Turcios testified that the landlord "likes to [have the rent paid] through TD Bank, and there was a TD Bank around the corner." (Id.) According to Turcios, the landlord had given Turcios his account number so that she could deposit cash directly into his account. (Id. at 79)

The officers subsequently "search[ed] through everything" (id. at 47), and an officer asked questions about the guns. (Id. at 48) The officers also took photographs. (Id.) When the marshals left, one gave Turcios his telephone number. (Id.) Turcios then drove to the Bronx. (Id. at 49)

Turcios testified that she loves Green and does not want to see him go to prison. (Id. at 50; 72)

## C.  The Court's Factual Findings and Credibility Determinations

As is apparent from the summary of the testimony set forth above, there are numerous factual disputes between the marshals' testimony and that of Turcios. For the most part, the Court finds that Government's witnesses were clearly more credible than Turcios. Indeed, much of Turcios' testimony was not credible.

For example, the Court credits the marshals' testimony that they identified themselves at the traffic stop as United States Marshals and told Turcios that they were conducting an investigation. (Id. at 94-95, 131-32) Turcios' testimony that she did not know that the marshals who stopped her vehicle were police officers (id. at 62) is not credible. Given the flashing lights of their vehicle and the vests worn by the marshals, it would have been obvious to Turcios that they were law enforcement officers, a fact reflected in Turcios' testimony that she asked "if there was a reason why I was being pulled over" and that she handed over her identification. (Id. at 24)

The Court further concludes that Turcios' explanation for her and Green's move to Bridgeport, Connecticut in February 2017 was likely not truthful. Green and twelve other alleged members of the Blood Hound Brims gang were charged with serious racketeering, narcotics trafficking, and firearms violations in an indictment unsealed in early January 2017, and all but Green were apprehended a short time later.[8] As noted above, Green had served a lengthy sentence in federal prison based on a narcotics trafficking conviction. In February 2017 – soon after Green was indicted and his co-defendants were arrested – Turcios and Green left

---

[8]  On April 20, 2016, the lead defendant – Latique Johnson – was charged with using and carrying a firearm in relation to a drug trafficking crime and a crime of violence. He was already in custody on this charge when the January 2017 indictment was issued. (See Indictment (Dkt. No. 2); see also Dkt. No. 5 (ordering detention).

their Bronx apartment and moved to Bridgeport, Connecticut. There is no evidence in the record that either Green or Turcios had any prior connection to Bridgeport. As a result of the move, Turcios' daily commute to her job at Mt. Sinai Hospital – which previously had been from the Bronx to Manhattan – grew to four to five hours roundtrip per day. (Id. 16, 54) Turcios' explanation for the sudden change in residence was that it was done to "help [their] relationship," and to "keep [Green] out of the streets," because "he loves women." (Id. at 56-57) The Court concludes that it more likely that Green became aware of the arrests of his fellow gang members, discussed these developments with Turcios, and the two decided to move far away from New York City.

This Court credits Inspector Ricigliano's and Deputy Marshal Kamrowski's testimony that when Turcios was shown a photograph of Green at the traffic stop, she identified the person depicted in the photograph as her boyfriend. (Id. at 97, 133) Indeed, it appears that it was her identification of the photograph that motivated the marshals' interest in entering her apartment. Turcios' testimony that she told the marshals that she did not recognize the individual shown in the photograph is not credible.

Although Turcios testified that the officers "snatched [her] phone [out of her] hands" (id. at 30), the Court credits Inspector Ricigliano's and Deputy Marshal Kamrowski's testimony that Turcios was fully cooperative, and handed her phone to the marshals in response to Kamrowski's request. (Id. at 97, 134) The Court also rejects Turcios' testimony that Deputy Marshal Kamrowski searched through the photographs on her phone. Kamrowski testified that he did not have to unlock Turcios' phone to see the image of Green, because his image was the background image on Turcios' phone. (Id. at 97) The Court credits this testimony.

24

Turcios similarly testified that a marshal reached into her vehicle and grabbed her keys out of her handbag, which was sitting on the passenger's seat. (Id. at 29) This Court credits the testimony of the marshals that they asked Turcios for her keys, and that she complied with their request.

Turcios also testified that while Green had told her that his name was "Jonathan Brown," she had observed others refer to him as "Brandon." Her testimony that she did not ask Green why he used different names (id. at 65) is not credible. Moreover, although Turcios was aware that Green had cheated on her with other women – conduct that allegedly motivated their move to Bridgeport (id. at 56-57) – Turcios testified that she did not follow Green on social media. (Id. at 66) This testimony is likewise not plausible.

Turcios' testimony concerning the Louis Vuitton bag is not credible. Turcios testified that after she gave the Louis Vuitton bag to Green in February 2017 – the same time the two moved to Bridgeport – she never saw the bag again. (Id. at 75-76) The bag was recovered from a bedroom closet that contained her clothes, however. (Id. at 76) Accordingly, it is not credible that she never saw the Louis Vuitton bag again after she gave it to Green in February 2017.

Turcios also testified that the Louis Vuitton bag was "ripped open" when she saw it laying on the bedroom floor. (Id. at 42) The photographs admitted at the hearing demonstrate that the Louis Vuitton bag was not "ripped open," however. (See GX 2-4)

The Court concludes that when Officer Luciano discovered the Louis Vuitton bag in the upstairs bedroom closet it was wide open and was not locked. The Court further concludes that handguns and a magazine were clearly visible inside the bag before it was disturbed. Although Green asserts in his declaration that the Louis Vuitton bag was locked (see Green

25

Supp. Decl. (Dkt. No. 244-3) ¶ 3), Officer Luciano's testimony – which this Court finds entirely credible – is entitled to more weight because it was subject to cross-examination. See, e.g., United States v. Fuentes, No. 07 Cr. 329 (SHS), 2007 WL 2319142, at \*4 (S.D.N.Y. Aug. 10, 2007) (crediting witness testimony over defendant's sworn statement regarding consent); United States v. Robles, 253 F. Supp. 2d 544, 549 n.14 (S.D.N.Y. 2002) (noting that courts "'give greater weight to [witness] testimony, which was subject to cross examination, than to affidavits'") (quoting United States v. Gardner, 611 F.2d 770, 774 n.2 (9th Cir. 1980)) (alterations in original); United States v. Juliano, No. 99 Cr. 1197 (AGS), 2000 WL 1206745, at \*3 n.1 (S.D.N.Y. Aug. 24, 2000) (affording less weight to defendant's affidavit, because the court could not assess the defendant's credibility and the testimony of Government witnesses was "forthright and truthful") (citing United States v. Frank, 8 F. Supp. 2d 284, 291 (S.D.N.Y. 1998)).

Moreover, photographs taken at the time the Louis Vuitton bag was discovered – and before the bag was disturbed – show that the bag was open and unlocked and that the handguns and the magazine were immediately visible once the clothing on the hangers was shifted aside. (See GX 2-4) The lock cited by Green appears to be attached to the side of the bag. (Id.)

As to the upstairs closet in which the Louis Vuitton bag was found – a closet that Turcios shared with Green – Turcios testified that she kept summer clothes in this closet (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 20, 58, 75-76), suggesting that she would have had little cause to frequent that closet during the February to May 2017 period that she and Green were living in Bridgeport. Her declaration states, however, that she kept "winter coats" in that closet. (Turcios Decl. (Dkt. No. 244-4) ¶ 16)

26

Although Turcios testified that the kitchen cabinets were open when she first entered the apartment (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 37), Deputy Marshal Kushi testified that none of the kitchen cabinets were searched before the marshals obtained Turcios' consent to search. (Id. at 237-38) The Court credits Kushi's testimony that the kitchen cabinets were not searched until after Turcios gave consent to search.

As to the contents of the kitchen cabinets – which included a box of glassine envelopes and other drug paraphernalia (id. at 216-19; GX 15-21) – Turcios testified that she was not aware that Green had stored drug paraphernalia in their apartment. Photographs of the kitchen cabinet – once opened – show the box of glassines and other drug paraphernalia in plain view, however. (GX 15-21)

Turcios' testimony concerning the cash found in the apartment was not credible. Turcios testified that $2500 to $3000 in cash was stored in a bedroom drawer on the day of the arrest, and that the cash was rent money. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 44-45) Turcios later admitted that the rent was only $1150, however. (Id. at 46) Moreover, when asked why she had the rent money in cash, Turcios testified that the landlord "likes to [have the rent paid] through TD Bank[,] and there was a TD Bank around the corner." (Id.) But Turcios admitted that she had a checking account and that the landlord had not insisted that she pay in cash. (Id. at 79) To the extent that Turcios testified that the landlord had given her his account number so that she could deposit cash directly into his account (id.), that testimony is not credible.

Finally, the Court rejects Turcios' testimony as to where and when she signed the consent to search form. Turcios testified that she signed the consent form while she was still downstairs, and was brought upstairs after signing the form. (Id. at 40-41) But the two marshals

who counter-signed the form – Deputy Marshal Kushi and Inspector Masterson – testified that the form was signed upstairs. (Id. at 211, 213-14, 229; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 263) The Court credits their testimony.

As to oral consent to search, as noted above, Deputy Marshal Kushi testified that as soon as Turcios arrived at the apartment, he spoke with her outside, on the landing in front of her apartment. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 208-10) Kushi testified that he explained who he was, and that "there were illegal items found in the residence and that [the marshals] would like permission to search the residence for any other illegal items." Kushi did not at that time tell Turcios what had been recovered from the apartment. (Id. at 208) Kushi testified that Turcios provided oral consent to search while the two stood outside the front door of the apartment. (Id. at 209)

This testimony is unrebutted. Green's affidavit and declaration, Turcios' declaration, and Turcios' testimony do not address whether Kushi obtained oral consent to search from Turcios while the two were standing on the landing outside her apartment.

Moreover, it makes sense that Kushi would attempt to obtain oral consent from Turcios as soon as she arrived at the apartment. Having discovered six firearms and ammunition in the upstairs closet, the marshals would understandably be anxious to continue the search of the apartment. Moreover, the Court credits the marshals' testimony that Turcios had been fully cooperative up to that time, having willingly identified the photograph of Green, identified her apartment, and provided her house keys and cell phone at the marshals' request. Given these circumstances, it is logical that Kushi would have sought Turcios' consent to search as soon as she arrived at the apartment. Kushi testified that he did not threaten Turcios in any way in obtaining oral consent (id. at 209, 214), and the Court accepts that testimony. In sum, the Court

28

finds that Deputy Marshal Kushi sought and obtained oral consent to search from Turcios prior to the two entering Turcios' apartment, and accepts Kushi's testimony (id. at 237) that the marshals' search pursuant to that consent commenced immediately.

The Court finds, however, that once Kushi and Turcios entered the apartment, he asked her to sign a written consent to search form, and that a conversation about Kushi's request took place in front of Green, who was then handcuffed and sitting on a couch on the first floor. The exchange between Kushi and Turcios is what led Green to tell Turcios to "sign the consent form, let them search." (June 19, 2018 Hearing Tr. (Dkt. No. 340) at 278; see also June 18, 2018 Hearing Tr. (Dkt. No. 338) at 173-74 (Officer Luciano testifying that he heard Green say "something to the effect of, that's not on her, everything in the house is mine.")) The Court credits Kushi's testimony as to why he sought to obtain written consent to search even after having obtained oral consent. (See June 18, 2018 Hearing Tr. (Dkt. No. 338) at 212, 229)[9]

The Court concludes that, despite Green's instruction to sign the consent to search form, Turcios – as she maintains (Turcios Decl. (Dkt. No. 244-4) ¶ 12; June 18, 2018 Hearing Tr. (Dkt. No. 338) at 38-41) – "resisted" Kushi's request. (Id.) Kushi then took Turcios upstairs and showed her the firearms that had been recovered pursuant to the protective sweep. The firearms were displayed on the ledge overlooking the living room. According to Inspector Masterson, once upstairs "Deputy Kushi and [Inspector] Ricigliano[] asked [Turcios] about the firearms, if she owned any firearms, about knowing about the presence of them. Eventually got to the topic of consent to search." (June 19, 2018 Hearing Tr. (Dkt. No. 240) at 263) Accordingly, the Court concludes that Turcios was brought upstairs, was shown the firearms,

---

[9] As Kushi testified (see id.), it is not unusual in cases involving an oral consent to search for consent to be disputed later. Written consent to search is thus useful to rebut a later claim that consent was not provided.

was questioned about whether she owned the firearms and whether she had known that they were stored in her bedroom closet. It was in this context that Turcios was persuaded to provide written consent to search.

Turcios has alleged that a marshal told her that if she did not sign the consent to search form, she could be arrested. (Turcios Decl. (Dkt. No. 244-4) at ¶¶ 12-13; June 18, 2018 Hearing Tr. (Dkt. No. 338) at 38-40) At the suppression hearing, Turcios testified that she was "shaking [and] crying" and "felt like [she] was going to die" when the marshal demanded that she sign the consent to search form, and that a marshal had told her that "if you don't sign [the consent to search form], you can get arrested." (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 38, 40) In signing the form, Turcios expressed her reasoning as follows:

> I signed it once they was threatening to arrest me. I had no choice but to sign it. I had a choice, but I wasn't going to be arrested for something that I have no acknowledgement of.

(Id. at 40)

The testimony indicates that Deputy Kushi was the officer who primarily interacted with Turcios at her apartment. Kushi testified that he did not tell Turcios that she had to sign the consent to search form and that he did not threaten to arrest her if she did not sign the form. (Id. at 214) Kushi testified, however, that "once we got upstairs, [Turcios'] demeanor changed just a little bit because when we first met each other, she was concerned and wanted to know what was going on. Once we brought her upstairs, she appeared to become more cooperative . . . . [S]he was very cooperative upstairs and didn't seem to really have any concern for us looking through the upstairs bedroom or other areas of the house." (Id. at 215) Other marshals likewise described Turcios' demeanor upstairs as calm and cooperative. (June 19, 2018 Tr. (Dkt. No. 340) at 263 (Masterson testimony that Turcios "was calm, obviously upset about having police and a possible bag full of guns, but she was calm, she was coherent. She wasn't

hysterical or anything. Cooperative.")) Deputy Amaladas testified that Turcios "was upset when she first came into the apartment . . . . She was upset that she didn't know [Green's] real name. She was upset that she didn't know he was wanted. Things like that. . . . She was angry at Brandon Green. . . . She said that she didn't know that he was wanted, and she was pissed that he put her in that situation. . . . She didn't appear to be [intimidated by the agents]." (Id. at 274-76)

Based on the record as a whole and the Court's conclusions as to Turcios' credibility as a witness, the Court concludes that Turcios was upset by what she observed inside the apartment, and became angry at Green. The Court rejects her testimony that she was "shaking" and "crying" when she signed the consent to search form, however. As to whether Turcios was threatened with arrest if she refused to sign the form, the Court finds that while downstairs she "resisted" Kushi's initial request for written consent, and that Kushi then brought her upstairs. Once upstairs, Turcios was shown the numerous firearms and ammunition recovered from her closet, and questioned by marshals about whether she owned the guns and whether she was aware that they were being stored in her bedroom closet. The questioning was such that it would have been reasonable for Turcios to conclude that she might be at risk of arrest, even if no overt threat of arrest was made.

## DISCUSSION

Green has moved to suppress the evidence seized from his apartment on May 16, 2017, arguing that the officers exceeded the scope of a lawful protective sweep, and that Turcios' consent to search was not voluntary. (Mot. (Dkt. No. 243); Def. Post-Hearing Br. (Dkt. No. 336); Def. Post-Hearing Reply (Dkt. No. 361))

The Government contends, however, that the handguns were seized pursuant to a valid protective sweep and the plain view doctrine. (Govt. Post-Hearing Br. (Dkt. No. 355) at

21-23; Govt. Pre-Hearing Br. (Dkt. No. 268) at 3-4, 6-9)  The Government further contends that the remaining seized evidence – which includes more than $2,453 in cash, five cellphones, a Pennsylvania drivers' license in the name of "Jonathan Brown," and drug paraphernalia – was properly seized based on Turcios' consent to search. (See Breslin Decl. (Dkt. No. 244-1); Govt. Pre-Hearing Br. (Dkt. No. 268) at 4, 9-10; Govt. Post-Hearing Br. (Dkt. No. 355) at 23-27)

## I.      WHETHER THE PROTECTIVE SWEEP WAS LAWFUL

### A.      Applicable Law

#### 1.      Proper Scope of a Protective Sweep

"[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603 (1980); United States v. Lauter, 57 F.3d 212, 214 (2d Cir. 1995) (when officers have an arrest warrant, they "may enter a suspect's residence, or what they have reason to believe is his residence, in order to effectuate an arrest warrant [so long as] a reasonable belief exists that the suspect is present"). Accordingly, "the police [generally] do not need a search warrant to enter a suspect's home when they have an arrest warrant for the suspect." Lauter, 57 F.3d at 214.

"[T]he Supreme Court [has] identified three types of searches that [may] be performed during the course of an in-home arrest." United States v. Moran Vargas, 376 F.3d 112, 115 (2d Cir. 2004) (citing Maryland v. Buie, 494 U.S. 325, 333-36 (1990)) (footnote omitted). As an initial matter, the officers are entitled – "based on the authority of the arrest warrant" – "to search anywhere in the house in which [the arrestee] might [be] found." Buie, 494 U.S. at 330, 333. "Once [the arrestee] [is] found, however, the search for him [is] over, and there [is] no longer that particular justification for entering any rooms that ha[ve] not yet been

32

searched." Moran Vargas, 376 F.3d at 115 (quoting Buie, 494 U.S. at 333).

"[O]fficers may [also] perform a protective sweep incident to the arrest to protect themselves or others." Lauter, 57 F.3d at 216. "[A]n in-home arrest puts the officer[s] at the disadvantage of being on [their] adversary's 'turf,'" and presents the danger of "[a]n ambush in a confined setting of unknown configuration." Buie, 494 U.S. at 333. An in-home arrest also presents a significant risk of confrontation, because officers are taking the "serious step of taking a person into custody for the purpose of prosecuting him for a crime." Id. Officers executing an arrest warrant therefore have a legitimate interest "in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." Id.

There are two types of protective sweeps. "First, 'as an incident to the arrest the officers c[an], as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.'" United States v. Fadul, 16 F. Supp. 3d 270, 280 (S.D.N.Y. 2014) (quoting Buie, 494 U.S. at 334). "[B]ecause of the risks inherent in taking an individual into custody, officers are automatically justified in searching . . . the area adjoining the place of arrest 'from which an attack could be immediately launched.'" Moran Vargas, 376 F.3d at 115 (citation omitted). Second, officers may conduct a broader sweep beyond the areas "immediately adjoining" the place of arrest if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Buie, 494 U.S. at 334; Moran Vargas, 376 F.3d at 115 (same). "Reasonable articulable suspicion is needed only when the officers search a broader area, or when they engage in a full

33

search of the premises." United States v. Clarke, 133 F.3d 908, 1997 WL 829271 (2d Cir. 1997) (Table) (citing United States v. Blue, 78 F.3d 56, 61 (2d Cir. 1996); Buie, 494 U.S. at 334-35).

The lawful scope of a protective sweep is closely related to the security rationale animating this exception to the warrant requirement. Accordingly, a protective sweep does not justify "a full search of the premises." Buie, 494 U.S. at 335. Instead, a protective sweep must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Id. at 327. Moreover, "[t]he sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 335-36.

## 2. "Immediately Adjoining"

Whether or not a location is "immediately adjoining" for purposes of the first type of protective sweep "depends not on a static measurement but on the manner in which a space is configured." See United States v. Kirk Tang Yuk, 885 F.3d 57, 79 (2d Cir. 2018). Accordingly, physical distance alone is not dispositive in determining whether a space is "immediately adjoining." United States v. Chervin, No. 10 Cr. 918 (RPP), 2011 WL 4373928, at *4 (S.D.N.Y. Sept. 20, 2011); see also Kirk Tang Yuk, 885 F.3d at 79 (rejecting defendant's argument that a bedroom was not "immediately adjoining the hallway because the distance between the two areas is greater than the 'span of one room[]'"). The crux of the inquiry is instead whether the area searched is configured in such a way that "it 'immediately adjoin[s] the place of arrest' and . . . constitutes a space . . . 'from which an attack could be immediately launched[.]'" United States v. Thomas, 429 F.3d 282, 287 (D.C. Cir. 2005) (quoting Buie, 494 U.S. at 334); see also United States v. Big Apple Bag Co., 317 F. Supp. 2d 181, 188 (E.D.N.Y. 2004) (protective sweep of 6,000 to 10,000 square foot warehouse was permissible considering (1) the open layout

34

of the warehouse, "which was not cleanly subdivided by walls or other immovable barriers capable of preventing an attack," and (2) the presence of rows of boxes behind which a person could have been hiding; protective sweep of these areas was proper because "they were 'spaces immediately adjoining the place of arrest from which an attack could be immediately launched'"). In other words, it is "the 'safety of the officers, not the percentage of the home [or location] searched, [that] is the relevant criterion.'" Chervin, 2011 WL 4373928, at *4 (quoting Thomas, 429 F.3d at 287).

Accordingly, where – as here – the search of a small apartment is at issue, a protective sweep of a room or other space adjacent to the place of arrest is permissible under the "immediately adjoining" exception, where "an attack could be immediately launched" from that location. Such a search is lawful even absent reasonable suspicion to believe that third parties are present in the adjacent room or space. See Kirk Tang Yuk, 885 F.3d at 79 (concluding that bedroom "immediately adjoined" hallway where defendant was arrested, even though the distance was "greater than the 'span of one room'"); Lauter, 57 F.3d at 214 (back room of a two-room basement apartment "immediately adjoined" first room where defendant was arrested); United States v. Alejandro, 100 F. App'x 846, 848 (2d Cir. 2004) ("[W]hen a district court finds that an apartment is small, an immediately adjoining room is searchable under the 'protective sweep' exception." (citations omitted)); United States v. Clarke, 133 F.3d 908 (Table), 1997 WL 829271, (2d Cir. 1997) (concluding, in summary order, that the bedroom "immediately adjoined" the living room where defendant was arrested, where the living room was located "immediately next to a short hallway which led to the bedroom"); United States v. Sinclair, No. 10-CR-6211L, 2012 WL 5389729, at *6 (W.D.N.Y. Nov. 2, 2012) (explaining that "when officers execute an arrest warrant in a small apartment or premises, they generally will be entitled to perform a

35

cursory sweep of the entire premises," and concluding that officers were "entitled to conduct a security sweep of the garage and adjoining office . . . without probable cause or reasonable suspicion[]" where the defendant was arrested "near the threshold between the office and the garage bay" and the "business premises consisted of two adjoining spaces – an open garage and an office – both of which were described as small"), report and recommendation adopted, No. 10 Cr. 6211 (FPG), 2013 WL 6154409 (W.D.N.Y. Nov. 22, 2013); United States v. Lucas, 817 F. Supp. 2d 151, 156 (W.D.N.Y. 2010) (bedroom "immediately adjoined" living room and hallway where defendants were arrested where living room "led to [] hallway" and the bedroom was "[o]ff the hallway"), aff'd, 462 F. App'x 48 (2d Cir. 2012).

The law permits a protective sweep of "immediately adjoining" areas because an attack could feasibly be launched from such locations, presenting a safety risk to officers executing an arrest warrant. See, e.g., United States v. Parrilla, No. 13 Cr. 360 (AJN), 2014 WL 1621487, at *3 (S.D.N.Y. Apr. 22, 2014) ("Since the master bedroom was merely the width of one room away from the place of arrest, it is a place from which an attack could be immediately launched. The Court therefore finds that the search of the master bedroom was within the scope of a permissible protective sweep."), aff'd sub nom. United States v. Kirk Tang Yuk, 885 F.3d 57 (2d Cir. 2018).

### 3. Plain View Doctrine

"Patently incriminating evidence that is in plain view during a proper[ly conducted] security check may be seized without a warrant." United States v. Kiyuyung, 171 F.3d 78, 83 (2d Cir. 1999); see also United States v. Babilonia, 854 F.3d 163, 180 (2d Cir. 2017) ("When an officer, during a justified intrusion, encounters incriminating evidence, '[t]he [plain view] doctrine serves to supplement the prior justification – whether it be a warrant for another

object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused – and permits the warrantless seizure.'" (quoting Horton v. California, 496 U.S. 128, 135-36 (1990))). The "plain view" doctrine authorizes an officer to seize an object without a warrant where (1) the "'police are lawfully in a position from which they view an object,'" (2) "'its incriminating character is immediately apparent,'" and (3) "'the officers have a lawful right of access to the object.'" United States v. Delva, 858 F.3d 135, 149 (2d Cir. 2017) (quoting Minnesota v. Dickerson, 508 U.S. 366, 375 (1993)).

For an item's incriminating nature to be "immediately apparent," police must have "probable cause to believe that an object in plain view is contraband without conducting some further search of the object." Dickerson, 508 U.S. at 375. It "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief[]' that certain items may be contraband or stolen property or useful as evidence of a crime; . . . [a] 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." Texas v. Brown, 460 U.S. 730, 742 (1983) (internal citation omitted). In making this determination, a court should consider the experience and judgment of the officer. See id. at 746 ("[W]e have recognized that a law enforcement officer may rely on his training and experience to draw inferences and make deductions that might well elude an untrained person."). The purpose of the "immediately apparent" requirement is to ensure that the plain view doctrine is not "used to extend a general exploratory search from one object to another until something incriminating at last emerges." Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971).

**B.  Analysis**

Green contends that the handguns and ammunition recovered from the Louis

37

Vuitton bag found in the bedroom closet must be suppressed because (1) there was no reason to believe that anyone was were upstairs, and therefore the search of the bedroom closet cannot be justified as a protective sweep; and (2) the marshals exceeded the proper scope of a protective sweep by (a) remaining in the apartment longer than necessary to detain Green, and (b) conducting a more extensive search than is permitted under Buie. (Def. Post-Hearing Br. (Dkt. No. 336) at 10-16)

The critical issue raised by Defendant's motion is, however, whether the location in which the handguns was found "immediately adjoined" the place of Green's arrest.

Apartment 19B "consists of two small rooms": a living room/kitchen area on the first floor, with a short stairway leading to an upstairs bedroom. (See DX 3, 10-11, 13 (Photos of Apmt.); June 18, 2018 Hearing Tr. (Dkt. No. 338) at 12-13) Marshals observed Green on the balcony outside the second floor bedroom immediately before his arrest, and he retreated in the bedroom when spotted by the marshals. (See June 18, 2018 Hearing Tr. (Dkt. No. 338) at 136, 145) He was then arrested either on the stairway leading down from the second floor bedroom or near the base of the stairway on the first floor. (Id. at 102, 147, 179)

The first floor living room/kitchen area where the marshals were located after Green's arrest is immediately accessible from the second floor because of the loft feature. From a ledge in the bedroom one can look directly down on the living room/kitchen area. (See id. at 50-51, 237; June 19, 2018 Hearing Tr. (Dkt. No. 340) at 258; DX 14-15; GX 7-13) Accordingly, officers on the first floor of the apartment were exposed to immediate attack from anyone in the second floor bedroom as a result of the loft feature. Stated another way, the second floor "is a place from which an attack could be immediately launched." See, e.g., Lauter, 57 F.3d at 216-17 (concluding that backroom/basement area, connected by a hallway to the front room,

"immediately adjoined" the front room where defendant was arrested "in light of the small size of the apartment"); Thomas, 429 F.3d at 287 ("Because the entrance to the bedroom was a straight shot down the hallway from the spot where Thomas was arrested, the bedroom was a place 'immediately adjoining the place of arrest from which an attack could be immediately launched.'" (citation omitted)); Parrilla, 2014 WL 1621487, at *3 ("Since the master bedroom was merely the width of one room away from the place of arrest, it is a place from which an attack could be immediately launched."); Sinclair, 2012 WL 5389729, at *7 ("After entering the garage to execute the arrest warrant, the agents immediately encountered and detained Sinclair near the threshold between the office and the garage bay. Because of the small size of the premises, Sinclair's presence on the threshold between the bay and the office and the presence of automobiles, equipment and property in or behind which other persons could hide, I find that the officers were entitled to conduct a security sweep of the garage and adjoining office 'as a precautionary matter and without probable cause or reasonable suspicion.'" (citations omitted)); Chervin, 2011 WL 4373928, at *4 ("[C]ourts have held that arrests made in hallways with adjacent bedroom entrances are subject to the Buie 'immediately adjoining' protective sweep." (citations omitted)).

      The testimony at the hearing confirms that the loft design of the duplex apartment presented a threat of possible attack from the second floor. For example, Inspector Masterson testified that due to the layout of the apartment, the living room area was exposed "to possible fire from someone above" in the bedroom area. (June 19, 2018 Hearing Tr. (Dkt. No. 340) at 258) Deputy Marshal Kamrowski likewise testified that Apartment 19B is a loft-style apartment in which there was no ceiling separating part of the living room from the bedroom. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 101) Due to this loft feature, it was necessary for Kamrowski

to secure the area which the loft overlooked while the other officers made their way further into the apartment. (See id. at 101)

Because of the loft feature, the Court concludes that the second floor bedroom "immediately adjoins" the living room area, thus exposing officers to a risk of attack from above. Given the layout of the apartment, the marshals were entitled to conduct a protective sweep of the bedroom area in order to "ensure their safety and that of the arrestee." See, e.g., Moran Vargas, 376 F.3d at 115 ("[B]ecause of the risks inherent in taking an individual into custody, officers are automatically justified in searching . . . the area adjoining the place of arrest 'from which an attack could be immediately launched.'" (citation omitted)); Fadul, 16 F. Supp. 3d at 280 ("First, 'as an incident to the arrest the officers c[an], as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.'" (citation omitted)); United States v. Robinson, 775 F. Supp. 231, 235 (N.D. Ill. 1991) ("[T]he officers were entitled, under Buie, to conduct a protective sweep to ensure their safety and that of the arrestee. Surely the arrest would not be considered 'complete,' if the arresting officers were gunned down by persons concealed in 'closets [or] other spaces immediately adjoining the place of arrest[.]'" (citations omitted)); see also Chervin, 2011 WL 4373928, at *4 ("Ultimately, the 'safety of the officers, not the percentage of the home searched, is the relevant criterion.'" (citation omitted)).[10]

---

[10] United States v. Barone, 721 F. Supp. 2d 261 (S.D.N.Y. 2010), cited by defendant (see Def. Post-Hearing Br. (Dkt. No. 336) at 11-12), is not to the contrary. In Barone, the defendant was arrested outside of his house "in the driveway." See Barone, 721 F. Supp. 2d at 274. The "immediately adjoining" protective sweep exception was therefore not applicable, and the officers were required to demonstrate reasonable suspicion to believe that there were third parties present in the home. See id. Moreover, the officers in Barone conducted a protective sweep of every room in the defendant's "approximately 2,500 square foot, raised ranch house." See id. at 265. Accordingly, Barone is inapposite.

Defendant's remaining arguments regarding the scope of the protective sweep are not persuasive. Immediately after handcuffing Green, the officers conducted a protective sweep of the apartment. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 102, 166, 179-80, 203) The handguns in the Louis Vuitton bag were recovered within five to ten minutes of Green's arrest. (See June 19, 2018 Hearing Tr. (Dkt. No. 340) at 260, 269 (Inspector Masterson testifying that the firearms were found in the closet approximately five to ten minutes after the officers began the protective sweep); see also June 18, 2018 Hearing Tr. (Dkt. No. 338) at 32 (Turcios testifying that the officers arrived back at her car approximately ten to fifteen minutes after leaving with her house keys to arrest Green)) Contrary to Defendant's argument (see Def. Post-Hearing Br. (Dkt. No. 336) at 13-14), the protective sweep was not unreasonably long, and the officers were not required to immediately evacuate the apartment after handcuffing Green. Given the loft design of the apartment, which exposed the officers to attack from above, the officers could not be confident that they would be able to depart the premises safely without first performing a protective sweep of the bedroom area. Accordingly, the marshals were entitled to conduct a protective sweep of the bedroom after handcuffing Green. See, e.g., Thomas, 429 F.3d at 288 ("The sweep was necessary to complete the arrest safely . . . because . . . [t]he officers . . . had to depart through the hallway, and they need not have done so without first taking the precautionary measure of a limited protective sweep to avert a potential attack from one of the rooms adjoining the hallway.").[11]

Officer Luciano also stayed within the proper bounds of a protective sweep in

---

[11] As other courts have noted, "the fact that the officers did not leave the building immediately [after completing the protective sweep] . . . does not invalidate the sweep" where "[t]here is no evidence to suggest that the sweep was conducted at any time other than immediately after [the defendant had been [arrested]." See Robinson, 775 F. Supp. at 235. "The fact that the officers did not 'depart the premises' is really irrelevant for Buie purposes." See id.

searching Green's bedroom closet. Officer Luciano's search of the bedroom closet was limited
to areas in which a person could be hiding. (See June 18, 2018 Hearing Tr. (Dkt. No. 338) at
168; DX 16, 18 (photographs of bedroom closet); GX 1 (photograph of Louis Vuitton bag in
bedroom closet)) In order to ensure that no one was hiding in the "rear of the closet," Officer
Luciano pushed aside some of the hanging clothing and looked into the back of the closet. (See
June 18, 2018 Hearing Tr. (Dkt. No. 338) at 168-69) After doing so, Officer Luciano
immediately observed an open, unlocked, Louis Vuitton bag containing several handguns – one
of which was bright pink – and a handgun magazine. (Id. at 168-69, 185; GX 1-4 (photographs
of Louis Vuitton bag in bedroom closet)) Because the scope of a protective sweep extends to a
"cursory visual inspection of . . . places in which a person might be hiding," Buie, 494 U.S. at
327, 335, Officer Luciano was entitled to enter and look into the rear of Green's bedroom closet
to ensure that no one was hiding there.

      Under the plain view doctrine, Officer Luciano was then authorized to seize the
firearms. Because the search of the recesses of Green's bedroom closet was within the proper
bounds of a lawful protective sweep, Official Luciano was "lawfully in a position from which
[he] could view," and "had a lawful right of access to," the firearms and ammunition in the open,
unlocked, Louis Vuitton bag. See Delva, 858 F.3d at 149. The incriminating character of the
firearms was also immediately apparent. (See id.; GX 1-4 (photographs of Louis Vuitton bag in
bedroom closet)) Because the officers "lawfully entered [the] premises in connection with an
arrest, and in the course of making a permissible quick and limited protective sweep of the
premises . . . [observed] an object whose incriminating character [wa]s immediately apparent, . . .
they [were entitled to] seize [the firearms and ammunition] without a warrant." See Delva, 858
F.3d at 149 (citation and internal quotation marks omitted).

42

Green's motion to suppress the firearms and ammunition found in the Louis Vuitton bag will be denied.

## II.    CONSENT TO SEARCH

Because the Government has not argued, or attempted to demonstrate, that any of the other evidence was found in plain view pursuant to the validly conducted protective sweep (see Govt. Post-Hearing Br. (Dkt. No. 355) at 24 (arguing only that the guns were discovered in plain view during the protective sweep); Govt. Pre-Hearing Br. (Dkt. No. 268) (same)), the seizure of the remaining evidence turns on the validity of Turcios' consent to search. See Delva, 858 F.3d at 148 ("[T]he government has the burden of showing that the search was lawful because it fell within one of the exceptions to the warrant requirement.").

Green argues that Turcios' consent was involuntary, and that therefore the remaining evidence seized pursuant to the search of the apartment – namely, the five cell phones, the Pennsylvania driver's license in the name of Jonathan Brown, and the drug paraphernalia – must be suppressed.[12]

### A.    Applicable Law

"It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). In assessing the validity of an individual's consent, "courts examine the 'totality of all the circumstances' to determine whether the consent was 'a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority.'" United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995)

---

[12]  Because the officers conducted a valid protective sweep, Turcios' consent was not fruit of the poisonous tree. Accordingly, the following analysis focuses exclusively on whether Turcios' consent was involuntary.

(citations omitted); United States v. Isiofia, 370 F.3d 226, 231 (2d Cir. 2004) ("Voluntariness is a question of fact determined by a 'totality of all the circumstances.'" (citations omitted)). The test is an objective one, and the "ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" Garcia, 56 F.3d at 423 (quoting United States v. Sanchez, 32 F.3d 1330, 1335-36 (8th Cir. 1994)). "The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." Isiofia, 370 F.3d at 230 (citations omitted).

In making a voluntariness determination, courts should consider the "age, education, [and] intelligence [of the defendant], [the] length of detention, [the] use of physical punishments or deprivations, and whether the alleged consenting person was advised of his constitutional rights." United States v. Puglisi, 790 F.2d 240, 243 (2d Cir. 1986) (citing Schneckloth, 412 U.S. at 226). Other relevant factors include "whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent." United States v. Lavan, 10 F. Supp. 2d 377, 384 (S.D.N.Y. 1998) (footnotes omitted). Moreover, while the test is ultimately one of objective reasonableness, the Court may "consider the 'particularities of the situation that is presented in any given case' and the 'possibly vulnerable subjective state of the person who consents,'" id. (quoting Schneckloth, 412 U.S. at 229), and should "pay particular attention to coercive police questions," United States v. Garcia, 2001 WL 1297791, at *7 (S.D.N.Y. Oct. 25, 2001) (citing Schneckloth, 412 U.S. at 229).

### B. Analysis

Although the Government argues that Turcios provided oral consent to search

44

outside the apartment and written consent once inside (Govt. Post-Hearing Br. (Dkt. No. 355) at 11, 24-25, 27) Defendant says almost nothing about the oral consent, choosing instead to focus on whether the written consent was voluntary. (Def. Post-Hearing Br. (Dkt. No. 361) at 15-17) If Turcios voluntarily provided oral consent to search, however, the marshals were authorized to search the apartment, even if Turcios later balked at providing written consent.

## 1. **Voluntariness of Oral Consent to Search**

As to Ms. Turcios' "age, education, [and] intelligence," see Puglisi, 790 F.2d at 243, the Court notes that she is 34 years old, has an associate's degree in business administration, and is employed as an administrative assistant to the chief research director of Mt. Sinai Hospital in Manhattan. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 6-7) She was articulate in her testimony at the suppression hearing and her intelligence was obvious. These facts weigh in favor of finding that her consent was voluntary. See Garcia, 2001 WL 1297791, at *8 (finding that consent was voluntary where defendant's wife was "an articulate, bilingual employed adult and the mother of two").

Defendant argues, however, that the marshals "obtained consent while Ms. Turcios was, in effect, in custody, creating a highly coercive environment." (Def. Pre-Hearing Br. (Dkt. No. 244) at 8) According to Defendant,

M[s]. Turcios was pulled over that morning by three armed agents in ballistic vests, who surrounded her car and began questioning her about her boyfriend. They demanded her ID. They took her phone. They demanded her house keys . . . . When two of the agents left taking her keys, a third agent remained behind, with the government vehicle still behind her. No reasonable person under the circumstances would feel free to leave.

(Def. Post-Hearing Br. (Dkt. No. 336) at 21) (citations omitted)

While this Court has rejected parts of Turcios' account of her initial interactions with the marshals – such as her assertion that the marshals "snatched" her phone out of her hands

45

and "grabbed" her house keys out of her handbag (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 29-30) – the Court nonetheless concludes that a reasonable person would not have felt free to go. As an initial matter, the marshals – who were armed and wearing bulletproof vests – had stopped Turcios' vehicle, told her that they were looking for a fugitive, and that they would have to search her apartment. Two left with her house keys and her identification, while a third marshal stayed behind with Turcios. (Id. at 99; Turcios Decl. (Dkt. No. 244-4) ¶ 8) When the marshals returned, one told Turcios that "it looks like you are not going to be going into work today," and instructed her to drive back to her apartment. (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 32) Turcios testified that she felt that she was not free to leave (id. at 31), and the Court concludes that a reasonable person in these circumstances would not have felt free to leave. See, e.g., United States v. Glover, 957 F.2d 1004, 1008 (2d Cir. 1992) (quoting United States v. Lee, 916 F.2d 814, 819 (2d Cir. 1990) (identifying, inter alia, "display of a weapon" and "prolonged retention of a person's personal effects" as factors relevant to determining if a seizure has occurred).

The Court's conclusion that Turcios believed that she was not free to leave does not mean that her oral consent was involuntary, of course, but this conclusion does "require . . . more careful scrutiny" of the voluntariness of her oral consent. Cf. Puglisi, 790 F.3d at 243 (2d Cir. 1986) ("more careful scrutiny" required for consent to search obtained from a person in custody). Applying this "more careful [level of] scrutiny" to the circumstances here, the Court concludes that Turcios' oral consent to search was not involuntary.

As an initial matter – although Turcios was not free to leave – she had no reason to believe prior to re-entering her apartment that she was the subject of the marshals' investigation or was in legal jeopardy. To the contrary, the marshals told her that "we are going

46

to go to your apartment, see if the person that's in your apartment is the person that we are looking for. After that, I will bring you your keys and your ID back and you are good to go." (June 18, 2018 Hearing Tr. (Dkt. No. 338) at 30)  Throughout the marshals were clear that it was Turcios' boyfriend they were looking for, and not Turcios.

Even after the marshals returned and instructed Turcios to drive back to her apartment, she had no reason to believe that she herself was in legal jeopardy. She was not told that she was under arrest and was not handcuffed. (Id. at 70)

Once Turcios arrived back at her apartment she was met by Deputy Marshal Kushi, and the two had a conversation on the apartment's landing, outside the front door. (Id. at 208-10)  Turcios had not yet entered the apartment and thus had not seen Green in handcuffs. (Id.)  Kushi explained who he was, and told Turcios that "illegal items" had been found in the apartment, and that the marshals "would like permission to search the residence for any other illegal items that might be in here." (Id. at 208, 224)  Kushi did not tell Turcios what "illegal items" had been found in the apartment and did not threaten to arrest Turcios. (Id. at 208-09, 224)  Indeed, Kushi presented his request as a safety issue, telling Turcios that the marshals "wanted a consent just to make sure there was nothing else that could be in there that would cause harm to us, yourself, and others. (Id. at 208)  In response, Turcios immediately provided oral consent to search. (Id. at 209, 225)  While Turcios appeared "very concerned and wanted to know exactly what was going on," she "did not seem resistant to the request and was very cooperative." (Id. at 208)  Indeed, Turcios "instantly told [Kushi] that she didn't have a problem with [providing consent to search]." (Id. at 209, 225)  Although Kushi was armed at this time, there is no evidence that he displayed his firearm or otherwise made any show of force; by the time Kushi spoke with Turcios outside her apartment, he had removed his bulletproof vest. (Id.

at 223) Moreover, the conversation on the landing was only between Turcios and Kushi; Turcios was not surrounded by officers when she provided consent. (Id. at 222)

These circumstances are not indicative of impermissible coercion. See, e.g., United States v. Gomez, 199 F. Supp.3d 728, 746 (S.D.N.Y. 2016) (finding consent to search voluntary where the defendant, who interacted with a single trooper, "was not placed in handcuffs or restrained in any other way; was not told that he was under arrest; was not subjected to a show of force; was not threatened in any way; and was not told that he was not free to go"). Indeed, "[c]ourts have held that defendants voluntarily consented to searches in . . . situations that were considerably more coercive in nature." United States v. Zaleski, 559 F. Supp.2d 178, 187 (D. Conn. 2008) (citing, among other cases, United States v. Caballos, 812 F.2d 42, 51 (2d Cir. 1987) (consent to search not involuntary where a handcuffed defendant was questioned for "a couple of hours" at a Secret Service field office); United States v. Arango-Correa, 851 F.2d 54, 57 (2d Cir. 1988) (consent to search not involuntary where defendant was detained for five hours, strip-searched, and interrogated)); see also United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006) (third party's consent to search her apartment not involuntary where her "home was forcibly entered by a heavily armed SWAT team that initially secured her and her boyfriend in handcuffs and raised the possibility of taking the couple into custody while placing [the third party's] young daughter in protective care")).

This Court concludes that Turcios' oral consent to search was voluntary.

### 2. Whether Turcios' Alleged Reluctance to Provide Written Consent to Search Invalidates Her Earlier Oral Consent to Search

Although Defendant does not argue that Turcios withdrew her oral consent to

search,[13] he argues that Turcios resisted providing <u>written</u> consent to search, and that she ultimately provided written consent only after coercion. (Def. Post-Hearing Br. (Dkt. No. 336) at 22) Accordingly, the Court considers below whether Turcios' alleged reluctance to provide written consent to search once inside the apartment invalidates the voluntary oral consent to search that she provided before entering the apartment.[14]

---

[13] Although neither the Supreme Court nor the Second Circuit has squarely addressed whether consent to search – once voluntarily given – may later be withdrawn, the Circuits that have addressed the issue agree that someone who provides consent to search may later withdraw their consent. See <u>United States v. Williams</u>, 898 F.3d 323, 329 & 329 n.18 (3d Cir. 2018) (collecting cases); <u>United States v. Buckingham</u>, 433 F.3d 508, 513 (6th Cir. 2006) ("It is well-settled that 'the consenting party . . . at any moment may retract his consent.'"); <u>United States v. Mitchell</u>, 82 F.3d 146, 151 (7th Cir. 1996) ("Consent to search may, of course, be withdrawn or limited by a criminal suspect."); <u>United States v. McWeeney</u>, 454 F.3d 1030, 1034 (9th Cir. 2006) ("A suspect is free . . . after initially giving consent, to delimit or withdraw his or her consent at any time."). The standard for showing withdrawal of consent is high. <u>United States v. Gray</u>, 369 F.3d 1024, 1026 (8th Cir. 2004) ("Withdrawal of consent need not be effectuated through 'magic words,' but an intent to withdraw consent must be made by unequivocal act or statement."); <u>see also</u> <u>United States v. Lattimore</u>, 87 F.3d 647, 651 (4th Cir. 1996) (<u>en banc</u>) (withdrawal must be "express[]"); <u>United States v. Hughes</u>, 273 F. App'x 587, 589 (9th Cir. 2007) (unpublished) ("[T]he district court did not clearly err when it found that [defendant's] intent to withdraw consent to search the apartment was not objectively clear and unequivocal. . . .").

[14] Given the Court's conclusion – discussed below – that Turcios' alleged reluctance to provide written consent to search does not vitiate the earlier, voluntary oral consent to search she provided outside the apartment, the Court does not reach the issue of whether her written consent was involuntary. Even assuming <u>arguendo</u> that Turcios was threatened with arrest if she did not provide written consent to search – or believed that she was in legal jeopardy simply by virtue of the marshals' questioning – such circumstances would not compel a finding that her written consent was involuntary, however.

Where officers obtain consent to search through threats of arrest, courts' voluntariness analysis often turns on whether officers misrepresented the risk of arrest. See, <u>e.g.</u>, <u>United States v. Munoz</u>, 987 F. Supp.2d 438, 441, 447 (S.D.N.Y. 2013) ("Courts in this district have held that a police threat to arrest a suspect's loved ones undermines the voluntariness of consent where the police lack probable cause to make such arrests. . . . Where the police have an honest basis for their statement, it is not coercive to make it[, however]. But false threats made in order to obtain consent deprive the suspect of a free and informed choice based on the realities before him." (footnote omitted)); <u>United States v. Memoli</u>, 333 F. Supp. 2d 233, 235, 237, 238 n.3 (S.D.N.Y. 2004) (consent to search voluntary where officers, who were investigating defendant for selling firearms and suspected that he stored firearms in his girlfriend's apartment, told defendant that if he

As a general matter, a voluntary oral consent to search is not invalidated by a subsequent refusal to provide written consent to search. United States v. Roussos, No. 91 CRIM. 872 (LBS), 1993 WL 106383, at *2 (S.D.N.Y. Apr. 7, 1993) is instructive. In that case, defendant orally consented to a search of his vehicle, which was parked outside the building in which he had been arrested. Two detectives then headed outside to search the car. A third detective handed the defendant a consent to search form, which the defendant – without any

---

provided consent to search they "would neither charge [his girlfriend] with any accessory crime nor seek to develop any evidence against her"; court emphasized that the girlfriend "faced a very real possibility of being arrested if illegal guns were found in her apartment," and that "the police had every reason to believe that [she] could properly have been arrested as an accessory or, at a minimum, for constructive possession of illegal weapons," facts which distinguished the case from others in which there was no evidence "that the police had any legitimate reason to suppose that the third party . . . could have been lawfully arrested"); see also United States v. Morrow, 731 F.2d 233, 236 (4th Cir. 1984) (finding consent from defendant's girlfriend voluntary "[a]lthough [officers] did tell [her] that she could be charged as an accessory and, therefore, punished as a principal"); United States v. Bahonnan, No. 13-CR-229 (JCH), 2017 WL 1536391, at *2-5, 9, 11 (D. Conn. Apr. 28, 2017) (officers arrested defendant in third party's home and found crack cocaine under a bed in which he had been lying; consent to search provided by third party found involuntary where officers threatened to arrest her and her sister (who also lived in the apartment) for the crack cocaine found under the defendant's bed; the court reasoned that "the degree to which the officers' statements had a detrimental effect on the voluntariness of [her] consent depends, at least in part, on whether the statements were true or not, i.e., . . . whether the drug provided the officers with evidence to arrest [her] or her sister"; consent found involuntary where the government "concede[d] . . . [that] the officers had no legal right to arrest either [her] or her sister, contrary to their threat to do so").

Here, the marshals found six loaded handguns (GX 7-13) in an open bag in a bedroom closet containing Turcios' clothing. Under the circumstances, the marshals may well have had an "honest belief" that she had criminal exposure. See, e.g., Conn. Gen. Stat. Ann. § 29-37i (West) ("No person shall store or keep any loaded firearm on any premises under such person's control if such person knows or reasonably should know that . . . a resident of the premises is ineligible to possess a firearm under state or federal law . . . unless such person (A) keeps the firearm in a securely locked box or other container or in a location which a reasonable person would believe to be secure. . . ." Green was, of course, a prior felon and thus "ineligible to possess a firearm under . . . federal law.") In sum, it is not a foregone conclusion that any explicit or implicit threat to arrest Turcios would render her written consent involuntary.

explanation – refused to sign. Id. After determining that the oral consent had been voluntary, the court found that "there is no basis for claiming that the consent was withdrawn. . . . Refusal to sign a form acknowledging that one has orally consented does not, absent more, negate the oral consent." Id. at *3. See also United States v. Lattimore, 87 F.3d 647, 651 (4th Cir. 1996) (en banc) ("It is clear, however, that a refusal to execute a written consent form subsequent to a voluntary oral consent does not act as an effective withdrawal of the prior oral consent."); United States v. Thompson, 876 F.2d 1381, 1384 (8th Cir. 1989) (oral consent voluntary although defendant refused to sign written consent to search form); United States v. Castillo, 866 F.2d 1071, 1082 (9th Cir. 1988) (rejecting the argument that defendant's "refusal to sign a written consent form vitiated any oral consent"); United States v. Boukater, 409 F.2d 537, 539 (5th Cir. 1969) (finding defendant's oral consent voluntary despite defendant's later refusal to sign consent to search form); United States v. De Los Santos, 904 F. Supp. 91, 93 (N.D.N.Y. 1995) ("[A] defendant's refusal to sign a consent to search form does not vitiate [earlier oral] consent."). Accordingly, even if Turcios had refused to provide written consent to search, such conduct would not be sufficient to demonstrate that she had revoked her earlier oral consent.

United States v. Lattimore, 87 F.3d 647 (4th Cir. 1996) (en banc) involves circumstances somewhat similar to those here. In Lattimore, the defendant readily provided oral consent to search, but provided written consent only after a conversation in which a South Carolina state trooper said that he would "call a drug dog right up the road" if Lattimore refused to provide written consent to search. Lattimore moved to suppress, arguing that both his oral and written consent to search were involuntary. Lattimore, 87 F.3d at 649-50. The Fourth Circuit found that the oral consent was voluntary, but went on to address whether Lattimore's apparent reluctance to provide written consent constituted a withdrawal of his earlier oral consent. The

Fourth Circuit acknowledged that "if Lattimore had not already given an oral consent to the search, Trooper Frock's assertion that he would 'call a drug dog' to search the automobile if Lattimore refused written consent would raise serious questions concerning the voluntariness of his consent." The court ruled, however, that even "if Lattimore had refused to sign the written consent form, Trooper Frock would have been justified in searching the vehicle under the authority of the oral consent." Id. at 651-52. The same logic applies here.

"Once it has been established that [an authorized person] has voluntarily consented to a search, it is [defendant's] burden to demonstrate that [the authorized person] has withdrawn that consent by pointing to an act or statement that an objective viewer would understand as an expression of h[er] desire to no longer [permit the] search[]." Williams, 898 F.3d 323, 331 (3d Cir. 2008). There is no evidence here – much less an "unequivocal act or statement," United States v. Gray, 369 F.3d 1024, 1026 (8th Cir. 2004) – that Turcios revoked the oral consent to search that she had provided to Kushi outside the apartment's front door. Accordingly, the Court finds that Turcios' voluntary oral consent was not withdrawn, revoked, or invalidated by her alleged reluctance to provide written consent to search.

## CONCLUSION

For the reasons stated above, Defendant Green's motion to suppress is denied. The Clerk of Court is directed to terminate the motion (Dkt. No. 243).

Dated: New York, New York
December 4, 2018

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge