UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- against -

LATIQUE JOHNSON, BRANDON
GREEN, and DONNELL MURRAY,

Defendants.

**MEMORANDUM
OPINION & ORDER**

S5 16 Cr. 281 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Trial in this matter will begin on February 19, 2019. Defendants Latique Johnson,

Brandon Green, and Donnell Murray are charged with racketeering conspiracy, narcotics

conspiracy, and with using, possessing, carrying, brandishing and discharging firearms during

and in relation to a crime of violence and a drug trafficking crime. Johnson and Murray are also

charged with assault and attempted murder in aid of racketeering. (S5 Indictment (Dkt. No.

418)) The charges against the Defendants arise out of their alleged participation in the Blood

Hound Brims, an alleged racketeering organization engaged in narcotics trafficking and acts of

violence, including assault, robbery, attempted murder, and conspiracy to commit murder. (Id.)

This Opinion addresses the parties' motions in limine. (Dkt. Nos. 459, 464, 468,

469, 476)

I.      **GOVERNMENT MOTIONS _IN LIMINE_**

In its motions in limine, the Government seeks permission to introduce: (1)

evidence of all three Defendants' incarceration during the alleged conspiracies; (2) certain

alleged co-conspirator statements made after this case was indicted and the declarants were

incarcerated; (3) excerpts from a rap video; and (4) charts regarding voluminous jail records, and

the corresponding testimony of a summary witness. The Government also gives notice that it

intends to introduce evidence of certain uncharged acts of violence allegedly committed by the Defendants.

The Government also asks this Court to limit or preclude cross-examination concerning: (1) Defendant Murray's civil lawsuit against New York City Police Department ("NYPD") Officer Abraham Villavizar; (2) allegations made by sex trafficking victims concerning Cooperating Witness No. 6, a former pimp; (3) Cooperating Witness No. 7's use of a prostitute in the 1980s; (4) Cooperating Witness No. 5's masturbation before a female corrections officer and female inmates while in detention; (5) Cooperating Witness No. 1's Pre-Sentence Report ("PSR"); (6) NYPD Internal Affairs Bureau findings that Officer Jeffrey Valenzano drank alcohol while on duty, misused time, and violated NYPD record-keeping procedures; (7) Detective John Munley's misdemeanor convictions from the late 1990s; and (8) civil lawsuits brought against various law enforcement witnesses, including NYPD Officers Jeffrey Sisco, Abraham Villavizar, and Michael Dougherty, and NYPD Detective Edward Wilkowksi. (See Govt. MIL (Dkt. No. 469))

Defendants have not opposed the Government's motion concerning Cooperating Witness No. 7's use of a prostitute in the 1980s, and Detective Munley's misdemeanor convictions. Accordingly, the Government's motions in limine are granted as to these matters.

## II.  **DEFENDANTS' MOTIONS *IN LIMINE***

Defendant Johnson has moved in limine to preclude (1) evidence of certain uncharged criminal conduct, including a robbery in late 2011 or 2012; a 2011 robbery of various drug customers; a 2014 shooting at a Bronx bodega; and a 2013 drug seizure in Scranton, Pennsylvania; and (2) cross-examination concerning his criminal record, in the event he testifies. Johnson also seeks to preclude or limit the testimony of NYPD Detective Jonathan Fox, the

Government's ballistics expert, who intends to offer opinions involving toolmark identification.[1]
(Johnson MIL (Dkt. No. 468) at 5, 12, 19)

Defendant Green has moved in limine to preclude (1) rap videos and lyrics; and (2) testimony from a chemist concerning certain drug analyses she performed. (Green MIL (Dkt. No. 460) at 1; Jan. 17, 2019 Green Ltr. (Dkt. No. 476); Jan. 28, 2019 Green Ltr. (Dkt. No. 491))

Defendant Murray has moved in limine to generally preclude evidence of his prior arrests and convictions, and uncharged crimes or "bad acts." In particular, Murray seeks to preclude evidence of (1) his alleged possession of a firearm and ammunition on August 14, 2010; and (2) drugs, drug paraphernalia, and other contraband recovered inside his Dover, Delaware residence on January 4, 2017. Finally, Murray seeks to preclude photographs showing him with large amounts of cash. (Murray MIL (Dkt. No. 464) at 3, 5-6)

## DISCUSSION

## I.    UNCHARGED ACTS OF VIOLENCE

The Government's motion in limine gives notice that it intends to introduce evidence of six uncharged acts of violence that were allegedly committed in furtherance of the charged racketeering enterprise. The Government maintains that the uncharged violent acts listed in its motion constitute "direct evidence of the charged racketeering conspiracy" and therefore are admissible without reference to Fed. R. Evid. 404(b). (Govt. MIL (Dkt. No. 469) at 12 n.1)[2]

---

[1] As discussed at the final pretrial conference on February 15, 2019, the Court will conduct a hearing concerning Detective Fox's proposed testimony.

[2] Unless otherwise noted, citations in this Order reflect page numbers assigned by this District's Electronic Case Filing (ECF) system.

Johnson and Murray have moved to preclude three of the violent acts listed by the Government: (1) Murray's May 2010 alleged assault of a tow-truck driver; (2) Johnson's January 2012 alleged slashing of members of a rival gang at a strip club; and (3) Johnson's December 2, 2014 shooting of an individual in a bodega. (Govt. MIL (Dkt. No. 469) at 12-16; Johnson MIL (Dkt. No. 468) at 7-10; Murray MIL (Dkt. No. 464) at 1)

Johnson also seeks to preclude evidence of (1) his alleged robbery of an individual of jewelry and money in late 2011 or early 2012; and (2) Johnson and Murray's alleged robbery of drug customers in December 2011. (Johnson MIL (Dkt. No. 468) at 5, 7-9) Johnson contends that this conduct is not direct evidence of the charged offenses and is not admissible under Fed. R. Evid. 404(b), because the Government has not identified a proper purpose for introducing these acts. Johnson further contends that this evidence is inadmissible under Fed. R. Evid. 403. (Johnson MIL (Dkt. No. 468) at 7-10)

The Government contends that evidence of these acts is admissible as direct evidence of the charged crimes or, in the alternative, is admissible under Rule 404(b). (Govt. Opp. Br. (Dkt. No. 483) at 6)

### A.    Applicable Law

#### 1.    Uncharged Criminal Conduct as Direct Evidence

Where uncharged criminal activity "'arose out of the same transaction or series of transactions as the charged offense, . . . [or] is inextricably intertwined with the evidence regarding the charged offense, or . . . is necessary to complete the story of the crime[s]'" for which a defendant is on trial, the evidence "is considered direct evidence of the charged offenses." United States v. Kassir, No. 04 Cr. 356 (JFK), 2009 WL 976821, at *2 (S.D.N.Y. Apr. 9, 2009) (quoting United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)). "However,

'where it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b).'" Id. (quoting United States v. Nektalov, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004)).

Courts in this District employ a narrow construction in determining whether uncharged crimes are direct evidence of charged offenses. See United States v. Martoma, 12 Cr. 973 (PGG), 2014 WL 31191, at *3 (S.D.N.Y. Jan. 6, 2014). For example, uncharged conduct is not "inextricably intertwined" with charged conduct simply because it "provides context or is relevant" to charged conduct. Accordingly, "numerous courts in this circuit . . . [have] found it necessary to conduct Rule 404(b) analysis of uncharged criminal activity that merely provided context or was somehow relevant to the charged conduct." Kassir, 2009 WL 976821, at *2 (citations omitted). "In deciding whether uncharged conduct is 'inextricably intertwined' with charged conduct[,] . . . courts have considered whether '[the] details of the uncharged transaction are necessary to understand the charged transaction.'" Martoma, 2014 WL 31191, at *3 (quoting United States v. Stein, 521 F. Supp. 2d 266, 271 (S.D.N.Y. 2007)).

Uncharged conduct is somewhat more readily admissible as direct evidence in racketeering cases, however, because the Government is required to prove, inter alia, the existence of a racketeering enterprise, and an agreement among the enterprise's members to conduct the affairs of the enterprise through a pattern of racketeering activity. See, e.g., United States v. Ashburn, No. 11 Cr. 303 (NGG), 2015 WL 588704, at *7 (E.D.N.Y. Feb. 11, 2015). Accordingly, "'it is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise.'" Id. at *8 (quoting United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003) (per curiam) and citing United States v. Mejia, 545 F.3d 179, 206 (2d Cir. 2008)).

Indeed, "'proof of the enterprise and pattern elements of racketeering "may well entail evidence of numerous criminal acts by a variety of persons,"'" and such evidence is "'admissible against each defendant "to prove (i) the existence and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and continuity of illegal activities."'" Id. (quoting United States v. Basciano, 599 F.3d 184, 207 (2d Cir. 2010) (quoting United States v. DiNome, 954 F.2d 839, 843, 844 (2d Cir. 1992))).

### 2. **Uncharged Criminal Conduct Under Rule 404(b)**

Fed. R. Evid. 404(b) provides that while evidence of a "crime, wrong, or other act" is not admissible as character evidence, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).

### 3. **Rule 403**

Whether uncharged conduct constitutes direct evidence or "other crimes" evidence under Rule 404(b), the uncharged conduct must still survive scrutiny under the Fed. R. Evid. 403 balancing test to be admissible. Rule 403 provides that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of," inter alia, "unfair prejudice." Fed. R. Evid. 403. "The Second Circuit has declined to find probative evidence which is properly used at trial unduly prejudicial under Rule 403 where it 'did not involve conduct more inflammatory than the charged crime.'" United States v. Brown, No. S2 16 Cr. 559 (DLC), 2017 WL 2493140, at *2 (S.D.N.Y. June 9, 2017) (quoting United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006) and citing United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992)).

**B.** **Analysis**

The Court addresses below each of the uncharged acts of violence that are the subject of the parties' motions in limine.

### 1. Murray's 2010 Assault of a Tow Truck Driver

The Government claims that on May 5, 2010, Murray threatened a tow truck driver with a firearm after an argument arose between Murray and another driver from the same towing company. A man with Murray, whom the Government refers to as "CC-1," slashed the driver with a razor and said, "[t]his is how the Bloods do it." (Govt. MIL (Dkt. No. 469) at 13) Other than CC-1's reference to the Bloods, there appears to be no connection between this incident and the charged conspiracies, and it is not apparent how the conduct of Murray and his associate furthered the charged conspiracies. Given the limited probative value of this evidence and the potential for unfair prejudice, evidence concerning this incident will be excluded under Fed. R. Evid. 403.

### 2. Club Heat Slashing

The Government alleges that in January 2012, all three Defendants were present at Club Heat, a strip club in the Bronx. Members of the Gorilla Stones, a rival gang, were also at the club, and a member of the Gorilla Stones shot a Blood Hound Brims member; Johnson, in retaliation, allegedly slashed Gorilla Stones gang members with a scalpel. The Government intends to introduce surveillance video showing all three Defendants inside the club on the night of the slashings. (Govt. MIL (Dkt. No. 469) at 15)

Johnson has not moved to preclude evidence of this incident, which appears to constitute conduct in furtherance of the charged racketeering conspiracy. To the extent that Murray seeks preclusion of this evidence, his application is denied, because proof of Johnson's

racketeering activity is admissible against each defendant charged in the racketeering conspiracy count. See Basciano, 599 F.3d at 207.

### 3.    **Mandela Store Shooting**

The Government alleges that on December 2, 2014, at a Bronx bodega (the "Mandela Store"), Johnson shot a man who had gotten into a dispute with the bodega's owner, who is known as "Mandela" (the "Mandela Store Shooting"). (Govt. MIL (Dkt. No. 469) at 15-16) Johnson asserts that the dispute between the shooting victim and Mandela stemmed from a car accident, and was unrelated to the Blood Hound Brims and the gang's criminal activities. (Johnson MIL (Dkt. No. 468) at 9-10) Johnson argues that, "[e]ven assuming the truth of the government's evidence, the shooting was not part of the [Blood Hound Brims'] activities" and "does not provide necessary background to the charged RICO conspiracy." (Id. at 10)

The Government does not dispute that the alleged shooting arose from a car accident – a personal dispute unrelated to the Blood Hound Brims and their criminal activities. The Government argues, however, that the evidence will show that Mandela was a Blood Hound Brims member or associate; that Mandela's nephew was a member of the gang or was otherwise a close associate of Johnson; that members of the Blood Hound Brims frequently "hung-out" at the store; and that Johnson sometimes stored firearms at the store. (Govt. MIL (Dkt. No. 469) at 15-16; Govt. Opp. Br. (Dkt. No. 483) at 18) According to the Government, the shooting reflects gang members' obligation to retaliate against individuals who would harm fellow gang members, and "promot[ed] [the gang's] objectives by protecting a Gang stash spot, and further enhancing [Johnson's] own reputation within the Gang." (Govt. Opp. Br. (Dkt. No. 483) at 18) Citing United States v. Vernace, 811 F.3d 609 (2d Cir. 2016), the Government notes that, in some

circumstances, violence arising from a personal dispute can constitute direct evidence of a racketeering conspiracy. (Govt. Opp. Br. (Dkt. No. 483) at 18-19)

In Vernace, the defendant – who was an associate of the Gambino crime family – got into a dispute with two bar owners. He felt "disrespect[ed] . . . as a Gambino associate" and sought to "demonstrate [to the owners] that the Gambino family 'r[an] th[e] place,'" as well as to enhance his own reputation within the Gambino organization. Accordingly, he enlisted two other Gambino associates to help him murder the bar owners. Vernace, 811 F.3d at 616.

Here, the facts alleged by the Government are not comparable. There is, for example, no evidence that Johnson or any other alleged member of the Blood Hound Brims perceived the dispute about the car accident as presenting a threat to the gang, or to the gang's use of the Mandela Store as a stash house or meeting place. Moreover, unlike in Vernace, Johnson did not enlist any other member of the gang to assist him in addressing the supposed threat to the gang. While the Government posits that Johnson committed the shooting to "further enhance[e] [Johnson's] own reputation within the Gang" (Govt. Opp. Br. (Dkt. No. 483) at 18), Johnson was then – according to the Government – the leader of the gang. (Govt. MIL (Dkt. No. 469) at 8) While a leader of a racketeering organization could theoretically take certain actions to enhance or solidify his leadership role, the Government has not proffered evidence that would permit a reasonable jury to infer that Johnson committed this shooting for that purpose. Finally, while the Government contends that this incident reflects the obligation of a gang member to retaliate against those who present a threat to other gang members, it is not clear that Mandela was a member of the gang, and there is no evidence that Johnson committed the shooting

because Mandela was a gang member. On the current record, evidence of the Mandela Store Shooting is not admissible as direct evidence of the charged racketeering enterprise.[3]

### 4. Johnson's Alleged 2011-2012 Robbery

Johnson seeks to preclude evidence that he "robbed an individual of jewelry and money" in late 2011 or early 2012. In an October 10, 2018 letter, the Government listed this crime as a violent act that it might seek to introduce at trial, but provided little factual detail. (See Johnson MIL (Dkt. No. 468) at 7; Oct. 10, 2018 Govt. Ltr. ¶ 15) In his motion, Johnson asserts that "[w]ithout more, the incident has no connection to the RICO conspiracy charge. . . .

---

[3] In its opposition, the Government – citing United States v. Slaughter, 03 Cr. 455 (KFK), 2004 WL 856323, at *1-2 (S.D.N.Y. Apr. 20, 2004) – contends that evidence of the Mandela Store Shooting is also admissible under Rule 404(b) "to show knowledge, intent, and access to firearms during the timeframe of the conspiracy, and modus operandi." (Govt. Opp. Br. (Dkt. No. 483) at 24) As an initial matter, Slaughter is inapposite. There, the defendant was charged as a felon in possession of semiautomatic handgun – not with use of a firearm in furtherance of a racketeering conspiracy – and the court permitted introduction of two prior instances in which the defendant possessed semi-automatic handguns, emphasizing the similarity between the weapons. Slaughter, 2004 WL 856323, at *1-2; see also United States v. Midyett, 603 F. Supp. 2d 450, 459 (E.D.N.Y. 2009) ("[t]o balance against th[e] high risk of unfair prejudice" when determining whether to admit prior gun possessions under Rule 404(b) in connection with a gun charge, "courts in the Second Circuit seem to require substantial[ly] more relevanc[e], i.e., similarity between the charged gun possession and the uncharged gun possession. . . . The similarity required is . . . evidence that the gun involved in the uncharged criminal offense is the same or similar to the gun involved in the charged offense").

As to the Rule 404(b) purposes cited by the Government, the Mandela Store Shooting does not constitute proof of "modus operandi." Moreover, because the car accident underlying the Mandela Store Shooting is divorced from the criminal activities of the Blood Hound Brims, evidence of this incident is of limited probative value for purposes of showing knowledge of, and intent to participate in, the affairs of the Blood Hound Brims under Rule 404(b). The Court concludes that evidence of this shooting is more prejudicial than probative under Rule 403 for purposes of showing knowledge and intent. As discussed below, however, Johnson alludes to the Mandela Store Shooting in attempting to persuade a Crips gang member to join the Blood Hound Brims, and Johnson's reference to the shooting as part of his recruitment effort is a statement in furtherance of the charged racketeering conspiracy.

On these bare facts, the alleged robbery did not enrich, promote, or enhance [the Blood Hound Brims] or protect its power." (Johnson MIL (Dkt. No. 468) at 7-8)

The Government provides additional factual detail in its opposition brief. According to the Government, in late 2011 or early 2012 Johnson invited an individual who had recently joined the Blood Hound Brims – identified as Cooperating Witness No. 5 – to assist Johnson in robbing an intoxicated man who had appeared at a club wearing a significant amount of jewelry. Cooperating Witness No. 5 arrived at the club with Prince Wareham – another member of the Blood Hound Brims – and a member of a rival gang. Johnson refused to permit Cooperating Witness No. 5 and Wareham to assist in the robbery because they were accompanied by the rival gang member. Johnson later called Cooperating Witness No. 5 and provided a "play by play" of the robbery. (Govt. Opp. Br. (Dkt. No. 483) at 7)

This incident constitutes direct evidence of the charged racketeering conspiracy. The S5 Indictment states that one of the purposes of the charged racketeering enterprise is to "[e]nrich[ ] the members and associates of the Enterprise through, among other things, robberies." (S5 Indictment (Dkt. No. 418) ¶ 7(a)) Given the evidence that Johnson solicited fellow members of the Blood Hound Brims to participate in the robbery, this incident constitutes evidence of the charged racketeering conspiracy.[4]

---

[4] After this incident, Johnson solicited Cooperating Witness No. 5 and Wareham to commit another robbery. When they met Johnson and Murray for purposes of committing the proposed robbery, "Murray took Wareham's gun and fired shots at Wareham to discipline him for associating with a member of [a] rival gang." (Govt. Opp. Br. (Dkt. No. 483) at 8) This conduct is likewise admissible as direct evidence, because the S5 Indictment charges that the means and methods of the racketeering enterprise included "acts of violence . . . against other [Blood Hound Brims] members to resolve disputes and foster gang discipline." (S5 Indictment (Dkt. No. 418) ¶ 8 (a))

### 5.    Johnson and Murray's December 2011 Robbery of Drug Customers

In its October 10, 2018 letter, the Government disclosed that it might seek to introduce evidence at trial that, "[i]n or about December 2011, in the vicinity of Bussing Avenue and Boyd Avenue in the Bronx, Johnson and Murray, along with other members of [the Blood Hound Brims], robbed drug customers from Newburgh, New York, during which robbery Murray brandished a firearm and one of the victims was physically restrained." (Oct. 10, 2018 Ltr. ¶ 12) Johnson seeks to preclude evidence of this incident. (Johnson MIL (Dkt. No. 468) at 8-9)

Johnson contends that it is not "manifestly clear" that this incident constitutes direct evidence of the charged racketeering conspiracy. (Johnson MIL (Dkt. No. 468) at 9) Citing United States v. Nektalov, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004), Johnson argues that "where it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)." (Johnson MIL (Dkt. No. 468) at 6)

The Court concludes that it is "manifestly clear" that the robbery of the drug customers constitutes direct evidence of the charged conspiracy. As discussed above, the S5 Indictment alleges that one purpose of the Blood Hound Brims was to enrich its members and associates through the commission of robberies. (S5 Indictment (Dkt. No. 418) ¶ 7(a)) Moreover, this 2011 robbery took place within the time period of the charged racketeering conspiracy. (Id. at ¶ 9) Nektalov is not to the contrary; the money laundering transactions at issue there occurred three years before the charged conspiracy, and it was on that basis that the district court concluded that they were not direct evidence of the charged conspiracy. Nektalov, 325 F. Supp. 2d at 369, 370.

Johnson's motion in limine to exclude evidence of the drug customers robbery will be denied.

## II.   JOHNSON AND MURRAY'S MOTIONS TO EXCLUDE EVIDENCE OF DRUG TRAFFICKING

### A.   February 14, 2013 Scranton Drug Seizure

Johnson seeks to preclude evidence that on February 14, 2013, Lackawanna County detectives and Scranton police officers executed a search warrant at the home of Sean Fairweather in Scranton, Pennsylvania, and recovered heroin, cocaine, ecstasy, marijuana, and drug paraphernalia from Fairweather's apartment. Johnson's duffel bag was also found in Fairweather's apartment, but no contraband was found in the duffel bag. (Johnson MIL (Dkt. No. 468) at 11; Govt. Opp. Br. (Dkt. No. 483) at 8) The search took place a day after officers had made a controlled buy from Fairweather. (Govt. Opp. (Dkt. No. 483) at 8) Prior to the search, officers observed Fairweather and Johnson leaving the residence and entering a vehicle. After Fairweather and Johnson drove away, officers stopped the vehicle. Officers found $2300 in cash and heroin on Fairweather, and observed that Johnson had three cellphones. (Id. at 8)

Johnson moves to preclude evidence of the Scranton drug seizure on the grounds that the Government "lacks the foundation to connect this seizure to either the RICO or narcotics conspiracies." (Johnson MIL (Dkt. No. 468) at 11)

The Government responds that the Scranton drug seizure "occurred squarely in the middle of both charged conspiracies," and that Johnson is charged with distributing many of the controlled substances found in Fairweather's apartment. The Government further states that it intends to offer evidence that the Blood Hound Brims were "well-established in Pennsylvania and sold drugs there." (Govt. Opp. Br. (Dkt. No. 483) at 22)

While the evidence discussed above suggests that Sean Fairweather was selling drugs in Scranton, this evidence does not demonstrate that Defendant Johnson and the Blood Hound Brims were involved in selling drugs with Fairweather in Scranton. Absent evidence linking Fairweather to the Blood Hound Brims, or linking the Blood Hound Brims to the sale of drugs in Scranton, there is not an adequate basis to infer that the drugs recovered from Fairweather and his residence are connected to the conspiracies charged in the S5 Indictment. Johnson's motion in limine to exclude this evidence is granted, without prejudice to the Government seeking reconsideration based on a broader factual record.[5]

### B.     January 4, 2017 Seizures From Murray's Residence

Defendant Murray seeks to preclude the Government from offering evidence seized from his Dover, Delaware home on January 4, 2017. The search of Murray's residence was conducted pursuant to a search warrant. (See Aug. 8, 2018 Mem. Op. & Order (Dkt. No. 366) at 3) Officers recovered, inter alia, heroin, glassines and baggies, a digital scale, and marijuana from Murray's residence. (Id. at 3-4)

Murray argues that "there is no provable nexus between those items and Mr. Murray's involvement in the conspiracy," and that the Government "has not yet alleged any facts to demonstrate that Mr. Murray engaged in any activities of the Bloodhound Brims after the year 2013." (Murray MIL (Dkt. No. 464) at 5)

---

[5] The Government also argues that the evidence recovered from Fairweather is admissible under Rule 404(b) to show "knowledge, . . . opportunity, and . . . access to illegal drugs." (Govt. Opp. Br. (Dkt. No. 483) at 24) Proof that Johnson was seen with Fairweather has little probative value, however, and whatever probative value exists is far exceeded by the potential for unfair prejudice flowing from the possibility that the jury may assume that Johnson – merely because he was observed with someone who was selling drugs – also was selling drugs.

As an initial matter, Murray is mistaken in suggesting that the Government bears the burden of proof on the issue of whether Murray withdrew from the charged conspiracies. "Since conspiracy is a continuing offense, a defendant who has joined a conspiracy continues to violate the law 'through every moment of [the conspiracy's] existence.'" Smith v. United States, 568 U.S. 106, 111 (2013) (quoting Hyde v. United States, 225 U.S. 347, 369 (1912) (internal citation omitted)). The Government does not bear the burden "of proving the nonexistence of withdrawal"; the defendant, instead, bears the burden of establishing that he withdrew from a conspiracy. Id. at 112. Moreover, "[p]assive nonparticipation in the continuing scheme is not enough to sever the meeting of the minds that constitutes the conspiracy." Id. at 112-13. Instead, a defendant arguing withdrawal must show "'affirmative action . . . to disavow or defeat the purpose' of the conspiracy." Id. at 113 (quoting Hyde, 225 U.S. at 369).

Here, Murray has not proffered any evidence suggesting that he withdrew from the charged conspiracies. Moreover, the S5 Indictment alleges that the charged conspiracies continued "at least" through "in or about December 2016" (S5 Indictment (Dkt. No. 418) ¶¶ 9, 20) and the seizures at issue here were made on January 4, 2017, close in time to December 2016. Finally, the Government represents that "[t]here is ample evidence that Murray continued participating in the Blood Hound Brims through the date of his arrest in 2017 and beyond," citing his cell phones – which contain contact information for members of the Blood Hound Brims – and Murray's possession of "Blood Hound Brims paraphernalia." (Govt. Opp. Br. (Dkt. No. 483) at 9, 22-23)

Murray's motion in limine to preclude evidence of the seizures made from his Dover, Delaware residence will be denied. The seized items constitute direct evidence of the racketeering and narcotics conspiracies.

### C.    Photographs of Murray with Large Sums of Cash

Murray moves to preclude the Government from introducing "any photographs depicting [him] in possession of large amounts of cash." (Murray MIL (Dkt. No. 464) at 6) Murray anticipates that the Government will use such photographs to "argue that the money in [his] possession is drug proceeds." Murray contends that "the Government does not have a good faith basis to make such arguments," because he has been gainfully employed and has recovered money damages in several civil suits. (Id.)

"[P]roof of the availability of cash [to] defendants with no legitimate occupation is permitted as tending to show that it was derived from ill-gotten gains." United States v. Viserto, 596 F.2d 531, 536 (2d Cir. 1979) (citations omitted). Where there is "no affirmative evidence that the cash was derived from legitimate business," there is "sufficient relevance [in a narcotics case]" for the cash to be considered by a jury. Id.; see also United States v. Mejia, 376 F. Supp. 2d 460, 462 (S.D.N.Y. 2005). Murray's unsupported assertion that he has been lawfully employed, and has obtained judgments in civil suits, is not "affirmative evidence" that the cash he is shown with was derived from a legitimate source.

Murray's motion in limine to exclude photographs of himself with large amounts of cash is denied, without prejudice to Murray submitting additional evidence justifying reconsideration.

### III.    JOHNSON'S MOTION TO PRECLUDE CROSS-EXAMINATION REGARDING HIS CRIMINAL RECORD

Johnson requests that the Court, pursuant to Fed. R. Evid. 609, preclude the Government from cross-examining him about his August 4, 2000 felony convictions for attempted murder, manslaughter, and knowingly making or possessing dangerous contraband in

prison.[6] (Johnson MIL (Dkt. No. 468) at 19)  The Government asks that the Court reserve ruling on this request, because "the permissible use of Johnson's criminal record for cross-examination turns on the contents of any direct testimony that [Johnson] may offer." (Govt. Opp. Br. (Dkt. No. 483) at 43)  In the absence of a proffer concerning the substance of Johnson's proposed testimony, this Court will reserve decision on Johnson's motion.  See United States v. Weisberg, No. 08 Cr. 347 (NGG) (RML), 2012 WL 1714969, at *7 (E.D.N.Y. May 14, 2012) ("[B]oth parties agree that it is premature to rule on [the] admissibility [of other bad acts evidence] for the purposes of cross-examining Weisberg should he testify.  Accordingly, the court reserves decision on these aspects of Weisberg's motion."); United States v. Johnson, No. 16 Cr. 457-1 (NGG), 2017 WL 5125770, at *2 (E.D.N.Y. Sept. 21, 2017) ("Courts considering a motion in limine may reserve decision until trial, so that the motion is placed in the appropriate factual context." (citation omitted)).

## IV.  CO-CONSPIRATOR STATEMENTS

The Government seeks a ruling as to certain statements that it seeks to introduce as co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(E).  (Govt. MIL (Dkt. No. 469) at 23)  The statements at issue were "made by co-conspirators after the case was indicted and the declarants were incarcerated in federal prison" (id. at 23-24), and include the following:

(1) testimony from Cooperating Witness No. 1 about a conversation he had with Johnson about the Mandela Store Shooting;

(2) testimony from Cooperating Witness No. 3 about statements Murray made concerning a January 28, 2012 shooting at a Bronx Restaurant (the "Restaurant Shooting");

---

[6] Johnson completed his term of imprisonment for these convictions on June 26, 2009.  (Govt. MIL (Dkt. No. 469) at 17)  Accordingly, these convictions fall within the ten-year period specified in Fed. R. Evid. 609(b).

(3) testimony from Cooperating Witness No. 8 about a conversation he had with Johnson about the Restaurant Shooting;

(4) testimony from Cooperating Witness No. 1 about a conversation he overheard between Johnson and Cooperating Witness No. 2, in which Johnson expressed his belief that Cooperating Witness No. 2 was cooperating with the Government;

(5) testimony from Cooperating Witness No. 1 about Johnson's instruction to harm a suspected cooperator;

(6) testimony from Cooperating Witness No. 2 about a message relayed from Johnson, concerning Cooperating Witness No. 2's suspected cooperation;

(7) testimony from Cooperating Witness No. 2 about Johnson's plans to attack a Blood Hound Brims member who had joined a rival gang.

(Id. at 30-31, 34-35)

Defendants maintain that none of these statements – save that from Cooperating Witness No. 2 about the message relayed from Johnson concerning his suspected cooperation – are properly considered now, because "[m]ost of [the Government's] motion is directed to vague and non-specific categories of evidence, upon which no ruling could possibly be made until the Court and the defendants hear the questions and testimony in context." (Defs. Jt. Opp. Br. (Dkt. No. 482) at 9-10) Accordingly, Defendants urge the Court to reserve decision on the Government's motion. (Id. at 11)

### A. <u>Applicable Law</u>

Fed. R. Evid. 801(d)(2)(E) provides that a statement "offered against an opposing party and . . . made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay. To admit testimony pursuant to Rule 801(d)(2)(E), "the district court 'must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy.'" <u>United States v. Al-Moayad</u>, 545 F.3d 139, 173 (2d Cir. 2008)

(quoting United States v. Alameh, 341 F.3d 167, 176 (2d Cir. 2003)).[7] "The court must find these preliminary facts by a preponderance of the evidence." Id. (citing Bourjaily v. United States, 483 U.S. 171, 176 (1987)).

The requirement that a co-conspirator statement be made "during the course of a conspiracy" means "that the statement[] cannot be made after the cessation of the conspiracy or before its formation." United States v. Saneaux, 365 F. Supp. 2d 493, 499 (S.D.N.Y. 2005) (citations omitted). "Generally, a statement is not made in the course of a conspiracy when it is made after the main objective of the conspiracy has been accomplished." United States v. Arrington, 867 F.2d 122, 130 (2d Cir. 1989) (citation omitted). However, "[t]he fact that some of the conspirators have been indicted and incarcerated does not inexorably lead to the conclusion that the conspiracy has been terminated." Id. (citing United States v. Persico, 832 F.2d 705, 715-16 (2d Cir. 1987) ("That some of the conspirators had been indicted and were under arrest is unimportant; as some of the charges in this case indicate, the Colombo family was quite capable of continuing operations despite the fact that some of its members were incarcerated. Moreover, some members of the conspiracy found prison no obstacle to continuing their association with the enterprise. . . . In this type of enterprise, the mere imprisonment of some of its members does not precipitate the demise of the conspiracy."))

As for the requirement that a co-conspirator statement be made "in furtherance" of a conspiracy, "[t]he touchstone of the 'in furtherance' requirement is that the statement be

---

[7] "To find that a conspiracy existed, . . . the evidence need only show 'a likelihood of an illicit association between the declarant and the defendant.'" United States v. Lombardozzi, No. S1 02 Cr. 273 (PKL), 2003 WL 1956290, at *1 (S.D.N.Y. Apr. 24, 2003) (quoting United States v. Ragland, 375 F.2d 471, 477 (2d Cir. 1967)). "Once the prosecution has shown that a conspiracy exists, the evidence needed 'to link another defendant with it need not be overwhelming.'" United States v. Ginsberg, 758 F.2d 823, 828 (2d Cir. 1985) (quoting United States v. Provenzano, 615 F.2d 37, 35 (2d Cir. 1980)).

designed to promote the accomplishment of the conspiracy's goals." Saneaux, 365 F. Supp. 2d at 500; see also United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir. 1989) ("The principal question in the 'in furtherance' issue is whether the statement promoted, or was intended to promote, the goals of the conspiracy.") Accordingly, "'statements between co-conspirators that . . . inform each other as to the progress or status of the conspiracy'" are in furtherance of the conspiracy, United States v. Mulder, 273 F.3d 91, 103 (2d Cir. 2001) (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 958-59 (2d Cir. 1990)), as are statements that "provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness." Maldonado-Rivera, 922 F.2d at 959. Statements that "'prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity'" are also in furtherance of a conspiracy. United States v. SKT Metals & Alloys, Inc., 195 F.3d 83, 88 (2d Cir. 1999) (quoting Maldonado-Rivera, 922 F.2d at 958). However, "casual conversation about past events," "idle chatter" between co-conspirators, or "'merely narrative' descriptions by one coconspirator o[f] the acts of another" do not qualify as statements in furtherance of the conspiracy. United States v. Heinemann, 801 F.2d 86, 95 (2d Cir. 1986); United States v. Lieberman, 637 F.2d 95, 103 (2d Cir. 1980); United States v. Birnbaum, 337 F.2d 490, 495 (2d Cir. 1964).

B.    **Analysis**[8]

1.    **Cooperating Witness No. 1's Proposed Testimony Concerning
      Johnson's Statements Regarding Suspected Cooperators**

The Government seeks to introduce testimony from Cooperating Witness No. 1

concerning statements Johnson allegedly made regarding suspected cooperators. Cooperating

Witness No. 1 is prepared to testify that he overheard Johnson tell Cooperating Witness No. 2 –

another Blood Hound Brims member – that Johnson believed Cooperating Witness No. 2 was

cooperating with law enforcement, and that the next time Cooperating Witness No. 2 came to

Johnson's unit, Cooperating Witness No. 2 had better have "paperwork" demonstrating that he

was not cooperating. Statements that Johnson made are, of course, admissible against him as

admissions pursuant to Fed. R. Evid. 801(d)(2)(A).

Cooperating Witness No. 1 will also testify that when he was moved from the

Metropolitan Correctional Center ("MCC") to the Metropolitan Detention Center ("MDC"),

another Blood Hound Brims member named "Mitch" passed him a message from Johnson.

"Mitch" told Cooperating Witness No. 1 that Johnson had said that Cooperating Witness No. 2,

Murray, and another former Blood Hound Brims member named "Freaky" were cooperating

with law enforcement, and that Johnson had issued a "fire on sight" order as to Freaky. "Mitch"

also gave Cooperating Witness No. 1 Blood Hound Brim codes and gang paperwork. (Govt.

MIL (Dkt. No. 469) at 34)

Statements made "'to make sure [a co-conspirator does] not consider turning

against the conspiracy'" are admissible as co-conspirator statements, since they "'motivate [the

---

[8] The Court's rulings concerning the alleged co-conspirator statements cited by the Government
assume that the Government will, in fact, offer the evidence described in its motion. To the
extent that the evidence offered at trial differs from the Government's forecast, Defendants will
be permitted to object to the alleged co-conspirator statements.

individual's] continued participation'" in the conspiracy. See United States v. Arline, 660 F.

App'x 35, 41 (2d Cir. 2016) (quoting United States v. Carson, 455 F.3d 336, 367 (D.C. Cir.

2006)). Likewise, a "plot to silence [a] witness[ ]" is admissible as a co-conspirator statement,

because the plot "furthers the goals of the conspiracy in that the [conspiracy's objectives] would

be facilitated by the acquittal of all the defendants." Arrington, 867 F.2d at 130. Johnson's

alleged statements to Cooperating Witness No. 2 appear intended to "make sure [Cooperating

Witness No. 2 does] not . . . turn[] against the conspiracy," while Mitch's warning to

Cooperating Witness No. 1 concerning Cooperating Witness No. 2, Murray, and Freaky appears

designed to protect the gang and its members. The alleged "fire on sight" order regarding Freaky

constitutes "a plot to silence [a] witness." Accordingly, these statements are all admissible as co-

conspirator statements.

### 2.     Cooperating Witness No. 2's Proposed Testimony Concerning Johnson's Statements Regarding Suspected Cooperators

Cooperating Witness No. 2 is prepared to testify that a member of the MacBallas

gang told him that Johnson had said that Cooperating Witness No. 2 needed to produce

paperwork demonstrating that he was not a cooperator, and that if Cooperating Witness No. 2 did

not do so, he would be placed on probation. (Govt. MIL (Dkt. No. 469) at 34) Defendants point

out that the Government contends that the Blood Hound Brims and the MacBallas are fierce

rivals, and that accordingly a statement from a MacBallas gang member cannot qualify as a co-

conspirator statement. (Def. Jt. Opp. Br. (Dkt. No. 482) at 10)

The Government responds that "Rule 801(d)(2)(E) does not require that the

conspiracy between the declarant and the defendant be identical to any conspiracy that is

specifically charged in the indictment." (Govt. Reply Br. (Dkt. No. 495) at 9) The Government

further contends that "[h]ere, the declarant and Johnson were in a conspiracy to ferret out and

punish Brim gang members who were suspected of cooperating with the Government." (Id. at 10)

At this point, the only evidence the Government has proffered indicating that Johnson and the MacBellas gang member were participants in an uncharged conspiracy is the "hearsay statement itself." "'While the hearsay statement itself may be considered in establishing the existence of the conspiracy, "there must be some independent corroborating evidence of the defendant's participation in the conspiracy."'" Al-Moayad, 545 F.3d at 173 (quoting United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999) (quoting United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996)) Absent the "independent corroborating evidence," this statement is not admissible.

Cooperating Witness No. 2 is also expected to testify that Johnson confronted him at the MCC, told Cooperating Witness No. 2 that Johnson had been informed that Cooperating Witness No. 2 was cooperating, and demanded that Cooperating Witness No. 2 produce "paperwork" showing that this was not true. (Govt. MIL (Dkt. No. 469) at 34-35) This statement is admissible against Johnson as an admission, and is admissible against all Defendants as a co-conspirator statement, for the reasons explained above.

### 3. Cooperating Witness No. 2's Proposed Testimony Concerning Johnson's Statements Regarding a Blood Hound Brims Member's Decision to Join a Rival Gang

Cooperating Witness No. 2 is prepared to testify that while he and Johnson were at the MCC, Johnson told him that he and another Blood Hound Brims member "were trying to get close to a former BHB member," Briscoe, "in order to attack him," because Briscoe had joined the MacBallas without obtaining Johnson's permission. (Govt. MIL (Dkt. No. 469) at 35)

This statement is admissible against Johnson as an admission. This statement is also admissible against all Defendants as a co-conspirator statement. The S5 Indictment alleges that the means and methods of the charged racketeering enterprise include violence "in connection with rivalries with members of other street gangs, and against other BHB members to resolve disputes and foster gang discipline." (S5 Indictment. (Dkt. No. 418) ¶ 8(a)) Accordingly, Johnson's alleged statement was made in furtherance of the alleged racketeering conspiracy, and is admissible as a co-conspirator statement.

### 4. Cooperating Witness No. 3's Proposed Testimony Regarding Murray's Statements Concerning the January 28, 2012 Bronx Restaurant Shooting

Cooperating Witness No. 3, a former member of the Blood Hound Brims, will testify that, while he was incarcerated at the MDC, he overheard Murray and other Blood Hound Brims members speaking together in a common area. Gang members were teasing Murray about his age and about not having "put in work." In response to the teasing, Murray stated that he had participated in the Bronx Restaurant Shooting. (Govt. MIL (Dkt. No. 469) at 30)

Cooperating Witness No. 3 will also testify that, about a month later, Murray told Cooperating Witness No. 3 that he was the driver and Johnson was the shooter in the Bronx Restaurant Shooting. (Id. at 31)

These statements are admissible against Murray, both as admissions and as statements against penal interest, pursuant to Fed. R. Evid. 804(b)(3). The Government argues, however, that these statements are admissible against all Defendants as co-conspirator statements. (Id.)

According to the Government, Murray's statement directly to Cooperating Witness No. 3 was "intended to keep [a] co-conspirator[] 'abreast of current developments and

problems facing the group,'" and was designed "to foster trust and cohesiveness among the co-conspirators and to provide reassurance about the Gang's future despite the present prosecution." (Id.) However, where statements have been admitted pursuant to Rule 801(d)(2)(E) on an "update" theory, the statements related directly to ongoing illegal conduct by co-conspirators. See, e.g., United States v. Ciresi, 697 F.3d 19, 30 (1st Cir. 2012) (statements reporting the progress of an attempted bribe); United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000) (statements reporting a botched murder attempt that killed five children instead of intended victim); see also United States v. Flemmi, 402 F.3d 79, 94-95 (1st Cir. 2005) (admission that co-conspirator killed his stepdaughter kept defendant "abreast of current developments and problems" where defendant was charged with obstructing investigation concerning stepdaughter's death).

Similarly, statements admitted on a "building trust or reassurance" theory have generally related to ongoing or future criminal conduct. See, e.g., United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991) (statements concerning the murder of a drug debtor "warned members of [the gang] that a similar fate awaited those who failed to follow [the leader's] orders," and "may have promoted cohesiveness . . . and helped induce . . . member assistance in the affairs of the criminal enterprise"); United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987) (statements that "may reasonably be interpreted as an attempt [by a co-conspirator] to reassure [another co-conspirator]" of the former's "ability to produce heroin in the quantity he claimed" were admissible as co-conspirator statements). Here, Murray's statements do not relate either to (1) current developments or problems that the gang is facing; or (2) ongoing or future criminal conduct. Accordingly, Murray's statements made directly to Cooperating Witness No. 3 are not admissible as co-conspirator statements.

As to the statements that Cooperating Witness No. 3 overheard Murray making to other Blood Hound Brims members, the Government argues that these statements furthered the conspiracy by "promoting the reputation of the Gang and one its leaders, Murray." (Govt. MIL (Dkt. No. 469) at 32). Murray's statements allegedly "informed the listeners of Murray's activities on behalf of the gang," and "provided reassurance that Murray was a loyal gang member who could be trusted." (Id. at 33) (citations omitted).

The circumstances described by the Government do not support this characterization, however. In response to jokes and teasing about his age and purported lack of gang accomplishments, Murray boasts that he was involved in the Bronx Restaurant Shooting. Mere bragging about past criminal exploits does not constitute statements made to build trust or provide reassurance, however. See United States v. Zandstra, No. 00 Cr. 209 (RWS), 2001 WL 26211, at *3 (S.D.N.Y. Jan. 10, 2001) ("A conspirator discussing current criminal activity has much more of an interest in being careful about what is said and to whom than a statement about a completed scheme by a braggart who believes he has successfully evaded detection. It is only the former statement that is sufficiently reliable to constitute nonhearsay under Rule 801(d)(2)(E) and to warrant admission for the jury's consideration."). The cases cited by the Government – which do not involve bragging and "idle chatter" of the sort at issue here – prove this point.[9]

Murray's statements to other Blood Hound Brims members about his role in the Bronx Restaurant Shooting are admissible against Murray as admissions, but are not admissible as co-conspirator statements.[10]

---

[9] The Government cites United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1989) (admitting as a co-conspirator statement a defendant's admission that he was receiving extortion proceeds), and Simmons, 923 F.2d at 945 (2d Cir. 1991), which is discussed above.

[10] To the extent that this Court has ruled that certain evidence cannot be admitted as a co-conspirator statement, defense counsel is invited to submit proposed limiting instructions.

### 5. Cooperating Witness No. 8's Proposed Testimony Regarding Johnson's Alleged Recruitment Effort

Cooperating Witness No. 8 – who was not a Blood Hound Brims member, but instead was a member of the Crips and a Bronx street gang – will testify that in late 2016 or early 2017 – while he and Johnson were at the MCC – Johnson asked him to join the gang. The two men discussed violent acts they had committed. Johnson disclosed that he had committed the Bronx Restaurant Shooting and shot a man in the "Mandela Deli," but had missed. (Govt. MIL (Dkt. No. 469) at 31) Johnson's statements are admissible against him as admissions and as statements against penal interest. The Government contends, however, that Johnson's admissions qualify as co-conspirator statements, because he "was using his history of violence to try to recruit [Cooperating Witness No. 8] to join the Gang," and his statements to Cooperating Witness No. 8 were "aimed at 'prompt[ing] the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity.'" (Id. at 33 (quoting United States v. Maldonado-Rivera, 922 F.3d 924, 958 (2d Cir. 1990)).

"'[E]fforts to recruit [others] into the conspiracy [are] 'in furtherance' of the conspiracy because they are intended to achieve the conspiracy's goals.'" Saneaux, 365 F. Supp. 2d at 500 n.7 (quoting United States v. Sanin, 113 F.3d 1230 (2d Cir. 1997) (unpublished)); see also United States v. Shea, 211 F.3d 658, 668 (1st Cir. 2000) ("statements . . . seemingly made for such purposes as recruiting new members into the conspiracy" were in furtherance of the conspiracy); United States v. Gardner, 447 F.3d 558, 560 (8th Cir. 2006) ("In general, statements by coconspirators concerning . . . their efforts to recruit other conspirators are admissible as in furtherance of the conspiracy."). Assuming that a reasonable jury could infer from Cooperating Witness No. 8's testimony that Johnson's purpose in recounting the Bronx Restaurant Shooting and the shooting at the "Mandela Deli" was to recruit Cooperating Witness No. 8 to the Blood

Hound Brims, Johnson's statements to Cooperating Witness No. 8 qualify as co-conspirator statements.[11]

## C.  **Rule 403**

As discussed above, Fed. R. Evid. 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of, [inter alia,] unfair prejudice." Where uncharged conduct is at issue, an important consideration in conducting this inquiry is whether the evidence at issue is "more inflammatory than the charged crime." Paulino, 445 F.3d at 223 (citation omitted).

To the extent that the Court has decided to admit the co-conspirator statements identified by the Government, it has considered whether the statements at issue present a risk of unfair prejudice. In a case replete with charged conduct involving acts of violence – including assaults, robberies, and attempted murders (see S5 Indictment (Dkt. No. 418)) – none of the statements at issue are "more inflammatory than the charged crime[s]." Moreover, the statements discussed by the Court have substantial probative value, for the reasons explained. The Court concludes that Rule 403 presents no barrier to the admission of the co-conspirator statements that the Court has approved.

---

[11] As to Cooperating Witness No. 1's proposed testimony concerning Johnson's statements regarding the Mandela Store Shooting, the Government has not demonstrated that these statements were made in furtherance of the charged conspiracies. To the extent that Johnson told Cooperating Witness No. 1 that gang members were "head-hunting for Mandela" – and the Government lays a foundation for why Cooperating Witness No. 1 understood that comment to mean that gang members were searching for Mandela because of his cooperation with law enforcement – this statement of Johnson is admissible as a co-conspirator statement, because it "inform[ed] [Cooperating Witness No. 1] as to the progress or status of the conspiracy."

## V.    EVIDENCE OF INCARCERATION

The Government has moved in limine to introduce evidence that would reveal that the Defendants were incarcerated during portions of the charged racketeering conspiracy. This evidence includes proof of the Defendants' management of the Blood Hound Brims from prison; recruitment of inmates; recorded calls from prison; and prison visitor and financial records. (Govt. MIL (Dkt. No. 469) at 17-18) Defendants argue that admitting evidence of prior incarceration creates "unnecessary prejudice" to Defendants and will "deal[] a near death blow to the presumption of innocence." (Def. Jt. Opp. Br. (Dkt. No. 482) at 6)

### A.    Applicable Law

In this Circuit, proof of incarceration in racketeering cases is introduced – not pursuant to Rule 404(b) – but rather as "evidence of the very racketeering crimes charged." United States v. Coppola, 671 F.3d 220, 245 (2d Cir. 2012) (citations omitted). Such proof is often introduced as necessary background to the conspiracy, see, e.g., United States v. Ashburn, No. 11 Cr. 0303 (NGG), 2015 WL 862118, at *1-2 (E.D.N.Y. Feb. 27, 2015) (permitting detective's testimony concerning interview of defendant at Rikers Island, where defendant admitted that he knew a co-conspirator when presented with prison visitor log showing co-conspirator's name; finding that defendant's "incarceration at Rikers . . . is inseparable from and thus inextricably intertwined with this evidence"; because the prior incarceration constituted "direct evidence of the relationship between [the] co-conspirators," the prejudicial effect of the evidence did not substantially outweigh its probative value); United States v. Rodney Johnson, No. S5 10 Cr. 431 (CM), 2013 WL 6091601, at *3 (S.D.N.Y. Nov. 15, 2013) (deeming testimony from a cooperating witness about his incarceration with the defendant prior to the charged conspiracy "a classic instance of background evidence that is necessary to . . . begin the

story that will be told at the trial"); or to explain how a relationship of trust developed amongst the defendants, see, e.g., United States v. Faison, 393 F. App'x 754, 759 (2d Cir. 2010) (approving testimony from defendant's co-conspirator that the two had shared a cell in prison; "[d]istrict courts have 'discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators'" (quoting United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 2003)); or where evidence of incarceration is reflected in communications between co-conspirators, see, e.g., United States v. Guang Ju Lin, 505 F. App'x 10, 12 (2d Cir. 2012) (upholding admission of "ten telephone calls between Lin and two associates identified by the Government as members of his criminal enterprise that were recorded while Lin was incarcerated and awaiting trial"; calls were "evidence of the continued operation of Lin's criminal enterprise"); Ashburn, 2015 WL 862118, at *3 (admitting "evidence of emails and prison calls recorded while [defendant] and his co-defendants ha[d] been imprisoned pending trial in [the instant] case"; evidence "establish[ed] that the [d]efendants have been communicating with others, as well as with other members of the [gang]").

Before deciding to admit such evidence, "the court must engage in the balancing test prescribed by Rule 403." Ashburn, 2015 WL 862118, at *2.

Where evidence of incarceration is introduced, there is typically no proof admitted as to the reason for the defendant's incarceration. See, e.g., United States v. Mauro, 80 F.3d 73, 76 (2d Cir. 1996) ("The court permitted the government only to reveal that Mauro was in prison, and not the reason for his incarceration.") A limiting instruction is often given. See,

e.g., Faison, 393 F. App'x at 759 ("[T]he district court instructed the jury that they should consider the evidence for those [proper] purposes only.").

**B.    Analysis**

Here, the Government argues generally that "[e]vidence of the defendants' incarceration is necessary for the jury to understand the charged conduct," because "the story of a prison gang cannot be told without reference to prison. The fact and timing of BHB members' periods of incarceration form an essential part of the story of the racketeering conspiracy, because the Gang originated in the NYS prison system and because BHB members' moves in and out of jail both mark and cause changes in the leadership structure and operation of the Enterprise." (Govt. MIL (Dkt. No. 469) at 20)  The Government also cites the gang's payments to and communications with gang members in prison, and its smuggling of drugs and weapons into prison, in asserting that the Blood Hound Brims' "street and prison operations were so wholly intertwined that the story of the Enterprise will not make sense without reference" to the Defendants' periods of incarceration.  (Id. at 20-21)

Defendants' primary argument against the Government's introduction of prior incarceration evidence is that it is "pervasive" and "extensive."  (Def. Jt. Opp. Br. (Dkt. No. 482) at 6, 7, 8)  Defendants argue that "[p]ervasive evidence of incarceration creates a unique threat of prejudice that [a]ffects due process," and request that such evidence be admitted only "where no evidentiary alternatives exist."  (Id. at 7)  Defendants do not explain where "evidentiary alternatives exist," however.

The Court considers below – as to each Defendant – the admissibility of evidence revealing past incarceration.

### 1. **Defendant Johnson**

Defendant Johnson was incarcerated for more than half of the time between 2005 and December 2016, when the racketeering conspiracy allegedly existed. (See S5 Indictment (Dkt. No. 418) ¶ 9) Between 2005 and June 2009, Johnson was detained in state prison. Following a parole violation, he was incarcerated again between September 2009 and September 2011. Between December 2014 and May 2016, Johnson was held at Rikers Island. Between May 2016 and the present, Johnson was in federal custody. (Govt. MIL (Dkt. No. 469) at 17)

The Government maintains that the evidence will show that Johnson founded the Blood Hound Brims while he was incarcerated in state prison; continued to run the organization from prison; and recruited inmates to join the gang while in prison. (Id. at 17-18) The Government contends that evidence of incarceration is also necessary to "help the jury understand why [Johnson] was not always physically present at pow-wows and for other 'street' gang activity during significant portions of the charged conspiracy." (Id. at 20) Finally, the Government intends to introduce a "jailhouse confession[]" that Johnson made to a cooperating witness, which "will necessarily reveal that [he] w[as] incarcerated prior to trial." (Id. at 21)

Defendants' arguments concerning the "pervasive" nature of this proof apply with particular force to Johnson, who was incarcerated for more than half of the eleven-year period that the racketeering conspiracy allegedly existed. Johnson's prior incarceration is central to the Government's proof here, however. According to the Government, Johnson founded the Blood Hound Brims while in prison; led the gang from prison; and recruited members of the gang while in prison.

For example, the Government will introduce "testimony from cooperating witnesses about being recruited to [the Blood Hound Brims] by Johnson while he was

incarcerated." (Govt. MIL (Dkt. No. 469) at 18) This evidence will be instrumental in explaining "'how the illegal relationship between participants in the crime developed, [and why] mutual trust . . . existed between coconspirators.'" Faison, 393 F. App'x at 759 (quoting Rosa, 11 F.3d at 334)) In sum, Johnson's alleged role in and activities on behalf of the Blood Hound Brims is inextricably intertwined with his prior periods of incarceration.

The Court has also considered whether the prior incarceration evidence is admissible under Rule 403. While evidence of prior incarceration always carries some prejudicial taint, here the Court is persuaded – for the reasons explained above – that the probative value of this evidence is not substantially outweighed by a danger of unfair prejudice to Johnson. To ensure that Johnson suffers no unfair prejudice, no evidence as to the reasons for Johnson's prior incarcerations is to be offered during the Government's direct case.

The Government's motion in limine to introduce evidence of prior incarceration is granted as to Defendant Johnson. Johnson's counsel will submit an appropriate limiting instruction.

## 2. **Defendant Murray**

Defendant Murray was arrested in the instant case on January 13, 2017, and has been detained ever since. (Govt. MIL (Dkt. No. 469) at 17; Bail Disposition Sheet (Dkt. No. 74)) As discussed above, Cooperating Witness No. 3 – who has been incarcerated with Murray – will testify that he overheard Murray telling other Blood Hound Brims in prison that he participated in the Bronx Restaurant Shooting. Murray later told Cooperating Witness No. 3 – again while they were together in prison – that he was the driver for the Bronx Restaurant Shooting and Johnson was the shooter. (Govt. MIL (Dkt. No. 469) at 21, 30-31)

The prison context for these conversations is important. It explains why (1) the participants in the conversation are together; (2) there is a relationship of trust between them; and (3) Murray is repeatedly discussing an incident that took place five years earlier.

I conclude that the probative value of this incarceration evidence is not "substantially outweighed by a danger of . . . unfair prejudice [to Murray]." Fed. R. Evid. 403. Accordingly, the Government's motion in limine to admit evidence of Murray's incarceration is granted. Murray's counsel will submit an appropriate limiting instruction.

### 3.     Defendant Green

Defendant Green was incarcerated in a federal prison between 2005 – when the alleged racketeering conspiracy began – and October 2006. He has been detained in the instant case since his May 2017 arrest. (Govt. MIL (Dkt. No. 469) at 17; Bail Disposition Sheet (Dkt. No. 105))

According to the Government, "Green's brief period of incarceration during the beginning of the charged conspiracy is an integral part to the story of how he became one of BHB's leading heroin suppliers." (Govt. MIL (Dkt. No. 469) at 21) The Government's cooperators – former members of the Blood Hound Brims – will testify that "other BHB members told them that Green became connected to his heroin supplier when he was incarcerated." (Id.)

Evidence of how Green met his heroin connection is relevant background to both the racketeering and narcotics conspiracies. After all, the lifeblood of the Blood Hound Brim's criminal activity was drug trafficking (see S5 Indictment (Dkt. No. 418) ¶¶ 7(a), 8(c), 9(d), 17-19), and the Government will offer evidence that Green was the gang's "leading heroin supplier." (Govt. MIL (Dkt. No. 469) at 21)

And in contrast to other cases in which the Government may have overwhelming evidence of large scale drug trafficking – such as seizures of large quantities of drugs and/or taped evidence, see, e.g., United States v. Barret, No. S3 10 Cr. 809 (KAM), 2011 WL 6704862, at *11-12 (E.D.N.Y. Dec. 21, 2011), aff'd, 677 F. App'x 21 (2d Cir. 2017) – there is no such evidence against Green. No large quantity of drugs was seized from Green at the time of his arrest or at any other time, and – to the Court's knowledge – he does not appear on any taped calls or videos. Accordingly, the evidence at issue is not cumulative.

Evidence of rumors within the Blood Hound Brims about how Green met his heroin connection does not meet the test for admissibility under Rule 403, however. The Government's proffer does not explain how the Blood Hound Brims who spoke about Green's heroin connection knew that they had met in prison. And the alleged heroin source is not identified. When the limited probative value of this evidence is measured against the prejudicial taint Green will suffer – including the risk that the jury will speculate as to why he was previously imprisoned – it is clear that the balancing test for admissibility under Rule 403 is not satisfied. The Government's motion in limine is denied as to evidence of Green's prior incarceration.

## VI.    RAP VIDEO EXCERPTS

The Government has moved in limine to introduce excerpts from a rap video. (Govt. MIL (Dkt. No. 469) at 37) The Government states that Cooperating Witness No. 1 will testify that, during the period of the charged racketeering conspiracy, Johnson directed certain members of the Blood Hound Brims to participate in the filming of a rap video. The Government claims that in the video a Blood Hound Brims "associate" – "China Mac" – raps

about Johnson, the gang, and acts of violence committed by the gang. (Govt. MIL (Dkt. No. 469) at 37)

The Government seeks to introduce two excerpts from the rap video, which is entitled "01-100 Freestyle."[12] The Government represents that Johnson, Cooperating Witness No. 1, and another Blood Hound Brims member – Eric Grayson – appear in the video. According to the Government, Johnson makes hand gestures that correlate with certain lyrics, including a Blood Hound Brim gang sign, a "one-handed 'pistol' gesture," and a "two-handed gesture as if . . . holding a large gun or assault rifle." (Id. at 38)

The lyrics from the first excerpt are as follows:

> Yo, they want to know who the man behind the mask is
> And if he really down to do all that his rap says
> See, I ain't no mother fucking fool, I ain't no crash dummy
> But if he's trying to kill me, I'm gonna blast homie
> And teach my kids by any means like they was Malcolm X
> I'm not promoting violence. I'm preaching self-defense.
> So any time these motherfuckers wanna oppress
> And leave my brother's blood stain on my mother's dress
> I'm gonna pick up the AK and shoot away
> Pucka, Pucka, Pucka, Pucka, Pucka – Words of Little Fame.

(Id. at 37-38)

The lyrics from the second excerpt are as follows:

> I just made a phone call, got La on Lenox
> And he brought his whole team of G5 on Lenox.

(Id. at 38)

The Government contends that these lyrics are co-conspirator statements made in furtherance of the racketeering conspiracy, or are adoptive admissions. According to the Government, the purpose of the lyrics "was to promote the Gang and to warn rival gangs not to

---

[12] The first excerpt is thirty-nine seconds long; the second excerpt is five seconds long. (Id.)

attempt any acts of violence against BHB due to the risk of retribution," and the video had the effect of "promot[ing] the trust and cohesion among the members of the gang." (Id. at 43)

Defendants object to introduction of these excerpts from the rap video, arguing that "the lyrics have no concrete connection to any charged activity in this case." (Def. Jt. Opp. Br. (Dkt. No. 482) at 12) Defendants further contend that admission of the video would be unduly prejudicial, because of the references to violence. (Id. at 12, 16) Finally, Defendants argue that the lyrics are neither co-conspirator statements nor adoptive admissions. (Id. at 17)

The Court concludes that the Government has not demonstrated that the lyrics contain any direct references to the Blood Hound Brims or to gang activity. While the lyrics appear to have little to no probative value, the references to violence and possible allusions to police misconduct, and the use of profanity, present a risk of unfair prejudice to the Defendants. Accordingly, the rap video excerpts are excluded both as irrelevant and as more prejudicial than probative under Rule 403. The Government's motion in limine is denied as to the excerpts from the rap video. See United States v. Herron, No. 10 Cr. 0615 (NGG), 2014 WL 1871909, at *4 (E.D.N.Y. May 8, 2014) ("[C]ircuit courts have admonished trial judges against admitting rap videos or lyrics with merely a tenuous connection to the defendant or issues in the case").[13]

---

[13] Green has moved in limine to preclude the Government from introducing any of the thirteen rap videos and corresponding transcripts the Government produced to Defendants during discovery. (Green MIL (Dkt. No. 460) at 1) The Government has represented that it "has no present intention to offer any of the other rap videos produced to the defendants in discovery . . . . However, should Green raise certain defenses at trial, the Government would anticipate offering excerpts of videos featuring Green that show BHB members appearing to engage in drug transactions and the manufacturing and packaging of drugs." (Govt. MIL (Dkt. No. 469) at 46 n.12) In light of the Government's representations, Green's motion is denied as moot. In the event that Green decides to testify, and the Government intends to use the videos referenced above for purposes of cross-examination, the issue will be revisited.

## VII.   MURRAY'S AUGUST 14, 2010 ARREST

NYPD Officer Abraham Villavizar and his partner conducted a traffic stop of Defendant Murray on August 14, 2010. The officers claimed that Murray had failed to signal before making a right turn. According to Officer Villavizar, when asked to produce his driver's license, Murray "produced a letter of some form that stated restrictions on his license," and that did not authorize him to drive a vehicle under the circumstances. (GX 3517-05 at 409, 414, 457) Officer Villavizar issued a summons to Murray for unlicensed operation of a motor vehicle. A hostile crowd began to gather at the scene, and officers took Murray and the vehicle back to the 47th Precinct. (Id. at 419-20, 468) Officer Villavizar maintains that he did an inventory search of the vehicle and recovered a firearm. (Id. at 477-78, 483-84) Murray was charged with criminal possession of a weapon, but the criminal case against him was dismissed. (GX 3517-04 at 139, 144-45; Govt. MIL (Dkt. No. 469) at 46)

Murray subsequently filed a Section 1983 lawsuit against the City of New York, Officer Villavizar, and Officer Villavizar's partner alleging, inter alia, false arrest, malicious prosecution, illegal search, and excessive force. (Govt. MIL (Dkt. No. 469) at 46) A state court judge granted defendants summary judgment, but that decision was reversed on appeal. Murray v. City of New York, 154 A.D.3d 591 (1st Dept. 2017) The City subsequently entered into a settlement with Murray that resolved this lawsuit and two other pending lawsuits brought by Murray against the City and other NYPD officers. (Govt. MIL (Dkt. No. 469) at 47)

The Government has moved in limine to preclude "cross-examination . . . regarding the allegations" in Murray's lawsuit concerning the traffic stop "or [the] merits of [Murray's] claim[s]" in that lawsuit, on the grounds that these matters "are totally irrelevant to the crimes alleged in this case and are highly prejudicial and completely unfounded." (Id.)

Meanwhile, Defendant Murray has moved in limine to preclude evidence of the firearm and ammunition recovered at the time of his August 14, 2010 arrest, arguing, inter alia, that a state court judge issued an order suppressing this evidence as having been seized in violation of his Fourth Amendment rights. (Murray MIL (Dkt. No. 464) at 3-4)

## A.    Murray's Motion to Preclude

According to Murray, he "was arrested and charged in [s]tate [c]ourt for this weapon [which Officer Villavizar seized]. However, the firearm was suppressed because it was seized without probable cause. . . . Moreover, [Murray] brought a civil lawsuit alleging that his civil rights were violated. The civil lawsuit settled and the City of New York paid [him] a sum of money to dispose of that lawsuit." (Murray MIL (Dkt. No. 464) at 3)

Although Murray contends that "the firearm was suppressed because it was seized without probable cause," there is no evidence that the firearm was the subject of a suppression order in state court.[14] After the parties submitted their motions in limine, the Court ordered Murray and the Government to produce "[a]ll documents concerning the state criminal case against Defendant Murray" stemming from the August 14, 2010 arrest, as well as "[a]ll documents concerning the subsequent civil action Defendant Murray filed." (See Order (Dkt. No. 474))

On January 22, 2019, Murray's counsel submitted a letter stating that "[t]he only documentation [he] ha[s] is (1) a copy of a summons; and (2) one page of a 2-page affidavit that was apparently from Mr. Murray." (Jan. 22, 2019 Konoski Ltr. (Dkt. No. 516)). The Government produced voluminous documentation concerning the August 14, 2010 arrest and

---

[14]  Murray's counsel conceded as much at the final pretrial conference on February 15, 2019. (February 15, 2019 Conf. Tr. at 10-11)

Murray's subsequent civil suit. Those documents show that state prosecutors moved for dismissal of the charges against Murray before the case against him was presented to a grand jury. Although Murray's motion in limine is premised on the notion that the firearm for which he was charged in state court was ordered suppressed, there is no such indication in the state court files.

To the extent Murray suggests that this Court should now exclude the firearm as the fruit of an unconstitutional search,[15] any such motion has been waived. See United States v. Howard, 998 F.2d 42, 52 (2d Cir. 1993) ("The failure to file a timely motion [to suppress] constitutes a waiver."); see also United States v. Wilson, 11 F.3d 346, 353 (2d Cir. 1993) (finding waiver where defendant filed suppression motion three weeks after court-imposed deadline for such motions).

The Government provided Murray with records concerning his August 14, 2010 arrest in January 2017. (See Govt. Opp. Br. (Dkt. No. 483) at 21) The deadline for filing pretrial motions – including motions to suppress – was October 27, 2017. (See Order (Dkt. No. 103)) Murray timely filed a motion to suppress concerning evidence seized from his Delaware

---

[15] Murray's arguments for preclusion in his motion in limine are confused, and include elements of Rules 401, 403, and 404(b), as well as a suggestion that the firearm may have been unlawfully seized. Murray states that his "motion to preclude is made on the basis that the probative value of the . . . firearm possession charge of 8/14/2010, is outweighed by its potential for unfair prejudice. Fed. R. Evid. 403, 404(b). . . . Since the gun and ammunition was seized illegally and without probable cause, the Government should never have been in possession of this evidence. Permitting the Government to now use this evidence a[t] trial would be unduly prejudicial and may create a collateral issue at trial (i.e., whether the seizure of the firearm was lawful). Moreover, such evidence is irrelevant, i.e., it does not tend to make a consequential fact more or less probable." (Murray MIL (Dkt. No. 464) at 3-4) At the final pretrial conference on February 15, 2019, Murray's counsel argued that the firearm should be suppressed because it was the product of an unconstitutional search. (Feb. 15, 2019 Conf. Tr. at 12)

residence in January 2017. (See Mot. (Dkt. No.149)) He did not move to suppress the firearm seized on August 14, 2010.

Although "a district court may grant relief from [a] waiver upon a showing of (1) good cause for the defendant's non-compliance; and (2) actual prejudice arising from the waiver," Howard, 998 F.2d at 52, Murray has not demonstrated good cause for his delay in moving to suppress the firearm seized on August 14, 2010.[16] Accordingly, Murray's motion in limine to preclude evidence of the firearm and ammunition seized on August 14, 2010 is denied.

### B.  Limitations on Cross-Examination Regarding Murray's Civil Suit

As discussed above, on November 1, 2011, Murray filed a Section 1983 lawsuit in Bronx County Supreme Court against the City of New York, Officer Villavizar, and Officer Villavizar's partner arising out of his August 14, 2010 arrest. (GX 3517-05 at 7-12) The trial court granted the City and the officers summary judgment, but the First Department reversed. See Murray v. City of New York, 154 A.D.3d 591 (1st Dept. 2017).

The First Department found that "[t]he parties' differing versions of the events leading up to [Murray's] arrest, including whether [Murray] produced a driver's license and registration, present a triable issue of fact whether the individual defendants had probable cause to arrest him and to impound and search his car." Id. (citations omitted).

As to the malicious prosecution claims, the court concluded that

the triable issues of fact as to probable cause for the initial arrest and search, viewed in conjunction with plaintiff's claim that an officer planted the gun in the car and the record evidence of possible retaliation against him by members of the

---

[16] In an October 10, 2018 letter to Defendants, the Government provided additional notice of its intent to introduce evidence concerning Murray's August 14, 2010 arrest: "[T]he Government anticipates introducing evidence at trial regarding the . . . firearms possession of the defendants," including "Murray's possession of a loaded firearm . . . on or about August 14, 2010." (See Oct. 10, 2018 Govt. Ltr. at p. 4 & ¶ 12) Despite this notice, Murray did not move to suppress the firearm at that time.

[47th] precinct, present issues of fact as to probable cause to bring the weapon possession charge and actual malice.

(Id. at 591-92) (citation omitted).

Finally, as to qualified immunity, the First Department found that

in view of the factual disputes as to whether the officers had probable cause to arrest [Murray] and impound the car and [Murray's] allegations that the officers in the 47th Precinct had been engaging in a pattern of harassment against him for years and had planted the gun in the car, questions exist as to whether the officers knowingly violated the law.

(Id. at 592) (citation omitted).

Although the Government concedes that aspects of Murray's lawsuit are relevant,

it has moved in limine to preclude "cross-examination . . . regarding the allegations" in Murray's

lawsuit "or [the] merits of [Murray's] claim[s]":

The existence of the civil lawsuit could be relevant to inquiries into Officer Villavizar's potential bias against Murray as a result of that suit. In addition, prior statements Officer Villavizar made during the course of the lawsuit regarding the events of August 14, 2010 are fair game for cross-examination to the extent that they may be inconsistent with his testimony. However, any cross-examination of Villavizar regarding the civil suit should be extremely limited in scope and duration so as to avoid a mini-trial on a tangential, potentially prejudicial, and misleading topic. In particular, cross-examination of Villavizar regarding the allegations in the lawsuit or merits of the defendant's claims should be precluded. The nature of the defendant's lawsuit, and the allegations, and the proceedings that occurred during that suit are totally irrelevant to the crimes alleged in this case and are highly prejudicial and completely unfounded. A lawsuit is merely an allegation, and this lawsuit was settled without any judicial finding or admission of wrongdoing. Thus, allowing cross-examination of Officer Villavizar regarding the allegations in the lawsuit, in particular, unfounded allegations that the NYPD had a pattern of harassing Murray or that the search was illegal, would risk unfairly prejudicing the jury and could sow potential confusion about the issues properly before the jury.

(Govt. MIL (Dkt. No. 469) at 47-48)

In their opposition, Defendants argue that the firearm was "'planted'" by Officer

Villavizar and that, in any event, there was no probable cause for the traffic stop and the search

of Murray's vehicle. Given these circumstances, Defendants argue that they "should be permitted broad latitude in cross-examining [Officer Villavizar]. . . . Any alleged misconduct perpetrated by PO Villavizar and other officers present at the time of the stop, including whether they lacked probable cause and illegally stopped and arrested Mr. Murray, bears on the witness's overall credibility and is highly probative to the issue of whether Mr. Murray possessed a gun on that day." (Def. Jt. Opp. Br. (Dkt. No. 482) at 20, 22)

Murray's counsel also states that he is contemplating introducing evidence that Murray was the victim of "on-going harassment by members of the 47th Precinct" "as a result of bringing numerous civil lawsuits against police officers." (Id. at 23 & n.11) Murray contends that he

> should be permitted to question PO Villavizar about [his] lawsuit against him, as well as lawsuits against other officers. Moreover, Mr. Murray should be permitted to cross-examine other law enforcement officers regarding their knowledge of other lawsuits brought by Mr. Murray against police officers that were members of the 47th Police Precinct.

(Id. at 23)

As an initial matter, this Court will permit broad cross-examination of Office Villavizar regarding the circumstances of the traffic stop and recovery of the firearm on August 14, 2010. Defense counsel will be allowed to challenge Officer Villavizar's account of the justification for the traffic stop, Murray's failure to produce a proper license, and discovery of the gun. Cross-examination regarding Murray's lawsuit concerning this incident is also relevant, because it goes to Officer Villavizar's potential bias. Accordingly, Murray will be permitted to elicit from Oficer Villavizar that Murray accused Officer Villavizar of violating his constitutional rights through false arrest, malicious prosecution, excessive force, and illegal search and seizure. While the fact that the lawsuit has been resolved may be elicited, the court decisions and the ultimate settlement are not to be alluded to. The Court finds that introducing

details regarding the court decisions and settlement present a significant risk of jury confusion and have little probative value. Accordingly, these matters are excluded under Rule 403.

As to questioning regarding the 47th Precinct's alleged ongoing harassment of Murray, it is not clear that Murray will pursue such questioning. (See id. at 23 n.11) While questioning of Officer Villavizar on this point might be appropriate – as relevant to his motive for pulling over Murray and overall credibility – such questioning directed to law enforcement officers who have no connection with the 47th Precinct would appear to be a waste of time. The Court's understanding is that 47th Precinct officers played no part in the investigation of the instant case. The Court reserves decision on the permissibility of questioning about the 47th Precinct's alleged harassment of Murray pending a further offer of proof from defense counsel and disclosure from the Government as to whether additional officers from the 47th Precinct will testify at trial.

## VIII.  CHEMIST TESTIMONY

Defendant Green was arrested on August 3, 2010, and was found in possession of cocaine. Green seeks to preclude chemist testimony concerning this cocaine, arguing that the Government's production of the chemist report was tardy. (Jan. 17, 2019 Green Ltr. (Dkt. No. 477); Jan. 28, 2019 Green Ltr. (Dkt. No. 491)).

Green acknowledges that the Government properly gave notice of its intention to introduce evidence of Green's August 3, 2010 arrest at trial. Green also acknowledges that the Government produced a lab report and accompanying chemist notes on December 20, 2018. Green complains that the Government did not identify the chemist expected to testify concerning the lab report until January 16, 2019, however, and asserts that the lab report and underlying notes contain language that Green's counsel "cannot hope to interpret without our own expert

assistance." (Id. at 1-2)  The language cited by Green reads: "not confirmed. Due to: spectrum not sufficiently similar." (Jan. 17, 2019 Green Ltr. (Dkt. No. 477) at 2; Jan. 28, 2019 Green Ltr. (Dkt. No. 491) at 2)

The Court's review of the lab report and underlying notes reveals that the substance recovered from Green on August 3, 2010, was originally tested for the presence of cocaine. (See Jan. 23, 2019 Govt. Ltr., Ex. 3 (Dkt. No. 488-1) at 15; id., Ex. 4 at 20)  The chemist found that the substance recovered from Green was cocaine, and weighed 29.942 grams. (Jan. 23, 2019 Govt. Ltr., Ex. 3 (Dkt. No. 488-1) at 15)  The substance was later reanalyzed for the presence of cocaine base, commonly known as "crack."  The reanalysis for cocaine base came back "not confirmed." (Id., Ex. 4 at 20)

At a January 23, 2019 conference, the Government explained that NYPD forensic chemists typically do not determine whether a suspected drug sample is cocaine or cocaine base. They merely test for the presence of cocaine.  Accordingly, the Government requested that the substance obtained from Green be re-tested for the presence of cocaine base.  The re-test result was that the presence of cocaine base was "not confirmed."   (See Jan. 23, 2019 Hearing Tr. (Dkt. No. 509) at 38, 42)

The Court finds that the Government's disclosure of these lab results was proper. Green received notice of the lab report two months before trial, and notice of the Government's expert a month before trial.  The lab report and the accompanying notes are not difficult to interpret.  They clearly indicate that an initial test was performed that was positive for cocaine, and that a subsequent reanalysis for cocaine base came back "not confirmed."  The request to preclude the chemist's testimony is denied.

## IX.    SUMMARY CHARTS

The Government requests that I permit the introduction of summary charts reflecting voluminous jail records. While the introduction of such summary charts may be proper, the Court cannot rule on the admissibility of summary charts and related witness testimony until the charts have been produced to the Court and defense counsel, and the nature of the underlying evidence has been made clear. Accordingly, the Court reserves decision on the Government's application.

## X.    LIMITATIONS ON CROSS-EXAMINATION OF GOVERNMENT WITNESSES

The Government has moved <u>in limine</u> to limit the scope of cross-examination of certain of its cooperating witnesses and law enforcement witnesses. (Govt. MIL (Dkt. No. 469) at 49-51, 55-57)

### A.    Applicable Law

Federal Rule of Evidence 608(b) provides that generally, "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b). Rule 608(b) "leaves the admissibility of extrinsic evidence offered for other grounds of impeachment (such as contradiction, prior inconsistent statement, bias, and mental capacity) to Rules 402 and 403." Fed. R. Evid. 608(b) Committee Notes on Rules – 2003 Amendment.

Federal Rule of Evidence 611(a) provides that "[t]he court should exercise reasonable control over the mode . . . of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (b) avoid wasting time; and (3)

protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a). Rule 611(b), in turn, provides: "Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility." Fed. R. Evid. 611(b).

**B.    Analysis**

**1.    Cooperating Witness No. 5**

Cooperating Witness No. 5 has admitted that he masturbated in front of a female corrections officer and in front of female inmates while in state custody. His misconduct is outlined in a March 2017 disciplinary report and in proffer notes that have been produced to Defendants. The Government seeks to preclude Defendants from cross-examining Cooperating Witness No. 5 about this misconduct, on the grounds that it is not probative of his character for truthfulness. (Govt. MIL (Dkt. No. 469) at 52-53) Defendants oppose this request, arguing that this witness's misconduct -- which took place after he began cooperating with the Government -- gives him "a special motive for seeking the government's support by testifying favorably for the prosecution," since the conduct could be considered an aggravating factor when Cooperating Witness No. 5 is sentenced.    (Def. Jt. Opp. Br. (Dkt. No. 482) at 25-26)

Defendants' argument is not persuasive. Defendants have ample material available to them to challenge Cooperating Witness No. 5's credibility. The Section 3500 material for this witness indicates that he faces a life sentence as a result of his guilty pleas to Hobbs Act robbery, narcotics violations, and firearm offenses. Cooperating Witness No. 5 has also engaged in other serious acts of misconduct while in prison, including assault with a dangerous weapon, possession of contraband, and fighting with other inmates. Defendants concede as much, observing that Cooperating Witness No. 5's masturbation is "one of many instances of [his] jail misconduct." (Id. at 26)

In sum, Defendants have ample material from which to cross-examine and argue that Cooperating Witness No. 5 has a powerful motive to curry favor with the Government, both based on the crimes he has pleaded guilty to – and the potential life sentence he faces – and on his serious misconduct while in detention. Evidence of his masturbation before a female corrections officer and female inmates has little probative value in these circumstances. Admission of this evidence risks unfair prejudice to the Government, however, given the disgusting nature of the witness's misconduct. Accordingly, the Government's motion in limine to exclude evidence of Cooperating Witness No. 5's public masturbation while in detention is granted.

### 2. Cooperating Witness No. 6

Cooperating Witness No. 6 is a former pimp who pled guilty, pursuant to a cooperation agreement, to sex trafficking and transportation of an individual in interstate commerce for commercial sexual activity. (Govt. MIL (Dkt. No. 469) at 49) As part of his guilty plea, Cooperating Witness No. 6 admitted to a number of acts – including threatening and using violence against prostitutes; denying them sleep unless they met specified quotas for sex with customers; and providing prostitutes with drugs. The Government concedes that cross-examination concerning these matters is appropriate. (Id.)

The Government seeks to preclude Defendants from cross-examining Cooperating Witness No. 6 about, inter alia, certain inflammatory statements he made, on the grounds that such evidence is not probative of his character for truthfulness and that, even if it were, the prejudicial effect of this evidence far outweighs any probative value. (Id. at 49-50, 52-53)

Defendants seek to cross-examine Cooperating Witness No. 6 about statements reflecting his use of violence against the women he prostituted, and the sexual slavery he imposed on them. (Feb. 15, 2019 Conf. Tr. at 25; Def. Jt. Opp. Br. (Dkt. No. 482) at 25-26)

The Court agrees that statements that reflect Cooperating Witness No. 6's use or threats of violence, and the degree of control he exercised over his prostitute victims, may be inquired about on cross-examination, including Cooperating Witness No. 6's references to "breaking a bitch" and "mash[ing] her up." Questioning is also appropriate as to any coerced or forced sex Cooperating Witness No. 6 had with his prostitutes, including when they were intoxicated. Questioning concerning Cooperating Witness No. 6's alleged instruction to his prostitutes to rob clients who passed out will also be allowed, because crimes of theft go to dishonesty. References to "threesomes," sexual fetishes, anal sex, and beating a dog are excluded under Rule 403. Such matters are highly inflammatory and have little probative value, particularly given that Cooperating Witness No. 6 faces a potential life sentence, which obviously gives him a strong motive to curry favor with the Government.

The Government's motion in limine as to Cooperating Witness No. 6 is granted in part and denied in part as set forth above.

### 3.   Cooperating Witness No. 1

Cooperating Witness No. 1 has pleaded guilty to Hobbs Act robbery, conspiracy to commit Hobbs Act robbery, discharge of a firearm during and in relation to a crime of violence, and use of a firearm to commit a murder. (See GX 3503-74 at ¶¶ 1-5) The Government states that – in connection with the Pre-Sentence Report for Cooperating Witness No. 1 – it provided the Probation Department with an account of a robbery/murder that was based on information supplied by Cooperating Witness No. 9. Cooperating Witness No. 1 later

provided the Government with a slightly different account of the robbery/murder that the Government finds more credible. While the Government concedes that Cooperating Witness No. 1 can be cross-examined about the inconsistent account provided by Cooperating Witness No. 9, the Government contends that Defendants should be precluded from referencing Cooperating Witness No. 1's PSR in cross-examining Cooperating Witness No. 1.

Although the Government does not explain what the inconsistency is between Cooperating Witness No. 1's account of the robbery/murder and the account set forth in Cooperating Witness No. 1's PSR, a comparison of the Section 3500 material for Cooperating Witness No. 1 and the PSR reveals the following: Prosecutors' notes for a November 1, 2018 meeting with Cooperating Witness No. 1 indicate that he told prosecutors that it was not his idea to rob a particular store; that he went along as a look-out; and that he never received any money for his role in the robbery/murder. (GX 3503-58) The Offense Conduct section of Cooperating Witness No. 1's PSR states, however, that Cooperating Witness No. 1 suggested to others that a retail store located at 906 Amsterdam Avenue in Manhattan be robbed, and that his two co-conspirators in the robbery agreed. (GX 3503-30 (Draft PSR) at ¶ 17)) The PSR also states that after the robbery, Cooperating Witness No. 1 and his co-conspirators met at Cooperating Witness No. 1's apartment and split the approximately $279 in proceeds. (Id. ¶ 19)

To the extent that the Government contends that cross-examination based on Cooperating Witness No. 1's PSR is improper, the Court does not agree. The Government concedes that it provided an Offense Conduct section to the Probation Department that is inconsistent with the account of the robbery/murder that the Government will present at trial. (Id.) Although the parties have not addressed whether the Government's draft of the Offense Conduct section constitutes an admission by the Government as to the circumstances of the

robbery/murder, it would appear so. To the extent the account of the robbery/murder in the Offense Conduct section of the PSR is materially different from the account the Government intends to present at trial, Defendants are entitled to explore that material inconsistency on cross-examination. Moreover, it is reasonable to assume that Cooperating Witness No. 1 was given a copy of his draft PSR, and was given an opportunity to comment on its accuracy. To the extent that Cooperating Witness No. 1 did not challenge the account of the robbery/murder provided in the draft PSR, the jury is entitled to consider that fact.

The Court concludes that cross-examination premised on inconsistent statements in Cooperating Witness No. 1's PSR and on Cooperating Witness No. 1's failure to challenge alleged misstatements in his PSR is appropriate. The Government's motion in limine is denied to the extent that the Government contends otherwise.

### 4. Officer Valenzano

NYPD Officer Jeffrey Valenzano will testify about his participation in the search of the residence of Eric Grayson, a co-defendant who has pled guilty. (Govt. MIL (Dkt. No. 469) at 55) On September 1, 2014, while on duty, Officer Valenzano attended a party for a fellow officer who had been transferred to a new assignment. The NYPD Internal Affairs Bureau ("IAB") found that Officer Valenzano improperly drank alcohol while on duty, violated NYPD documentation procedures, and misused time in connection with attending this farewell party. (Id. at 55-56) Although the IAB found that Officer Valenzano had violated NYPD rules and procedures, IAB made no adverse credibility findings against the officer, and it does not appear that he was sanctioned. The Government has moved to preclude cross-examination of Officer Valenzano concerning this incident and the IAB's finding. (Id.)

Defendants argue that "time theft is a violation of trust and an offense of dishonesty," particularly when committed by a law enforcement officer, and that this misconduct bears on Officer Valenzano's credibility, despite the absence of any adverse credibility finding by IAB. (Def. Jt. Opp. Br. (Dkt. No. 482) at 30)

The Court concludes that evidence that Officer Valenzano – while on duty in 2014 – attended a farewell party for a departing colleague and drank alcohol, and that he did so in violation of NYPD policies and procedures, will not measurably assist the jury in making a credibility determination as to his testimony. Accordingly, evidence of this incident will be precluded under Rules 401 and 403.

### 5. Lawsuits Against Law Enforcement Witnesses

The Government "has disclosed to defense counsel the existence of certain civil lawsuits filed against [Jeffrey Sisco, Abraham Villavizar, Michael Dougherty, and Edward Wilkowksi – ] law enforcement witnesses who will testify at . . . trial." The Government represents that none of these lawsuits (1) are related to the facts of this case; or (2) resulted in adverse credibility findings. (Govt. MIL (Dkt. No. 469) at 57) The Government seeks to preclude Defendants from cross-examining the officers about these lawsuits. (Id. at 59-60)

Defendants contend that any such ruling would be premature. (Def. Jt. Opp. Br. (Dkt. No. 482) at 30) The Court agrees. The Government has not provided the Court with any information concerning the nature of the lawsuits brought against these officers.

Accordingly, the Court reserves decision on this aspect of the Government's motions in limine.

## **CONCLUSION**

The parties' motions in limine (Dkt. Nos. 459, 464, 468, 469, 476) are granted or denied as set forth above.

Dated:  New York, New York
       February 16, 2019

SO ORDERED.

Paul G. Gardephe
United States District Judge