UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

LATIQUE JOHNSON, BRANDON
GREEN, and DONNELL MURRAY,

Defendants.

**MEMORANDUM
OPINION & ORDER**

(S5) 16 Cr. 281 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendants Latique Johnson, Brandon Green, and Donnell Murray are charged in

the (S5) Indictment (the "Indictment") with offenses related to the Blood Hound Brims, a gang

and alleged racketeering organization engaged in, inter alia, drug distribution and acts of

violence. Johnson, Green, and Murray are charged with participating in a racketeering

conspiracy between 2005 and December 2016 (Count One); with conspiring – between 2006 and

December 2016 – to distribute and possess with intent to distribute at least 280 grams of crack

cocaine ("crack"); one kilogram of heroin; five kilograms of cocaine; and marijuana (Count

Four); and with using, possessing, carrying, brandishing, and discharging a firearm in connection

with the charged racketeering and narcotics conspiracies (Count Five). (Indictment (Dkt. No.

418))[1] Johnson and Murray are also charged with assault and attempted murder in aid of

racketeering (Count Two), and Johnson is charged with a second count of assault and attempted

murder in aid of racketeering (Count Three). (Id.)

The three defendants proceeded to trial on February 19, 2019. The Government

called twenty-one witnesses, including five former members of the BHB. After a five-week trial,

---

[1] Unless otherwise noted, citations in this Order reflect page numbers assigned by this District's
Electronic Case Filing (ECF) system.

on March 27, 2019, the jury returned a verdict finding the Defendants guilty on all counts.

(Verdict (Dkt. No. 570))[2]

Johnson and Green have moved for a judgment of acquittal or a new trial,

pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. (Johnson Mot. (Dkt.

---

[2] The jury almost made findings regarding predicate acts and drug quantities:

As to Defendant Johnson, the jury found: (1) as to Count One, that the racketeering activity he agreed would be committed as part of the racketeering conspiracy involved (a) attempted murder or conspiracy to commit murder; (b) at least two predicate crimes constituting "crimes of violence"; and (c) distribution, possession with intent to distribute, or conspiracy to distribute or possess with intent to distribute five kilograms of cocaine, 280 grams of crack cocaine, and one kilogram of heroin; (2) as to Count Two, Johnson was guilty of assault in aid of racketeering, but not attempted murder; (3) as to Count Three, Johnson was guilty of attempted murder in aid of racketeering, but not assault; (4) as to Count Four, Johnson agreed to distribute or possess with intent to distribute five kilograms of cocaine, 280 grams of crack cocaine, one kilogram of heroin, and a quantity of marijuana; and (5) as to Count Five, Johnson possessed or used a firearm in relation to both the racketeering and narcotics conspiracies, and brandished and discharged a firearm in connection with the racketeering conspiracy.

As to Defendant Murray, the jury found: (1) as to Count One, the racketeering activity he agreed would be committed as part of the racketeering conspiracy involved (a) at least two predicate crimes constituting "crimes of violence"; and (b) distribution, possession with intent to distribute, or conspiracy to distribute or possess with intent to distribute controlled substances; (2) as to Count Two, Murray was guilty of assault in aid of racketeering, but not attempted murder; (3) as to Count Four, Murray agreed to distribute or possess with intent less than 500 grams of cocaine, less than 28 grams of cocaine base, less than 100 grams of heroin, and a quantity of marijuana; and (5) as to Count Five, Murray possessed or used a firearm in relation to the racketeering conspiracy, and brandished and discharged a firearm in connection with the racketeering conspiracy.

As to Defendant Green, the jury found: (1) as to Count One, the racketeering activity Green agreed would be committed as part of the racketeering conspiracy involved (a) at least two predicate crimes constituting "crimes of violence"; and (b) distribution, possession with intent to distribute, or conspiracy to distribute or possess with intent to distribute five kilograms of cocaine, 280 grams of crack cocaine, and one kilogram of heroin; (2) as to Count Four, Green agreed to distribute or possess with intent to distribute five kilograms of cocaine, 280 grams of crack cocaine, one kilogram of heroin, and a quantity of marijuana; and (3) as to Count Five, Green had possessed or used a firearm in relation to the narcotics conspiracy, but had not brandished or discharged a firearm.

(Verdict (Dkt. No. 570))

No. 643); Green Mot. (Dkt. No. 639)) Johnson argues that the evidence at trial is insufficient to prove that (1) he was a member of a conspiracy to distribute cocaine, crack cocaine, and heroin, or that the conspiracy involved the quantities of narcotics the jury found; or (2) he committed assault and attempted murder in aid of racketeering. (Johnson Br. (Dkt. No. 644)) Johnson also argues that the jury's findings – for purposes of Count Five (the Section 924(c) count) – that he brandished and discharged a firearm are inconsistent with its finding – as to Count Two – that he did not commit attempted murder in aid of racketeering. (Id.) In a supplemental motion, Johnson argues that the jury's brandishing and discharge findings as to Count Five cannot stand in light of the Supreme Court's decision in United States v. Davis, 139 S. Ct. 2319 (2019) – decided three months after the jury rendered its verdict. (Johnson Supp. Br. (Dkt. No. 707))

Green argues that the Government did not establish a nexus between the firearms he possessed and the charged narcotics conspiracy, and thus his conviction on Count Five – the Section 924(c) charge – cannot stand. Green also contends that, as a result, the Court's admission of firearms seized from his apartment was unfairly prejudicial. Green further contends that the evidence is insufficient to demonstrate that he entered into a conspiracy to distribute crack cocaine and marijuana. Finally, Green argues that the jury's finding that the racketeering conspiracy is a "crime of violence" is based on insufficient evidence. (Green Br. (Dkt. No. 640))

Murray joins in Johnson's new trial motion as it pertains to their conviction on Count Two, for assault in aid of racketeering. (See Apr. 25, 2019 Murray Ltr. (Dkt. No. 642)) Murray has also submitted a letter requesting that, in light of the Supreme Court's decision in Davis, his conviction on Count Five be vacated. (August 20, 2019 Murray Ltr. (Dkt. No. 727))

For the reasons stated below, Murray's motion to vacate his conviction on Count Five will be granted. Defendants' motions for a judgment of acquittal or for a new trial will otherwise be denied. As to Defendants' challenges to certain of the jury's findings, the jury's finding that the racketeering conspiracy is a "crime of violence" will be vacated, as will the findings that Johnson brandished and discharged a firearm in connection with a "crime of violence." Defendants' challenges to the jury's findings will otherwise be denied.[3]

## BACKGROUND

## I.     THE EVIDENCE AT TRIAL

### A.     The Blood Hound Brims

#### 1.     Formation

The evidence established that in 2005, Defendant Latique Johnson – also known as "La Brim" or simply "La" – established the "Blood Hound Brims" ("BHB" or the "Gang") while incarcerated at Attica Correctional Facility. (See, e.g., GX 183 at 2 ("April 26[,] 2005 In Attica C.F. is when 'BHB' was Born By Latique 'La Brim' Johnson." ); GX 189 at 1; Trial Tr. ("Tr.") 2136 (Moore)) From the Gang's inception, Johnson was the "Godfather" ("GF") and its "undisputed leader." (See Tr. 2895 (Rosario) ("[Johnson] was the [G]odfather . . . [T]he creator of the [BHB]. He's the undisputed leader of the [BHB]."); Tr. 1604 (Jones) ("[Johnson] was the founder slash . . . [G]odfather" and "the creator of the [BHB]."))

Johnson recruited members from within the New York State prison system. For example, cooperating witness Michael Adams, a/k/a "Measy" – who was a member of the Gang

---

[3] In addition to the papers filed by their counsel, Defendants Green and Johnson have made pro se submissions supporting their Rule 29 and Rule 33 motions. (See Green Am. Decl. (Dkt. No. 665); Johnson Supp. Br. (Dkt. No. 666)) The Court has considered these pro se filings – much of which echo arguments about witness credibility made by Defendants' counsel – and concludes that they are without merit.

from 2005 to 2016 (Tr. 155 (Adams)) – testified that he joined the BHB while incarcerated at Comstock Correctional Facility. Adams had received a "kite," or letter, from Johnson stating that Johnson was starting the BHB and "was looking for shooters." (Tr. 157, 159 (Adams)) Similarly, cooperating witness Manuel Rosario – who was a BHB member from 2007 to 2013 (Tr. 2904 (Rosario)) – testified that he "[c]ame to join the Blood Hound Brims [while] in Southport Correctional Facility," after Johnson recruited him.[4] (Tr. 2892 (Rosario))

When Adams joined the Gang in 2005, it had no more than fifteen members. (Tr. 160 (Adams)) Over the next decade, however, the Gang grew to include approximately 480 members (id.), and operated "[e]verywhere" in the New York State prison system, as well as in New York City, upstate New York, Pennsylvania, Delaware, New Jersey, North Carolina, Virginia, Texas, and Georgia. (Tr. 162 (Adams); Tr. 2901 (Rosario) (While Rosario was a member of the BHB, the Gang was "[o]perating all over the prison system in New York. It was operating . . . in the five boroughs, . . . in Pennsylvania, [in] Upstate New York, such as Rochester, Syracuse, Buffalo, Elmira . . . [a]nd [in] the federal [prison] system as well."); see also GX 172; GX 173 at 1)

New Gang members took the BHB oath, and were given "a booklet with all the rules [of the BHB] in it, [its] history," and other information about the Gang. (Tr. 826 (Morton); see also Tr. 2892 (Rosario) (testifying that Johnson "g[ave] [him] an oath, . . . rules, [BHB] commandments and the material that is needed for recruiting a person so they could know their history and things of the sort"); Tr. 2135-37 (Moore) (describing "paperwork" that contained,

---

[4] Prison records admitted at trial show that Johnson and Rosario were both incarcerated at Southport Correctional Facility for several weeks in November and December of 2007. (See GX 402, 403, 904)

inter alia, "[t]he history of the [BHB]," and testifying that he learned the oath after leaving his previous gang to join the BHB))

## 2. **Gang Structure**

The BHB is a "set,"[5] or unit, "of the New York Blood Brim Army [the 'NYBBA']." (Tr. 2890 (Rosario)) The NYBBA is, in turn, "a faction under [the] Bloods," a gang with nationwide reach. (Tr. 2915 (Rosario) ("Blood[s] is a gang . . . all over the United States. . . . There are hundreds of subdivisions under [the] Blood[s] from East Coast to the West Coast, to all over the globe. . . . Here on the East Coast our faction of [the Bloods] was the New York Blood Brim Army.") The NYBBA is structured as a "committee" comprised of the Godfathers of nine gangs, all of which are "Brim" sets. (See Tr. 828, 804 (Morton); Tr. 2916 (Rosario)) The gangs or "sets" that make up the NYBBA include, for example, the Blood Hound Brims; the "MacBalla Brims"; the "5-9 Brims"; the "Low Rida Brims"; the "Hit Squad Brims," and the "Mad Hatter Brims." (See, e.g., GX 182, 184, 185 at 5; Tr. 2182 (Moore)) While all of the Brim sets operate within the NYBBA, they do not always peacefully co-exist. For example, as discussed below, "[t]here was a war going on between" the BHB and the MacBalla Brims in 2011. (See Tr. 2977 (Rosario))

The BHB itself consists of numerous subsets, called "pedigrees." (See, e.g., Tr. 1702 (Jones); Tr. 160 (Adams)) The various pedigrees – of which there are approximately sixteen (see Tr. 160 (Adams); GX 902) – are associated with different geographical locations. For example, the "Greyhound" pedigree is based in Harlem; the "220" pedigree is based in the Bronx; and the "Double Breed Wolf Hound" pedigree is located in Westchester and Buffalo. (See GX 902; see also Tr. 160 (Adams) ("You've got the Bassett, Long Island; Beagle, Queens;

---

[5] Gang members sometimes refer to a "set" as a "hood." (See Tr. 804 (Morton))

220s, the Bronx; the Greyhound, which is Harlem; O[]tter Hounds, which is [Pennsylvania]. It's a bunch. It's 16.") All of the BHB pedigrees are subjected to a "line-up" or "chain of command." (Tr. 159 (Adams); Tr. 2893 (Rosario); Tr. 824 (Morton); Tr. 1602 (Jones))

At the top of the chain of command is the "Godfather" – Defendant Johnson. The Godfather is responsible for appointing the heads of each pedigree. (Tr. 164 (Adams); Tr. 1602 (Jones); Tr. 554 (Adams)) If the Godfather is incarcerated – as Johnson was for substantial portions of the time period covered by the charged conspiracies (see GX 400, 402, 416, 904, 905) – the "Acting GF" manages the Gang's activities, pursuant to orders provided by the imprisoned GF. (See, e.g., Tr. 168 (Adams); Tr. 2140 (Moore); see also Tr. 2896 (Rosario)). Beneath the Godfather and Acting GF there is a chain of command within each pedigree: the "High 020"; the "Low 020"; the 5 Star General; the 4 Star General; the 3 Star General; the 2 Star General; and the 1 Star General.[6] (GX 901 (BHB leadership chart); Tr. 164 (Adams)) BHB members are "automatically [supposed] to listen to anybody in the lineup that's higher than [themselves.]" (Tr. 1052 (Morton))

Defendants Brandon Green, a/k/a "Light," and Donnell Murray, a/k/a "Don P," served in leadership positions in the Gang. Former BHB members testified that Green and Murray were Acting GFs for certain periods of time between approximately 2011 and 2013. (See, e.g., Tr. 174 (Adams); Tr. 2140 (Moore); Tr. 179 (Adams))[7] Green and Murray also held

---

[6] The "High 020" and "Low 020" are also referred to as the "high OG" and the "low OG." (Tr. 1663 (Jones)) The Gang's hierarchy also includes a "Godmother." (See GX 901) The Godmother, or "GM," is "basically the only one who's in touch with all the pedigrees. She goes from pedigree to pedigree," communicates where BHB meetings will take place, and "goes to see the Godfather." (Tr. 168 (Adams); see also GX 300A-C (excerpts of phone calls between Johnson and Godmother Inez Sanchez, a/k/a "Meth"))

[7] Adams testified that Green was the Acting GF "[a]round 2011," and that Murray held that position before 2011. Former BHB member Kenneth Moore testified that Green was the Acting

other positions in the BHB hierarchy at various points:  Green served as High 020 and Low 020

of the 220 pedigree in the Bronx (Tr. 174 (Adams)) Tr. 1614, 1781 (Jones));[8] and Murray was a

High 020 for the 220 pedigree in approximately 2011 or 2012.  (Tr. 386 (Adams)); Tr. 1604-05

(Jones))

      The BHB held meetings, which Gang members referred to as "powwows."  (See

Tr. 177 (Adams); Tr. 812 (Morton); Tr. 1617 (Jones); Tr. 2134-35 (Moore))  At the powwows,

the Gang members would "talk about who we had problems with . . . talk about the structure,

who was on the lineups, who was plates."[9]  (Tr. 227-28 (Adams))  "[K]itty dues" – fees members

paid to the Gang – were also collected during powwows.  (Tr. 227 (Adams); Tr. 2136 (Moore)

---

GF in about 2013, and shared the position with Murray. (See, e.g., Tr. 174, 179 (Adams); Tr.
2140 (Moore))

[8] Adams did not specify when Green served in these roles; Jones testified that Green was a Low
020 at the time of the Club Heat slashings in January 2012, which are discussed below.  (Tr.
1781 (Jones))

[9] A "plate" is "[s]omeone who's exiled" from the BHB, and thus becomes an "enemy" of the
gang.  (Tr. 164 (Adams); Tr. 1014 (Morton); see also Tr. 2927 (Rosario) (discussing letters
Rosario wrote in prison to other imprisoned BHB members, in which he "alert[ed] them if [he]
knew there was an enemy over there, such as a plate. I would tell them to take care of that, to
make sure he's injured.")) Gang members also referred to Gang exiles as "faded." To be
"faded" is to be "[k]icked . . . out" of the BHB.  (Tr. 319 (Adams); see also Tr. 2931 (Rosario)
(For a gang member to be "faded" means "[t]hat he was no longer Blood Hound Brim. He's not
to be recognized as Blood Hound Brim, and he's completely kicked out of the set, and anywhere
that he's seen, he's to be attacked."))

A "plate" who was incarcerated was liable to being "cut," while a plate "[i]n the street" could
"get shot" by gang members.  (Tr. 166, 420 (Adams); see also Tr. 1286 (Morton) (a "plate" is
someone who has "violated the gang in some type of way, and he was supposed to be hurt in
some type of way"))

"Food" is a synonym for "plate."  (See Tr. 2894 (Rosario) ("Food is like an enemy or someone
who has committed a violation and must be dealt with through physical means."); see also Tr.
2925 (Rosario) ("Q: What does ['meet him at the diner'] mean? A: That means he food. Q:
That means he's food? A: Yeah, he's food. He's to be attacked. He's to be harmed. He's to be
jumped, cut, stabbed. He's to be hurt."))

("kitty" is "money collected by someone in the set" from other gang members"); Tr. 826

(Morton) ("[A]ny time you have a powwow, you [are] supposed to bring, you know, $20, $30.

You hand that in. . . .")) Gang members paid kitty dues from income obtained from "working,

selling drugs, robbing – whatever they were doing." (Tr. 165 (Adams)) Kitty dues were then

delivered to the GF, or to the acting GF. (Tr. 165, 349 (Adams); Tr. 826, 1120 (Morton)) Kitty

dues were used for drugs, guns, parties, prison commissary accounts, and lawyers. (Tr. 165

(Adams); Tr. 1112 (Morton); see also Tr. 826 (Morton) ("You hand that [money] in and . . . it

goes to getting scalpels or going to somebody's lawyer or . . . sending people on visits, or just

making sure people in jail have a couple of dollars on the[ir] commissary.")) Under the Gang's

rules, payment of kitty dues was mandatory. (See, e.g., Tr. 541 (Adams); Tr. 2170-74 (Moore)

(testifying about Mt. Vernon pedigree's failure to pay kitty dues, which resulted in a BHB

member getting kicked out of the Gang); GX 305A (phone call between Johnson and an

unidentified man, in which Johnson threatens to fine those who have not "turned their shit in"))

Gang members used coded language – referred to as "lingo" – to communicate

with each other, so that "no one else" – such as "[r]ival gang members, [or the] authorities" –

"c[ould] understand what [they're] talking about." (Tr. 165-166 (Adams); see also Tr. at 188

(Adams); Tr. 821 (Morton) ("Lingo" is "like a code, code words that members of the gang use so

outsiders don't hear or understand what [we're] talking about"); Tr. 2138 (Moore) (same)) The

BHB "lingo" was memorialized in "paperwork," along with the history and rules of the Gang.

This "paperwork" was copied and distributed to incarcerated and non-incarcerated BHB

members, who memorized the coded language. (Tr. 188 (Adams)) The Gang's coded terms

were changed "[p]robably every couple of months or whenever somebody would get caught with

them." (Tr. 188 (Adams); see also Tr. 1115 (Morton) (testifying about "paperwork with some

new lingo" sent to another BHB member incarcerated with Morton at Broome County Correctional Facility); Tr. 401 (Adams); GX 605 at 31) The GF developed the Gang's coded "lingo." (Tr. 164, 165 (Adams)) Former Gang members testified about certain "code words" the BHB employed, and at trial the Government introduced exhibits reflecting the Gang's "lingo." (See, e.g., GX 170, 171, 174, 175, 179, 183-85) The Gang's "lingo" includes coded language for, inter alia, drugs, weapons, the use of weapons, and acts of violence.[10]

In order to advance within the BHB, gang members had to "put[] in work." (See, e.g., Tr. 2903 (Rosario)) A member "put[s] in work" by following orders issued by Gang leaders (see Tr. 1601 (Jones) ("Somebody asked you to do something, you get it done; that's putting in work.")), and by "do[ing] something [to] the betterment or the advancement of the gang or the set." (Tr. 3027 (Rosario)) "Work" generally consists of drug dealing or acts of violence. (See,

---

[10] For example, "late night," "loud," "best I ever had," and "air bud" are all terms for marijuana. (See Tr. 1721 (Jones); Tr. 2196 (Moore); GX 174, GX 183) "Amazing ammo," "T.S.A. control," "supreme team," and "nose dive" are all terms for cocaine or crack cocaine, while "jet blue," "French Montana," "Tina Turner up," and "dog food" refer to heroin. (See GX 170, 174, 179, 183; Tr. 428 (Adams)) The phrase "money to blow" means "he gets drugs." (GX 174) The Gang's "lingo" includes coded language for weapons and the use of weapons. For example, "hunting season," means "I need a gun"; "we maxing & relaxing" means "I'm gonna shoot him"; "YSL belt buckle" means "we both shooting"; "port of Miami" means "sho[o]t first[,] think last" or "shoot 'em"; "chow time" means "shoot on si[gh]t[]" and "September 11th" means "shoot to kill." (GX 170, 174, 183; see also GX 170, 184 ("infinity" or "keys to the infinity" means "scalpel"); GX 179 ("Carlito's way" means "knife"; "3 times brazy" means "gun"; and "2 times stick" means "razor."

At trial, the Government introduced recorded prison calls in which Johnson used BHB "lingo." For example, in one call an unidentified man asks Johnson: "Conglomerates want to know, uh, duffle bag, port of Miami, yes no?" The "paperwork" introduced at trial indicates that "conglomerate" means "BHB" and that "duffle bag boys" refers to "M.B.B." – an abbreviation for the "MacBalla Brims." (GX 174 at 26; see also Tr. 1656 (Jones) (testifying that "Duffle Bags" is "a nickname for MacBallas")) A reasonable jury listening to this call could thus infer that the caller – using coded language – was asking Johnson: "BHB want[s] to know . . . MacBalla Brims, shoot them?" Johnson answered: "I got to talk to you face to face, bro." (GX 311A)

e.g., Tr. 160 (Adams) ("Q: What does it mean to put work in? A: To cut, beat people up, do whatever you got to do to further yourself in the gang."); Tr. 652 (Adams) (putting in work "[c]ould be cutting. It could be selling drugs. It could be whatever you're doing . . . to further the gang.); Tr. 3027 (Rosario) ("[Work] could be . . . selling drugs. It could be cutting somebody. It could be killing someone."); see also Tr. 2903 (Rosario); Tr. 3079 (Rosario); Tr. 2196 (Moore); Tr. 1090 (Morton)) As former BHB member Thomas Morton testified, a Gang member "mak[es] a name for [him]self" by "[b]eing out there, . . . selling drugs making money, or . . . robbing people or . . . cutting people. The more . . . people hear your name, the more likel[y] it is that you're going . . . to go up in status."[11] (Tr. 825 (Morton))

## B. The BHB's Involvement in Acts of Violence

Violence was a ubiquitous feature of Gang activities, and Gang members regarded acts of violence as central to Gang membership. (See Tr. 1235 (Morton) ("I was a member of a violent street gang, Blood Hound Brims. You had MacBallas. They was known for getting money. Blood Hound Brims was known for cutting people, violence."); see also Tr. 1123-24 (Morton) ("[T]his type of life that we live, it's different from the type of life that a regular civilian would live. . . . [T]here [are] a lot of guys . . . in this gang [who are] not going anywhere without their guns."))

At trial, the Government introduced evidence of numerous violent acts carried out by Gang members including:

---

[11] A Gang member could lose status in the Gang or become a "plate" if he did "not follow[] orders" or did not pay his kitty dues. (Tr. 166 (Adams)) BHB members also risked punishment if they did not "deal[] with" plates or "food" that they encountered. Gang members referred to this mandatory obligation as "eat food or be food." According to former Gang member Manuel Rosario, this expression "means [that] if you're told to attack the enemy and you don't attack the enemy, you will be attacked yourself." (Tr. 2894 (Rosario))

numerous "cuttings" of prison inmates, often associated with competing gangs[12] (Tr. 210-11, 216-17 (Adams); Tr. 2972-73, 3036 (Rosario));

the 2009 or 2010 attempted murder of BHB member Saeed Kaid, a/k/a "O-Dog," by Gang member Thomas Morton and BHB Acting GF David Cherry, a/k/a "Showtime," in Westchester County (Tr. 1019-23 (Morton); Tr. 577 (Adams));

a gunpoint robbery of a drug dealer, committed by Johnson, Murray, BHB member Rayshaun Jones, and several other BHB members in the Bronx at the end of 2011 (Tr. 1630-42 (Jones));

Johnson's January 21, 2012 cutting of multiple victims outside Club Heat, a Bronx strip club, where he, Green, and other Gang members were celebrating Johnson's birthday (Tr. 1741-64 (Jones); GX 350-61);

Johnson's January 28, 2012 attack on two rival gang members – in which he used an assault rifle – at a Kennedy Fried Chicken restaurant in the Bronx (the "Bronx Restaurant Shooting"). (E.g. Tr. 90-146 (Shabbir); Tr. 1347-1370, 1380-88; 1471-84 (Wilson); Tr. 1648-76, 1876-1882, 1917-25 (Jones))

Johnson's brandishing of a gun to threaten a delinquent drug customer in the summer of 2012 in Watkins Glen, New York (Tr. 2639-2642 (Daly)); and

a drive-by shooting directed at two members of the MacBallas gang that involved Johnson, Gang members Adams and Rosario, and other Gang members, in October or November of 2012 (the "Fall 2012 Drive-By Shooting"). (Tr. 314-32, 589-600 (Adams); Tr. 2981-85 (Rosario)).

The Bronx Restaurant Shooting provides the basis for Count Two of the Indictment, which charges Johnson and Murray with assault and attempted murder in aid of racketeering. The Fall 2012 Drive-By Shooting provides the basis for Count Three of the Indictment, which charges Johnson with assault and attempted murder in aid of racketeering.

---

[12] Four former members of BHB testified that – at Johnson's direction – Gang members regularly smuggled scalpels to BHB members held in state prison. (See Tr. 313-14 (Adams); Tr. 821-22 (Morton); Tr. 1695-96 (Jones); Tr. 2979-80 (Rosario)) Some of these witnesses also described instances in which they had used, or ordered others to use, scalpels or knives to cut someone, all at Johnson's direction. For example, in 2005, BHB member Adams slashed the face of someone who belonged to a different Brim set, and in 2010 he ordered a Gang member to slash another inmate. Both cuttings were performed at Johnson's direction. Adams described these cuttings as "work" that he "put in" as a member of the Gang, and this "work" led to his promotion within the Gang. (Tr. 210-11, 216-17 (Adams))

Because Johnson and Murray challenge their convictions on these counts, the Court will discuss the relevant evidence in some detail.

### 1.     <u>The Bronx Restaurant Shooting</u>

The evidence at trial demonstrates that on the evening of January 28, 2012, Johnson – using an AK-47 assault rifle – fired into a Kennedy Fried Chicken restaurant located near the corner of St. Ouen Street and White Plains Road in the Bronx. A restaurant employee and two customers – alleged rival gang members – were inside the restaurant at the time. One of the rival gang members was shot. (Tr. 99, 103 (Shabbir)) Murray allegedly served as a lookout for the shooting and as the getaway driver. (Tr. 1659, 1672 (Jones)) Johnson and Murray were convicted of Count Two, assault in aid of racketeering, in connection with this shooting. (Verdict (Dkt. No. 570))

Two cooperating witnesses – Derrell Wilson, a pimp and drug dealer who commonly sold drugs near the restaurant, and former BHB member Rayshaun Jones – testified that they had witnessed the shooting, and that Defendant Johnson was the shooter. Wilson and Jones further testified that Murray was at the scene of the shooting, and had served as a lookout and as Johnson's getaway driver. Former BHB member Manuel Rosario testified that while he and Murray were incarcerated together, Rosario twice heard Murray state that he had participated in the Bronx Restaurant Shooting.

#### a.     The Feud Between the Blood Hound Brims and the East Gangster Bloods

Wilson and Jones testified that the impetus for the Bronx Restaurant Shooting was a feud between the BHB and another gang, the East Gangster Bloods, or "EGB." (See Tr. 1643 (Jones); Tr. 1335, 1339, 1350 (Wilson)) Between 2011 and 2012, the BHB and East Gangster Bloods – as well as several other gangs – sold drugs in the vicinity of 241st Street and White

Plains Road in the Bronx. (Tr. 1329 (Wilson); Tr. 1646 (Jones))[13] In 2011, Wilson – who was a member of the "Black P Stones" gang – sold crack cocaine and marijuana at this intersection. (Tr. 1326 (Wilson)) Wilson was a friend of "Box Brim," a BHB member who sold marijuana at 241st Street and White Plains Road. (Tr. 1333, 1335 (Wilson)) Wilson also knew Murray, whom he had met in 2010 or 2011 through another BHB member who sold drugs at 241st Street and White Plains Road. (Tr. 1340-41 (Wilson)) Wilson saw Murray "almost every day" because Murray, whom Wilson knew as "Don P," lived close to Wilson's mother – about three or four blocks from the intersection where Wilson sold drugs. (Tr. 1341-42 (Wilson); GX 232 (map)) Wilson observed Murray driving a black BMW with a red interior. After July 2011, Wilson saw Murray driving a navy blue BMW 750.[14] (Tr. 1342, 1343-44 (Wilson))

In the summer of 2011, Wilson "witnessed Box get killed at 241st and White Plains Road." Box was shot by "[a] member of the . . . EGB." (Tr. 1335 (Wilson)) The BHB believed that the East Gangster Bloods had killed Box. (Tr. 1644 (Jones) ("[A]n EGB member . . . supposedly killed Box, who had a high role in the Blood Hound Brim[s], high OG status.")) The BHB also believed that another East Gangster Blood member – "Pat Pat" – had shot a BHB member named "Prince." (Id.) Johnson told BHB member Jones that "there was beef," because "nobody did nothing about [these shootings]." (Id.; see also Tr. at 1645 (Jones) ("[Johnson] said that there's one group, it's EGB, that he wasn't feeling the situation . . . because one member got killed and the other got shot and no one did nothing about it."))

---

[13] According to BHB member Jones, Johnson "wanted to take over the area[;] [h]e wanted to be the shot caller of the area," because it "was a gold mine." (Tr. 1646-47 (Jones))

[14] At trial, the Government introduced numerous photographs of Murray in and around the two BMW vehicles. (See, e.g., GX 708A, 708B, 708H, 708M)

One evening in January 2012, Johnson, Murray, and Jones drove to 241st Street and White Plains Road and – in retaliation for the shootings of the BHB members – "beat up a couple of" men Jones believed were members of the East Gangster Bloods. (Tr. 1645 (Jones); Tr. 1347-48 (Wilson)) According to Jones, Johnson – who was intoxicated (Tr. 1648 (Jones)) – announced that the three would "see what [was] up [at 241st Street and White Plains Road]." They drove to that intersection in Murray's navy blue BMW. (Id.) Murray was armed with a 9 mm. handgun that belonged to Jones. (Tr. 1649 (Jones)) They parked in front of the Kennedy Fried Chicken restaurant. (Tr. 1649-50 (Jones))

That night, Wilson was "standing in between Kennedy Fried Chicken and [a] grocery store" on the same block, selling drugs. He was there with two other gang members, "Bash" and "Dipset," who also sold drugs on 241st Street. (Tr. 1347-48 (Wilson)) Wilson saw a blue BMW at the corner of St. Ouen and White Plains Road, with three people inside: Murray – who was driving – and two others – Johnson and Jones – whom Wilson did not know. (Tr. 1349 (Wilson)) Johnson and Jones got out of the car. Johnson walked with "a limp," or a "diddy bop," a characteristic Jones also described. (Tr. 1358 (Wilson); Tr. 1642 (Jones)) (testifying that Johnson walked "with a little bop"))

Because "[s]omething didn't feel right," Wilson and Bash walked inside the grocery store, while Dipset ran up the block. (Tr. 1349 (Wilson)) Johnson and Jones entered the store. While Jones waited by the door, Johnson identified himself as "La Brim," and asked Wilson and Bash "if they were EGB." (Tr. 1350 (Wilson)) After they denied that they were members of EGB, Johnson told Wilson and Bash "to come out the store." (Tr. 1358 (Wilson)) Jones walked out of the store, and Bash followed. Johnson followed Bash out of the store. Once outside, Johnson and Jones "started jumping [Bash] . . . [b]oth punching him. They dragged him

15

down to the ground, started kicking him." (Tr. 1359 (Wilson); see also Tr. 1650-51 (Jones) (testifying that "Latique jumped out [of the BMW] and . . . starting punching dudes in the face"; after Jones got out of the car to help Johnson, "the dudes ran inside the store"; Jones "w[as] [then] beating up" one man in front of the grocery store))

Wilson left the store to help Bash. He then saw Murray standing outside the store and asked him, "what's up with your man." Murray "just stood there like he didn't hear [Wilson]." (Tr. 1359-60 (Wilson); see also Tr. 1651-52 (Jones) (testifying that Murray was "[s]tanding right [t]here, with [a] gun in his hand," while Johnson and Jones were beating a man)) Johnson and Jones then "turned and started attacking [Wilson]," dragging him down to the ground, punching, and kicking him. (Tr. 1359-60 (Wilson)) After Wilson fled up the block, he observed the three attackers walk back towards the blue BMW. (Tr. 1361 (Wilson))

Wilson saw Murray near his mother's home a few days later. Murray apologized for the incident, explaining that Johnson had been drunk and that he has "to do what [Johnson] says." (Tr. 1362 (Wilson)) Murray also "asked [Wilson] what [he] knew about the EGB members that hung out in the chicken spot, the one that was responsible for Box's murder," and asked Wilson to call or text him if he saw EGB members on the block. (Tr. 1363 (Wilson))

### b.    The Shooting at Kennedy Fried Chicken

A couple of weeks after Johnson, Jones, and Murray attacked Wilson and Bash, Wilson was again selling drugs on 241st Street and White Plains Road. Two members of the East Gangster Bloods – "Pat" and "Wheezy" – were in the Kennedy Fried Chicken restaurant that night. The two men were in the restaurant "all the time." (Tr. 1364, 1368, 1370 (Wilson))[15]

---

[15] Shabbir, the restaurant owner, testified that he had "had . . . problems" with drug dealers "doing . . . illegal stuff inside [his] store – and bothering [his] customers." (Tr. 111 (Shabbir)) Shabbir recognized either Pat or Wheezy as "a guy . . . [he] knew personally . . . was a drug

16

Jones, Johnson, and Murray – along with another BHB member who used the name B-Boy – approached the area in Murray's navy blue BMW. (Tr. 1653-54 (Jones); Tr. 1380-81 (Wilson)) Murray and B-Boy saw Pat Pat – the East Gangster Blood believed to have shot Prince – standing in the doorway of the Kennedy Fried Chicken restaurant. They told Johnson, who then pointed at Pat Pat through the window of the BMW, making a shooting gesture. (Tr. 1654 (Jones)) Pat Pat retreated inside the restaurant. B-Boy told Murray to pull over, because Pat Pat was "reaching for something." (Tr. 1655 (Jones)) Murray drove a couple of blocks away, to the block on which the girlfriend of Murray's friend G-Money resided. Murray parked the BMW, and Johnson and Murray then got out of the car and began using their phones. (Tr. 1656 (Jones))

Two men appeared from across the street with a "big bag[,] . . . like a cleaner's bag for suits." The men unzipped the bag – which was about five feet long – and handed a rifle to Johnson. The rifle was "black, [with] a little bit of brown on it," and approximately three to three and half feet long. (Tr. 1656-57, 1658 (Jones)) G-Money arrived on the scene in his girlfriend's car, which was small and silver. Two other BHB members – "Jiggs" and "Holiday" – arrived in Jiggs' black vehicle. (Tr. 1658-59 (Jones))

Johnson asked Jones for his ski mask, which Johnson then donned. Murray and Johnson then entered the silver car, with Murray in the driver's seat and Johnson laying down in the back seat with the rifle. Jones, B-Boy, and G-Money got into Murray's car. (Tr. 1657-59 (Jones)) Holiday and Jiggs remained in Jiggs' car. (Tr. 1660 (Jones)) Johnson directed those in

---

dealer." "During [a] period of nine years," Shabbir "ha[d] many times [had] arguments with him . . . because he was selling drugs inside [Shabbir's] store and right in front of the door of [his] store." (Tr. 99 (Shabbir))

the two other vehicles to follow him and Murray to 241st Street and White Plains Road. (Tr. 1660-61 (Jones))

Jones testified that he and the others in Murray's BMW parked on White Plains Road about half a block from, and across the street from, the Kennedy Fried Chicken restaurant. (Tr. 1665 (Jones)) Jiggs' car was across the street, but facing the other direction, away from the restaurant. (Tr. 1666 (Jones)) Less than five minutes after they had parked, B-Boy received a call from Holiday, who was in Jiggs' car. Holiday said that "Easy" – the Godfather of the East Gangster Bloods – was approaching the BMW. (Tr. 1667, 1668 (Jones)) Jones turned around – away from the restaurant – and then heard about five gunshots. He turned back towards the restaurant and saw several people running from the Kennedy Fried Chicken restaurant. He also saw "Latique getting in the back of the . . . [silver] car and the car driving off" up St. Ouen Street. (Tr. 1668-69 (Jones))

Wilson – who was standing on the same block as the Kennedy Fried Chicken restaurant that evening – saw the blue BMW.[16] He went to the restaurant, told Pat and Wheezy that he had seen the BMW pass by, and then walked across the street. (Tr. 1381, 1383 (Wilson)) Wilson saw the BMW circle the area a few more times. (Tr. 1384 (Wilson)) "A few moments later, [Wilson] saw someone come down the hill [on St. Ouens], turn the corner, stand in front of the chicken spot, and start shooting into it" with an assault rifle. Although the bottom half of the shooter's face was covered, Wilson recognized the shooter as La Brim, based on "[h]is size, his height, his body build, his complexion," and his gait. The shooter had "the same walk as the . . . person [Wilson] got jumped by." (Tr. 1384-86, 1462 (Wilson)) Wilson ducked behind a car,

---

[16] Wilson testified that he saw "two bodies in the [BMW] through the tint[ed] [windows]." (Tr. 1383 (Wilson))

heard several shots, and "peeked up a few times to see what was going on." He observed that the front plate glass of the restaurant was riddled with bullets, and observed "La Brim" walk back around the corner and up St. Ouens Street. (Tr. 1387 (Wilson))

### c. **Crime Scene Evidence**

In the aftermath of the Bronx Restaurant Shooting, New York City Police ("NYPD") Officer Orlando Martinez collected shell casings and bullet fragments from the sidewalk in front of Kennedy Fried Chicken. (Tr. 733 (Martinez); see also Tr. 1579 (Det. Green) ("[Shell casings] were all over the sidewalk. . . . [I]t was a cold, blustery night, and the shell casings were . . . blowing all over the place.")) The casings were from a 7.62 by 39 caliber firearm. (Tr. 730 (Det. Martinez); Tr. 2319 (Det. Fox)) Because of his military training, Martinez recognized the casings as from ammunition for semiautomatic weapons. (Tr. 730 (Martinez)) Martinez had served on the NYPD's evidence collection team for nine years, and had never recovered this type of shell casing before. (Tr. 734, 730 (Martinez))

In 2013, more than a year after the shooting, BHB member Parrish Powell, a/k/a "Scramz" – who co-led the Gang's Mount Vernon pedigree – sought Murray's assistance in obtaining a firearm. Powell was shot in Mount Vernon in 2013, and needed a gun so that he could retaliate. He and another member of the Mount Vernon pedigree – "Geezy" – approached Murray about a firearm. At an earlier meeting, Murray had offered to supply both guns and drugs to members of the Mount Vernon pedigree. (Tr. 2142, 2145, 2148-49 (Moore)) After Powell and Geezy met with Murray, Geezy asked Kenneth Moore – the other leader of the Mount Vernon pedigree – to "take a ride with him to the Bronx." (Tr. 2142, 2149-50 (Moore)) They drove to East 236th Street and White Plains Road. (Tr. 2151 (Moore)) Geezy made a phone call at that location and then entered a gray building. He came out "walking strange," "as

19

if he had something big on him." Once in a cab, Geezy told Moore that he had an AK-47 in the pant leg of his cargo pants. Geezy explained that he had obtained the gun from "A Hound" inside the gray building. (Tr. 2152-53 (Moore)) Powell later asked Moore to store the AK-47 in his home, but Moore refused, so Powell stored the gun in his grandmother's garage. (Tr. 2154 (Moore))

Later in 2013, Moore learned from another member of the Mount Vernon pedigree that Powell had been arrested after attempting to sell the AK-47 to an undercover police officer. (Tr. 2155-56 (Moore)) At trial, Westchester County Police Lieutenant Brian Hess testified that on September 25, 2013, an undercover officer purchased an AK-47-style rifle from Powell. (Tr. 2269-70, 2272 (Lt. Hess); GX 134 (photograph of rifle)) Detectives in the NYPD Firearms Analysis Section obtained this firearm, test-fired the weapon, and compared the ballistics output to the casings and fragments that had been retrieved from the scene of the Bronx Restaurant Shooting. Forensic analysis confirmed that the AK-47-style assault rifle purchased from Powell was the same weapon used in the Bronx Restaurant Shooting. (Tr. 2355 (Det. Fox))

### d.    Murray's Admissions

Manuel Rosario testified that while he and Murray were incarcerated at the Metropolitan Detention Center ("MDC") – sometime after March or April of 2017 – Rosario overheard Murray speaking to "Gutter" – another BHB member – and "a few more Bloods."[17] Rosario heard Gutter say to Murray that Murray "wasn't known for putting in work." Murray responded that "he [had] put in work. He got one of the most famous shootings in Brim history" – "[t]he chicken spot" shooting. (Tr. 3027-28, 3068 (Rosario)) Several months later, Rosario

---

[17] Prior to their incarceration, Rosario had not known Murray. They first met during a court appearance in March or April of 2017, and became acquainted in the MDC, because they were "together in the exact same housing unit for ten months." (Tr. 3018, 3068-69 (Rosario))

and Murray "had a conversation in [Murray's] cell" in which Murray "basically said he was the driver" for the Bronx Restaurant Shooting, and that "an AK was used." (Tr. 3028 (Rosario))

## 2. The Fall 2012 Drive-By Shooting of MacBallas Gang Members

Count Three of the Indictment alleges -- and the jury found – that Johnson aided and abetted "a BHB member . . . [who] shot at [two] . . . associates of a rival gang, in the vicinity of 213th Street and Barnes Avenue in the Bronx." ((S5) Indictment (Dkt. No. 418) ¶ 16) Former BHB members Michael Adams, a/k/a "Measy," and Manuel Rosario, a/k/a "Top Dollar," testified that in October or November of 2012 – at Johnson's direction – BHB member Saeed Kaid, a/k/a "O-Dog," shot at "Dummy" and "Biggs," two members of the MacBallas gang. (Tr. 2977, 2982-84, 3047 (Rosario); Tr. 314, 320-22 (Adams))

Adams and Rosario testified that the impetus for the Fall 2012 Drive-By Shooting was the "war going on" between the BHB and the MacBallas. (Tr. 2977 (Rosario); see also Tr. 314 (Adams) ("Q: [Y]ou mentioned you were personally involved in violence as a result of the conflict with the Mac Ballas, is that correct? A: Correct. Q: What kind of incident was it? A: I drove the car when Dummy and Biggs was shot at."))

On the day of the shooting, a number of BHB members – including Johnson, Adams, Adams' younger brother "Doc," Saeed Kaid, a/k/a "O-Dog," Brian Stroman, a/k/a "B-Zo," and Marques Cannon, a/k/a "Paper Boy" – were standing in front of Adams' home on 213th Street between Barnes Avenue and Bronxwood Avenue in the Bronx. (Tr. 316 (Adams); Tr. 2981 (Rosario) (testifying that the shooting took place "near Measy's house," and that he, O-Dog, Measy, Doc, La, Paper, Gistol, B-Zo, and Mace were there)) Another individual -- "Bettis" – who is not a BHB member – was also present. (Tr. 618, 663 (Adams); Tr. 2981 (Rosario))

According to Adams, the purpose of the meeting was to "rough[] out some differences between [himself] and B-Zo."[18] (Tr. 316, 319 (Adams))  Johnson ordered Adams and B-Zo "to put in work together to reconcile [their] differences." He "said that . . . Biggs and Dummy w[ere] on the corner," and that "[i]t is lit with them." (Tr. 320 (Adams))  Adams understood Johnson to be directing him and B-Zo to "[g]et [them] off the corner.  Shoot at [them]." (Id.)

As Adams and B-Zo were getting into a car to carry out Johnson's order, however, Johnson "told [Saeed Kaid that] he had to get in the car because he had to redeem himself." (Id.)  Kaid "had to redeem himself" because – after BHB member Thomas Morton had shot Kaid – Kaid had "told on" him, although "later on he took his statement back."[19] (Tr. 321 (Adams))  According to Adams, he, his brother, and Kaid got into a car: Adams was driving, and Kaid was in the back seat. (Tr. 321-22; 641 (Adams))  Kaid had a "baby 9" with him.  Adams had obtained the gun from Gistol, and it was supposed to be used "for [the] specific purpose [of] the Mac Ballas." (Tr. 327-28, 616 (Adams))  Adams had given the weapon to Bettis, and Bettis passed it to Kaid. (Tr. 616 (Adams))  Rosario recalled that Johnson had addressed Kaid prior to the shooting, and that the "[d]esignated shooters were picked up for one car." (Tr. 2982 (Rosario))

---

[18] According to Adams, B-Zo wanted "Flex" – another BHB member – "faded" from the Gang because Flex – who was a "soldier" who was not part of the BHB hierarchy (Tr. 551 (Adams)) – "messed . . . up" drugs that B-Zo had provided.  Adams did not want Flex to be kicked out of the Gang. (Tr. 316, 319 (Adams))

[19] The evidence at trial indicated that David Cherry, a/k/a "Showtime" – a leader of the BHB – had directed Morton to shoot Kaid because Kaid had disrespected Cherry and called his leadership into question. (Tr. 1018-22, 1129-31, 1135-36 (Morton))  Despite the shooting – which Kaid survived – he wanted to remain, and did remain, a member of the BHB. (Tr. 1023-24, 1137 (Morton); Tr. 2932 (Rosario) ("Q: Was [Kaid] kicked out of the gang forever? A: No. . . . [He] was kicked out of the gang like a few months. . . . [He] was brought back into the set . . . .")

Adams "drove up the block towards Bronxwood" and saw "Biggs and Dummy standing on the opposite side of the street next to a house." Because there "was a lot of people outside," Adams passed the location and circled back to his house, where Johnson and the other Gang members had remained. Adams reported that there "was a bunch of people standing outside," but Johnson directed him to "[a]ir it out" – i.e., shoot. (Tr. 322 (Adams)) Johnson and the others then drove away. (Tr. 329 (Adams)) Adams "went back around the block," and observed Dummy and Biggs standing on 213th Street and Barnes Avenue. "Dummy started walking towards the car with his hands up," making a "[w]hat's up?" gesture. (Tr. 323-24, 330, 608, 609, 614) Kaid then "shot like two times" at Dummy. (Tr. 323, 615 (Adams)) Adams drove to the Edenwald Houses, a housing project in the Bronx. He then got into a cab and went home. Adams did not know whether Biggs, Dummy, or anyone else had been injured in the shooting. (Tr. 330, 642 (Adams))

Biggs was in a relationship with Cassiah Ingram, who was married to Adams' cousin. (Tr. 590-91, 592 (Adams)) After the shooting, "Biggs banged her head inside the store on the glass," and shot in the air. (Tr. 593 (Adams); see also Tr. 331-32 (Adams)) Adams believed that Biggs attacked Ingram in order "to get back at [Adams]" for the shooting. Ingram called Adams and ran to his home, and Adams heard gunshots over the phone. (Tr. 593-94 (Adams)) Adams "ha[d] a conversation with La about what was going on," and Johnson "told [Adams] to get low, go to Elmira with O-Dog for a little while," and "[s]tay out of sight." (Tr. 331, 610 (Adams)) Adams went to Elmira about two weeks after the shooting. (Tr. 332, 598, 610 (Adams))

Rosario's account of this shooting differs in some respects. Although Rosario places "Doc, Measy, [and] O-Dog" in a car together, he testified that Johnson entered this car as

well. (Tr. 2982 (Rosario)) Rosario testified that he got into a second car, along with "Mace, Paper [Boy], and Bear." (Id.) The second car followed the first car. Rosario "s[aw] the [first] car driv[e] up to the corner," and "s[aw] two people at the corner." He saw "one person raising [his] hand[s] up toward the first car like he recognized the first car." (Tr. 2983-84 (Rosario)) Then, "[s]hots were fired." (Tr. 2984 (Rosario)) The first car pulled off, and Rosario's car "followed behind the first car, like a good block away." (Id.)

After the shooting, Rosario also went to Elmira. (Tr. 2986 (Rosario))

## C.    The BHB's Drug Trafficking

### 1.    The Elmira Operation

Much of the Government's evidence concerning the BHB's drug trafficking dealt with the Gang's activities in Elmira, a city in upstate New York, about four hours away from New York City. (Tr. 332 (Adams))

Adams, Rosario, and Patrick Daly – a former police officer who had become addicted to crack cocaine – testified about the Gang's drug dealing in Elmira, which began in 2012. Daly testified that he met Kaid – known to Daly as "G" – in the spring of that year, when Kaid offered him a free sample of crack cocaine. Kaid offered to "reward" Daly with crack if Daly introduced him to new crack customers. (Tr. 2593-96 (Daly)) Daly began purchasing crack cocaine from Kaid, and introduced several customers to him. (Tr. 2597 (Daly)) Within weeks of meeting Kaid, Daly had agreed to allow the Gang to use his Elmira home – located at 714 Washington Street – as a base for its drug operation, in exchange for crack cocaine. (Tr. 2598 (Daly); Tr. 333-34 (Adams))

Not long after Kaid moved in to 714 Washington Street, Kaid brought others to the house – including Michael Adams, Adams younger brother "Doc," Manuel Rosario, and a

24

BHB member who used the name "Mace." (Tr. 2602; see also Tr. 2615 (Daly) ("G, Mace, Me[as]y, Doc[,] and Top Dollar" sold drugs with Daly in Elmira); Tr. 332-34 (Adams) (confirming that "[h]e, [his] brother, Mace, O-Dog, and Top Dollar" were in Elmira, and that they stayed for a time "[o]n Washington Street" with "[a] guy named Pat," who "used to get high" on crack); Tr. 2985 (Rosario) (testifying that he was dealing drugs in Elmira with "O-Dog, Doc, Measy, Bear, Mace, [and] Pat"))

Gang members sold cocaine, crack cocaine, and heroin directly out of Daly's Washington Street home. (Tr. 2606 (Daly); Tr. 335-36 (Adams); Tr. 2987 (Rosario)) They made as many as "30 to 40 sales a day" from Daly's home, and also sold narcotics from other apartments and "trap houses." (Tr. 339 (Adams); 2611 (Daly); see also Tr. 2989-90 (Rosario)); Tr. 3000-01 (Rosario) (explaining that the Gang "had regulars" that they "would see a few times a day every single day" for heroin)) The Gang also rented a trailer in Elmira that was used to store and sell drugs. (Tr. 349, 351 (Adams) (explaining that the Gang shifted to using the trailer because there was "too much traffic" – i.e., "[t]oo many customers going in and out" – at the Washington Street house); Tr. 2624-26 (Daly); Tr. 2987-88, 2990 (Rosario); see also GX 205 (photograph of trailer)) To protect the Gang's drugs and drug proceeds, Gang members stored multiple firearms at 714 Washington Street. (Tr. 2618 (Daly) (testifying that the Gang kept a revolver and a shotgun in the home); Tr. 352 (Adams) (testifying that Gang members kept a shotgun under the couch and a .38 in the back room or in the basement of the Washington Street home); Tr. 2992 (Rosario) ("We had a 9 [millimeter], we had a .38, we had a shotgun, we had a AR-15, and we had a .380 . . . . [Those guns] w[ere] in the main house.") Gang members also braced the doors with two-by-fours and installed chain link fencing over the windows. (Tr. 2621

(Daly); Tr. 352 (Adams) (testifying that Daly and the Hounds put chicken wire and cardboard over the windows))

One or more Gang members – often Kaid – drove to New York City twice a week on average to obtain additional supplies of drugs. (Tr. 342 (Adams); Tr. 2606-07 (Daly); see also Tr. 2992 (Rosario) (Rosario and Kaid obtained new supplies of heroin "like twice a week") Gang members would return to Elmira with a "brick" of cocaine – half of which would be cooked into crack at 714 Washington Street – and at least a hundred bundles of heroin. (Tr. 342-43 (Adams) (heroin re-supplies consisted of "[n]o less than 200 bundles"); Tr. 2992 (Rosario) (Rosario and Kaid would purchase "[l]ike a hundred bundles" of heroin in each re-supply); Tr. 3002 (powder cocaine re-supplies consisted of 100 or 200 grams)) Drugs commanded a higher price in Elmira than in New York City; accordingly, BHB members in Elmira were expected to pay more in kitty dues than other Gang members.[20] (Tr. 349 (Adams); see also Tr. 3001-02 (Rosario) (testifying that a "dime bag" of heroin sold for twice as much in Elmira as in New York City))

Defendant Brandon Green, a/k/a Light, and a BHB member who used the name "Wheezy," supplied the drugs that the Gang sold in Elmira. (See Tr. 345 (Adams) ("Q: Now, did you ever take the trip to New York to get drugs? A: Yes. Q: Who did you pick up the drugs from? A: Two people. . . . One was Light and one was somebody from [the] Lincoln [housing project in Harlem] named Wheezy."); Tr. 2991 (Rosario) ("Q: Where were those resupplies coming from? A: The coke was coming from Wheezy. That was in Harlem. And the heroin

---

[20] Gang members sold crack cocaine in increments of a fifth of a gram, for about $20. Powder cocaine was sold in 3.5 gram increments, for between $180 and $210, and high-grade marijuana was sold for $10 per half-gram. Heroin was sold for $20 per "dime bag," or $150 for a bundle that consisted of ten "dime bags." (Tr. 2999-3005 (Rosario); see also (Tr. 2599, 2608 (Daly))

was coming from Light. That was in the Bronx. Q: Who is Wheezy? A: Wheezy, that was the Hound that was from Harlem. He was part of the Greyhound pedigree, and we was getting coke from him."); Tr. 3002 (Rosario)) According to Adams, Green "[s]upplie[d] . . . [the drugs] where he live[d]," in the Honeywell housing project in the Bronx. "Every time when [Adams] went" to Green for a new drug supply, "[they] . . . talked to Light for a little while, O-Dog gave him money, and he gave O-Dog a bag," which contained cocaine and heroin. (Tr. 346-47 (Adams)) Adams also saw Green twice in Elmira: once with B-Zo, and once with Johnson. On each occasion, Green's vehicle pulled up to the Washington Street residence; Kaid walked over to the car and gave the occupants money, and the vehicle drove off. (Tr. 348 (Adams))

Rosario described two occasions in which he obtained new drug supplies in New York City. On the first occasion, he and Kaid "drove up to see Light" in the Bronx. Once there, Kaid and Green got into a separate car, and when Kaid returned to Rosario's vehicle, Kaid "had the heroin he had just purchased." (Tr. 2993-94 (Rosario)) On the second occasion – around Christmas 2012 – Kaid "told [Rosario] that [they] needed some more heroin," sent him $2,000 through Western Union, and "gave [him] the address to [a] building to meet Light." Rosario called Green, and said he was on his way. When he arrived – at the same location in the Bronx – he met someone in the lobby and made the purchase. (Tr. 2294-95 (Rosario))

Daly testified that he made seven to nine trips to New York City with BHB members. The purpose of these trips was to deliver money and to pick up cocaine. (Tr. 2592, 2629 (Daly)) According to Daly, this money "was La Brim's money," and "at least a couple of times [Daly] went to New York City, [he and the Gang members he drove with] met with [Johnson]." (Tr. 2592-93 (Daly)) On one of those occasions, Daly and Mace delivered $ 22,000 to Johnson in a barbeque restaurant. (Tr. 2677-79 (Daly)) On two other occasions, Johnson put

crack cocaine – about 100 grams each time – in Daly's car just before Daly left for Elmira. (Tr. 2642-43 (Daly))  At Gang members' request, Daly – using a false name – also sent drug proceeds by Western Union to addressees in New York City. (Tr. 2630-33 (Daly); GX 501 (Western Union records showing more than $10,500 in transfers sent in Daly's name or in his alias between October 2012 and March 2013)[21]

Daly first met Johnson in the summer of 2012 in New York City.  Daly had been tasked with driving B-Zo from Elmira to New York City.  Once in the City, B-Zo directed Daly to a barbershop, where "La Brim came out, [and] got in [the] front of the car."  They dropped off B-Zo, and then Johnson "told [Daly] to take him back to Elmira."  (Tr. 2634-35 (Daly))  In the car, Johnson "asked [Daly] what was going on up there, what was going on with the money.  He didn't think it was coming like it should or like it did before."  (Tr. 2636 (Daly))  Once they arrived in Elmira, they entered the Washington Street residence.  Kaid and Mace were inside.  Johnson then gave Daly crack cocaine for driving him to Elmira.  Johnson was carrying a small black satchel, and Daly glimpsed a silver semi-automatic firearm inside, as well as "what . . . looked to [Daly] like a large amount" of crack cocaine.  Daly then went to his room to smoke the crack.  (Tr. 2367-68 (Daly))

About 30 or 40 minutes later, Kaid asked Daly to drive him and Johnson to Watkins Glen.  He also asked Daly where Daly's friend David Drake lived; the Gang had sold drugs to Drake.  After the trip to Watkins Glen, Daly drove Johnson and Kaid to Drake's home. (Tr. 2638-41 (Daly); see also GX 32 (Drake photograph))  After arriving at Drake's home, Johnson – who was holding the silver semi-automatic pistol – "put his hands on David Drake's

---

[21] The Western Union records also show that, in 2014, Green sent money via Western Union from Elmira.  (See GX 500)

shoulder" while Kaid grabbed Drake's chin or mouth. Johnson "asked [Drake] if he thought it was funny he was playing with his money." (Tr. 2641-42 (Daly)) Daly "went back out to the car because [he was] scared." (Tr. 2642 (Daly))

The Gang's Elmira drug operation diminished over the course of 2013. Adams was arrested at the end of 2012, during a traffic stop in which police found heroin in his car. (Tr. 354, 680 (Adams); Tr. 3011 (Rosario)) Daly did a short stint in a drug rehabilitation program in December and January 2013. (Tr. 2644 (Daly)) Although the Brims' drug trafficking continued in Daly's absence – and Daly later resumed his involvement with the Gang – the Gang moved its drug operations moved out of Daly's Washington Street home. (Tr. 2648, 2650 (Daly)) Rosario was arrested in January 2013 – while moving items from the Washington Street residence to the trailer. Police recovered "a big bag of crack, coke, and dope . . . [and] a good amount of money on [Rosario]." (Tr. 3010 (Rosario)) In March 2013, Daly and Kaid were arrested following a traffic stop, after police "saw a large bag of narcotics." (Tr. 2652, 2678, 2692 (Daly)) Daly and Mace were arrested in April 2013, after the two burglarized Daly's sister's home. (Tr. 2656-57 (Daly))

## 2. Other Evidence of Drug Trafficking

The Gang also distributed drugs in New York City, other cities in upstate New York, and outside of New York.

Former BHB members Adams, Morton, and Rayshaun Jones testified that Gang members were selling drugs in "Harlem, inside [the] Gun Hill projects, [and] uptown in the Bronx," as well as in Syracuse, Binghamton, and Troy, New York, and in Pennsylvania. (See, e.g., Tr. 355, 358, 359, 361-62 (Adams); Tr. 873-74, 879-80, 885 (Morton); 1704-07 (Jones))

29

All of these witnesses described Defendant Brandon Green as the Gang's primary drug supplier – the "plug" who "had all the drugs." (Tr. 174 (Adams)) Adams saw Kaid selling drugs nearly every day, and Adams himself "used to bag up cocaine" for Kaid in the Gun Hill projects. (Tr. 360, 367 (Adams)) Kaid told Adams that he was getting his drugs from "Light and Wheezy."[22] (Tr. 367-68 (Adams)) Adams also saw BHB member Gistol selling crack cocaine in the Frederick Douglass housing project in Harlem. Gistol also told Adams that he got his drugs from Green. (Tr. 368-69 (Adams)) Adams also referred drug customers to Green; in return, "[Green] would give [Adams] cocaine for cheaper." (Tr. 361 (Adams)) Adams' interactions with Green took place in a plaza outside the Honeywell projects, in the Bronx. (Tr. 361-62 (Adams)) Adams also saw a BHB member who used the name "Puff" – whom Adams described as "close with Light" (Tr. 181, 363 (Adams)) – selling crack a couple of blocks from the Honeywell projects. (Tr. 363 (Adams))

Former BHB member Thomas Morton testified that he went "a few times" to the Honeywell projects to purchase 10 to 15 grams of heroin between 2009 and 2011. (Tr. 854-55, 884-85 (Morton); see also GX 228) Morton bought the heroin from Puff. Morton would then package and bundle the heroin, and sell the bundles for $100 apiece in New York City, or nearly twice that amount – $180 to $200 – in Binghamton, where he also sold crack. (Tr. 857-58, 879-80, 884 (Morton)) Although Puff never told Morton the source of his drugs, other members of BHB, including David Cherry, a/k/a "Showtime," told Morton that Puff got his drugs from

---

[22] Morton testified that he also supplied Kaid with drugs, and that Kaid sold these drugs on 125th Street in Manhattan. (Tr. 1016-17 (Morton)) Both Adams and Jones testified that Kaid was selling drugs in Pennsylvania as well. Jones once saw Kaid at a BHB "powwow" with "a big [8 or 9 inch wide] ziplock bag" filled with "little twisties" of crack in his pants pocket and thousands of dollars of cash in a bundle. Kaid told Jones that he "should come out to [Pennsylvania] with him and get some money." (Tr. 359 (Adams); Tr. 1704-07 (Jones))

Green. Green had a "connect"; "[t]he drugs come from Light and Puff sells them." (Tr. 856-57 (Morton))

The Government introduced other evidence of Green's drug trafficking, including (1) testimony from an NYPD detective who had arrested Green and Puff in the Bronx in 2010, and recovered a "bag of cocaine" weighing approximately 29.5 grams from Green's waistband and $1,980 in cash from Puff. (Tr. 2845, 2864, 2884 (Sisco); GX 141 (cocaine)); (2) text messages extracted from two of Green's cell phones in which Green discussed marijuana sales (see Tr. 2569, 2574-75, 2578 (Volchko); GX 600A, 601A); a recorded phone call between Johnson and an unidentified man in which Johnson stated that he "kn[ew] where [Green's] stash is at" (GX 306); and drug paraphernalia seized from Green's apartment –glassine envelopes, a strainer, and coffee grinder. (See GX 109, 110, 112; Tr. 750-51, 753-54 (Kushi))

The Government also offered evidence of Defendant Murray's drug trafficking. Morton testified that he once sold ten grams of heroin to Murray for $600; Murray said that he was going to sell the heroin in Troy, New York.[23] (Tr. 873-74 (Morton)) Jones recalled conversations in which Murray discussed selling crack on 241st Street and White Plains Road. (Tr. 1646-47 (Jones)) Kenneth Moore stated that Murray once sold between ten and twenty grams of crack to Geezy, another BHB member, at a BHB powwow. Moore observed Geezy break the crack down into smaller quantities and bag it up for sale. (Tr. 2144-46 (Moore))

Delaware State Police Officer Scott Linus testified about items recovered from a search of Murray's home, including heroin, "packaging material," a digital scale, and wax papers Linus had "seen [used] for packaging heroin." (Tr. 267, 270 (Linus); GX 127, 187F, 187G,

---

[23] An extraction report performed on a phone seized from Murray's apartment shows that contacts in Murray's phone include "Troy" and "Troy Courts." (GX 602 at 11)

187H, 187J)  The Government also introduced photographs of what appeared to be marijuana on Murray's Facebook account.  (GX 708J, 708K)

Finally, the jury heard evidence that the Blood Hound Brims engaged in drug trafficking while in prison.  According to Adams -- who was incarcerated with Johnson at Auburn Correctional Facility in 2007 (see GX 904) -- Johnson "had drugs," including marijuana, in prison, and would "give it to . . . some of the Hounds" in prison.  Johnson told Adams that David Cherry, a/k/a "Showtime," and one of BHB's Godmothers were smuggling in drugs to Johnson during prison visits.  (Tr. 221-22 (Adams))  Rosario likewise testified that he saw Johnson selling marijuana in prison.  (Tr. 2929 (Rosario))

### D.    Defendant Green's Possession of Firearms

Law enforcement officers recovered a large stash of firearms in Green's Bridgeport, Connecticut apartment on May 16, 2017.  Green had fled to Bridgeport shortly after the first indictment in this case was issued.  (Tr. 744, 746 (Kushi))  Officers recovered six firearms – including two Glock 45 pistols; a Glock 27 pistol; a Wesson Arms .357 Magnum revolver; a Beretta 9mm. pistol; and a SCCY CPX 9mm. pistol, as well as ammunition – stored in a Louis Vuitton bag in a closet on the apartment's second floor.  Officers also found $2,000 in cash, and a driver's license containing Green's photo but in the name of "Jonathan Brown."  (Tr. 755, 757-60 (Kushi); GX 100-108; see also GX 186C, 186D, 186E (photographs))  In the kitchen, officers recovered drug paraphernalia, including a box of glassine envelopes, a strainer, and a coffee grinder.  (Tr. 751-755, 782 (Kushi); see also GX 109, 110, 112, 186B)

Five cell phones were seized from Green's apartment.  (See GX 113-117)  The Government introduced excerpts of extractions performed on two of those phones.  The extraction report for one of the phones reflected recent internet searches regarding firearms,

including search terms such as "glock 9 gen 4 price" and "price for M&P 9c mm." The extraction reports also contain the marijuana-related text messages discussed above. (GX 600A, 601A)

Jones and Adams testified that Green supplied Gang members with firearms. Indeed, according to Jones, Green's role in the BHB was to "[p]rovide[] drugs, guns." (Tr. 1615 (Jones)) For example, after BHB member "Beans" was shot at Club Heat by rival gang members in January 2012, Johnson and Jones looked to Green to obtain a firearm that could be used to retaliate. Green obtained a "small [.]380, all black and brown." (Tr. 1777, 1780-82, 1874 (Jones))

Adams testified that when he was released from prison in 2011, Green provided him with a "little black . . . handgun" and some cocaine. (Tr. 173, 374 (Adams)) Adams also testified about a dispute between B-Zo and Green: "Light and B-Zo was beefing because B-Zo ran off with Light's drugs and his guns while they was in Syracuse." (Tr. 358 (Adams))

Adams also described Green's participation in an alleged plot to murder David Cherry, a/k/a "Showtime," the former acting GF of the BHB. Adams learned at a powwow held shortly after his release from prison that Johnson had declared that "Showtime" – whom Adams had never met – was a "plate." (Tr. 228, 229-30) (Adams)) A couple of weeks after the powwow, Adams – who was at a party in the Bronx with several other BHB members, including his brother Doc and Puff – met a man who introduced himself as a "Brim" named "Showtime." (Tr. 230-31 (Adams)) Concerned that this individual might be the "Showtime" discussed at the powwow, Puff called Johnson. At Johnson's direction, Puff and Adams induced "Showtime" to accompany them out to the sidewalk. (Tr. 232 (Adams)) A van driven by Green pulled up. A passenger in the van pointed a shotgun out of the window, directly at "Showtime." Green got

out of the van, looked at "Showtime," got back in the vehicle, and drove away. (Tr. 232-33 (Adams)) A reasonable jury could have inferred that the "Showtime" at the party was not the "Showtime" who had been declared a "plate."

**DISCUSSION**

## I.    LEGAL STANDARDS

### A.    Rule 29 Standard

Federal Rule of Criminal Procedure 29(a) provides that a court shall, upon a defendant's motion, "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

In evaluating a sufficiency challenge, this Court "'must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'" United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012) (quoting United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008)); see also United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) ("The court should not substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury."). "So long as the inference is reasonable, 'it is the task of the jury, not the court, to choose among competing inferences.'" United States v. Kim, 435 F.3d 182, 184 (2d Cir. 2006) (quoting United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995)).

"The Second Circuit has observed that '[t]hese strict rules are necessary to avoid judicial usurpation of the jury function.'" United States v. DiPietro, No. S502 Cr. 1237 (SWK), 2005 WL 1863817, at *1 (S.D.N.Y. Aug. 5, 2005) (quoting Mariani, 725 F.2d at 865) (alterations in DiPietro). Given this standard, "[a] defendant bears a 'very heavy burden' in

challenging a conviction based on insufficient evidence." United States v. Goldstein, No. S2 01 Cr. 880 (WHP), 2003 WL 1961577, at *1 (S.D.N.Y. Apr. 28, 2003) (quoting United States v. Brewer, 36 F.3d 266, 268 (2d Cir. 1994)).

## B. Rule 33 Standard

Pursuant to Federal Rule of Criminal Procedure 33, a court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992). Courts may not only grant a Rule 33 motion where the evidence is legally insufficient, see United States v. Leslie, 103 F.3d 1093, 1100-01 (2d Cir. 1997), but also where a jury's verdict is contrary to the weight of the evidence, United States v. Ferguson, 246 F.3d 129, 136 (2d Cir. 2001) ("We cannot say that the district judge abused her discretion when she concluded that the weight of the evidence showed that [the defendant] was an outside hit man and not a [gang] member acting to further that membership."). Moreover, in contrast to the analysis under Rule 29, a district court considering a Rule 33 motion need not view the evidence in the light most favorable to the Government. United States v. Lopac, 411 F. Supp. 2d 350, 359 (S.D.N.Y. 2006) (citing United States v. Ferguson, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999), aff'd, 246 F.3d 129 (2d Cir. 2001)).

The Second Circuit has explained that

[t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person may have been convicted. Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for

acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

Ferguson, 246 F.3d at 134 (internal quotation marks and citations omitted).

Under Rule 33, "[i]n the exercise of its discretion, the court may weigh the evidence and credibility of witnesses." United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000) (citing Sanchez, 969 F.2d at 1413). However, "[t]he district court must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury." Ferguson, 246 F.3d at 133 (quoting Autuori, 212 F.3d at 120) (alteration in Ferguson). "Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, '[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.'" Id. at 133-34 (quoting Sanchez, 969 F.2d at 1414). Such "exceptional circumstances" may exist "where testimony is 'patently incredible or defies physical realities.'" Id. at 134 (quoting Sanchez, 969 F.2d at 1414).

## II.   ANALYSIS

### A.   Defendant Johnson's Motions

Johnson argues that the evidence at trial was insufficient to prove either charge of assault and attempted murder in aid of racketeering.[24] He also argues that the evidence was insufficient to prove (1) that he conspired to distribute cocaine, crack cocaine, and heroin; or (2) the drug quantities alleged in the Indictment. (Johnson Br. (Dkt. No. 644)) Finally, Johnson argues that the jury's findings -- with respect to Count Five -- that he brandished and discharged a

---

[24] As to Count Two, Johnson was convicted of assault in aid of racketeering, and as to Count Three, Johnson was convicted of attempted murder in aid of racketeering. (Verdict (Dkt. No. 570))

firearm during and in relation to the racketeering conspiracy charged in Count One cannot stand under United States v. Davis, 139 S. Ct. 2319 (June 24, 2019). (Id.)

### 1. The Evidence is Sufficient to Demonstrate that Johnson Committed the Bronx Restaurant Shooting

Johnson argues that he is entitled to a new trial on Count Two, because the Government "relied in large part on the testimony of Rayshaun Jones and Derrell Wilson," and their testimony is incredible as a matter of law. (Johnson Br. (Dkt. No. 644) at 10-11; Johnson Reply Br. (Dkt. No. 661) at 11) According to Johnson, Jones and Wilson "are serial liars who contradicted each other and themselves on crucial aspects of their testimony." Johnson further argues that their testimony was "evasive," inconsistent with their proffer statements, "highly improbable," contradictory, and "not corroborated." (Johnson Br. (Dkt. No. 644) at 11-13) Murray joins in Johnson's motion as to Count Two. (Murray Ltr. (Dkt. No. 642))

As noted above, a defendant seeking to overturn a jury verdict on the basis of witness credibility must convince the Court that the testimony at issue is "'patently incredible or defies physical realities.'" Ferguson, 246 F.3d at 133-34 (quoting Sanchez, 969 F.2d at 1414). Johnson has made no such showing here.

Jones and Wilson offered testimony that was detailed and broadly consistent, both as to the background for the shooting and the events of that night. Both explained that the Bronx Restaurant Shooting was motivated by the BHB's feud with the East Gangster Bloods and the EGB's murder of Box, a BHB member. (Tr. 1643 (Jones); Tr. 1335, 1339, 1350 (Wilson)) Both testified that – not long before the Bronx Restaurant Shooting – Johnson, Murray, and Jones[25] traveled to 241st Street and White Plains Road, where Johnson attacked Wilson and his

---

[25] Wilson did not identify Jones – whom he does not know – but testified about a third individual.

companion, suspecting them of being members of the East Gangster Bloods. (Tr. 1645 (Jones; Tr. 1347-50, 1358-61 (Wilson)) Their testimony about this incident was compelling and credible.

For example, Wilson and Jones offered similar testimony about Johnson's and the victims' movements in and out of the grocery store located next to Kennedy Fried Chicken. (See Tr. 1359 (Wilson); Tr. 1650 (Jones)). Both also testified that Murray was standing by, watching the altercation but not physically taking part. Both also testified that Wilson asked Murray what was going on. (See Tr. 1359-60 (Wilson); Tr. 1651-52 (Jones)). Jones testified that Johnson was drunk when he decided to go to 241st Street and White Plains Road, while Wilson testified that Murray – apologizing for the altercation – explained that Johnson "was drunk" that night and that Murray [had] to do what [Johnson] says." (Tr. 1648 (Jones); 1362 (Wilson))

As to their testimony about the night of the shooting, both Wilson and Jones testified that Murray's blue BMW passed by the Kennedy Fried Chicken restaurant that night, and that Pat Pat was inside the restaurant. (Tr. 1654 (Jones); Tr. 1381, 1383, 1384 (Wilson)) Both men testified that Johnson used a rifle (Tr. 1386 (Wilson); Tr. 1657 (Jones)), that they heard multiple shots, and that Johnson's face was partially covered. (Tr. 1384-7, 1462 (Wilson); Tr. (Tr. 1657-58, 1668 (Jones)) Wilson recalled that after the shooting stopped, he saw Johnson "going back around the corner, back up the hill" on St. Ouen Street (Tr. 1387 (Wilson); see also GX 222 (photograph of the corner of St. Ouen Street and White Plains Road, showing that St. Ouen Street slopes steeply upward)); Jones similarly testified that he saw Johnson get back into a car that drove up St. Ouen Street. (Tr. 1669 (Jones))

While Wilson's and Jones's testimony is not perfectly consistent, the witnesses did not "contradict[] each other on critical points," as Johnson argues. (Johnson Br. (Dkt. No.

644) at 13)  The inconsistencies that Johnson highlights – whether Johnson's head was covered by a ski mask, a bandanna, or a scarf; whether the getaway car was silver or blue;[26] and where the getaway car was parked (id.) – are hardly "critical points."  Any such inconsistencies do not provide a basis for casting aside the jury's verdict.  See, e.g., United States v. Murgas, 177 F.R.D. 97, 108 (N.D.N.Y. 1998) ("Even assuming there existed minor inconsistencies in the testimony of the government's witnesses . . . there exists sufficient evidence to allow the jury to conclude beyond a reasonable doubt that [the defendant] was guilty of the charge[].");  Blake v. United States, No. 10 CR. 349 RPP, 2012 WL 3154989, at *7 (S.D.N.Y. Aug. 3, 2012) ("The inconsistencies . . . are minor, and can reasonably be attributed to 'confusion, mistake, or faulty memory.'" (citation omitted))

In any event, Wilson and Jones were both subject to lengthy and vigorous cross-examinations, which fully explored their past crimes, motivations to testify, and any inconsistencies in their accounts.  Johnson and Murray both "had the benefit of . . . attorneys through trial who worked very diligently to assail all of the . . . contradictions and weaknesses in these witnesses' accounts as well as to underscore the incentives they had to testify falsely." United States v. Stanley, No. 3:15-CR-00198 (JAM), 2019 WL 103773, at *10 (D. Conn. Jan. 3, 2019).  Moreover, the jury was charged that "[t]he testimony of cooperating witnesses . . . must be scrutinized with special care and caution" (see Tr. 3598 (Jury Charge)), and – given that the

---

[26] Johnson also mischaracterizes Wilson's testimony concerning the color of the getaway car. Johnson asserts that Wilson "testified that he saw the shooter enter a blue BMW that was parked up the hill on Saint Ouen," but the record does not support this claim.  Johnson cites to page 1384 of the transcript, which reflects Wilson's testimony that Murray's blue BMW "went up the St. O[u]en hill and then it didn't come back."  (Tr. 1384 (Wilson))  But at this point in his testimony, Wilson is describing the location of the blue BMW when it first passed by the Kennedy Fried Chicken restaurant, before the shooting.  Wilson did not testify that he saw the blue BMW after the shooting.

jury deliberated over five days – there is every indication that the jurors heeded this admonition. See United States v. Martoma, No. 12 CR 973 PGG, 2014 WL 4384143, at *12 (S.D.N.Y. Sept. 4, 2014) ("Here, all of the issues raised . . . relate to [the witness's] credibility . . . and defense counsel explored all of these matters at length on cross-examination. . . . Defense counsel cross-examined [the cooperating witness] extensively about his cooperation with the Government. . . . Moreover, the jury was instructed that because [he] was a cooperating witness, his testimony 'must be scrutinized with special care and caution.'"), aff'd, 869 F.3d 58 (2d Cir. 2017), opinion amended and superseded, 894 F.3d 64 (2d Cir. 2017), and aff'd, 894 F.3d 64 (2d Cir. 2017).[27]

Accordingly, Johnson's and Murray's motion for a new trial on Count Two is denied.

### 2. The Evidence is Sufficient to Demonstrate that Johnson Participated in the Fall 2012 Drive-By Shooting

Johnson contends that he is entitled to a new trial on Count Three – which is premised on the Fall 2012 Drive-By Shooting involving the MacBallas – because his conviction "rests entirely on the dubious testimony of Adams and Rosario." (Johnson Br. (Dkt. No. 644) at 13 (emphasis in original)) According to Johnson, "Adams was an evasive and reluctant witness"

---

[27] Contrary to Johnson's assertion (Johnson Br. (Dkt. No. 644) at 13), Jones' and Wilson's testimony was also corroborated by other evidence. For example, Rosario testified that on two separate occasions Murray asserted that he had been involved in the Bronx Restaurant Shooting. (Tr. 3027-28 (Rosario)) Expert testimony also established that the assault rifle purchased from BHB member Parrish Powell, a/k/a "Scramz" – obtained by Mount Vernon BHB members from the Bronx, with Murray's assistance (Tr. 2149-54 (Moore)) – was the same firearm used in the Bronx Restaurant Shooting. Other pieces of corroboration include Morton's testimony that he saw Murray at a barbeque in the Bronx with "a baby AK." (Tr. 870 (Morton)) And while Johnson contends that it is "highly improbable" that Wilson "was in a perfect position to eyewitness the [Bronx] Restaurant Shooting and the events that provided a motive for it," Shabbir recognized a photograph of Wilson, suggesting that Wilson did in fact spend a significant amount of time on the same block as the Kennedy Fried Chicken restaurant, as he testified. (Tr. 110 (Shabbir); GX 29)

whose testimony "was incoherent as to crucial details and . . . riddled with inconsistencies." (Id. at 13-14) Johnson further asserts that Rosario's "retelling of the shooting conflicted with Adams's version in important and irreconcilable respects." (Id. at 15) Once again, Johnson's arguments about witness credibility are not persuasive.

Adams' and Rosario's accounts of the Fall 2012 Drive-By Shooting are generally consistent. Both testified that the shooting was part of BHB's ongoing war with the MacBallas gang (Tr. 314 (Adams); Tr. 2977 (Rosario)) – a conflict whose existence was not questioned at trial. Both testified that, before the shooting, a group of Gang members had gathered outside Adams's home in the Bronx. The two men identified many of the same people as present outside Adams' home, including Johnson, Rosario, Adams, Adams' brother, Kaid, Paper Boy, B-Zo, and Bettis. (Tr. 315-16, 617-18 (Adams); Tr. 2981 (Rosario)) Both men testified that Johnson directed Kaid to carry out the shooting. (Tr. 320-21 (Adams) (testifying that Johnson initially directed Adams and B-Zo to shoot at Biggs and Dummy, but later "told [Kaid that] he had to get in the car because he had to redeem himself"; Tr. 2982 (Rosario) ("Q: . . . You said, 'We spoke about what we were going to do.' Who was speaking? A: La was speaking. He was basically speaking to O-Dog more or less, but we was all in earshot vicinity. Q: What did La say to O-Dog? A: Where they was going to go. . . . Q: But did you have an understanding based on what La was saying of why you were going in that location? A: Oh, yes, yes, yes. Q: Why? A: . . . [A] hit was being on.")) Adams and Rosario also both testified that Adams, his brother, and Kaid were in the car from which the shots were fired, and both described the same distinctive arm-raising gesture Dummy made when he approached that car before the shooting began. (Tr. 321-22, 641 (Adams); Tr. 2982-84 (Rosario))

Johnson contends that there are several inconsistencies between the witnesses'

accounts of the Fall 2012 Drive-By Shooting, and asserts that these alleged inconsistencies

"place [his] conviction in doubt":

> According to Adams, Mr. Johnson gave the order to shoot at Biggs and Dummy.
> But Rosario, although in a position to hear such an order if it were made, did not
> support Adams's version. According to Adams, the only other people in the car
> that he was driving on the night of the shooting were his brother . . . and Ka[id].
> Rosario . . . also included Mr. Johnson. . . . Adams described circling the block
> twice before Kaid shot, which Rosario did not. Whereas, according to Adams, one
> car was involved in the shooting, Rosario described two. It should be noted that
> Rosario testified that another of Adams's brothers, who went by the nickname
> 'Bear,' drove the car that Rosario was in, a fact which Adams, in omitting the
> second car, left out.

(Johnson Br. (Dkt. No. 644) at 15-16)

As an initial matter, some of the alleged inconsistencies are not inconsistencies.

For example, Johnson asserts that "Rosario testified that another of Adams' brothers, who went

by the nickname 'Bear,' drove the car that Rosario was in," and states that Adams "left out" this

fact. (Id.) But Adams was never asked to identify the driver of the second car. Moreover,

Adams listed "Bearu" as one of the men gathered in front of his home that evening. (See Tr.

318-19 (Adams); Tr. 2981 (Rosario)) Given these circumstances, the fact that Adams did not

identify "Bear" or "Bearu" as the driver of the car Rosario was in is of no consequence.

Similarly, Johnson's argument that Adams only described "one car . . . involved

in the shooting," while "Rosario described two," is misleading. Rosario testified that the car he

was in trailed Adams' car; the occupants of the second car played no part in the actual shooting,

and Rosario's testimony is not to the contrary. Moreover, Adams acknowledged the presence of

the second car. (Tr. 323 (Adams) (testifying that after Kaid shot at Biggs and Dummy, the

second car "skirted off and [Adams] followed them"))

The other "contradictions" cited by Johnson are not significant. For example, the

fact that "Adams described circling the block twice before Kaid shot, which Rosario did not," is

42

not the type of inconsistency that raises doubts about whether the drive-by shooting happened. Similarly, the fact that Rosario places Johnson in Adams' car, while Adams testified that Johnson left the scene in another car, does not amount to an "important and irreconcilable" conflict that casts doubt on Johnson's conviction. Rather, "differing testimony as to details (such as exactly where [a] car was, whether it was moving, whether the shooter remained in the car, or how many people were in the car . . .) could reasonably have been understood by the jury to be attributable to differences among the witnesses' memory of events." Stanley, 2019 WL 103773, at *11.

Finally, Johnson contends that "the proffered motive for tasking Kaid with the shooting of the MacBallas" – Kaid's disclosure to police officers that Morton shot him – "is nonsense," and that Johnson "advanced a possible theory at trial that was far more plausible: . . . the shooting was the result of a personal conflict between . . . . Biggs . . . and the Adams family." (Id. at 16-17)

It was a jury question whether or not this drive-by shooting was in furtherance of the charged racketeering enterprise. The jury was free to accept Adams' and Rosario's accounts that Johnson ordered the shooting as part of the BHB's ongoing "war" with the rival MacBallas gang. Given the evidence that a large number of BHB members gathered before the shooting; that another BHB member, Kaid – and not Adams – fired the shots; and that Johnson directed the shooting, the evidence supports the jury's finding that this shooting was in furtherance of the charged racketeering enterprise and was not the product of a personal dispute between Adams and Biggs.

Accordingly, Johnson's motion for a new trial on Count Three of the Fifth Superseding Indictment is denied.

**3. The Evidence is Sufficient to Demonstrate that Johnson Engaged in the Charged Narcotics Conspiracy, and Substantial Evidence Supports the Jury's Drug Quantity Determinations**

Johnson asserts that the evidence is insufficient to establish (1) his participation in the charged narcotics conspiracy; or (2) that that conspiracy involved at least five kilograms of cocaine, 280 grams of crack cocaine, and one kilogram of heroin. (Johnson Br. (Dkt. No. 644) at 6-9; Johnson Reply Br. (Dkt. No. 661) at 6)[28]

Johnson's argument rests on the alleged unreliability of Patrick Daly's testimony. According to Johnson, "Daly is the only cooperator who testified about [his] participation in the narcotics conspiracy," and "Daly's testimony was filled with outright lies." (Johnson Reply Br. (Dkt. No. 661) at 14) This argument is not persuasive.

As an initial matter, Johnson's conviction on the narcotics conspiracy count rests on more than Daly's testimony. The evidence established that drug trafficking was a core activity for BHB members,[29] and four former Gang members confirmed that selling drugs was one way that members "put in work" and advanced within the Gang. (See Tr. 2196 (Moore) (testifying that "work" means "drugs"); Tr. 3027 (Rosario) ("Putting in work . . . could be . . . selling drugs. . . ."); Tr. 652 (Adams) (same); Tr. 825 (Morton) ("selling drugs making money" is one way a member of the gang "mak[es] a name for [him]self"))

---

[28] Johnson concedes, however, that "[l]egally sufficient evidence arguably exist[s] to find [his] participation in a marijuana conspiracy." (Johnson Br. (Dkt. No. 644) at 6 (emphasis in original))

[29] Indeed, the Gang's "lingo" or coded language – which was determined by Johnson (Tr. 164 (Adams) (the Godfather decides "the lingo [the Gang] speaks") – is replete with terms for drugs. For example, "late night," "loud," "best I ever had," and "air bud" were all terms for marijuana. (See Tr. 1721 (Jones); Tr. 2196 (Moore); GX 174) "Amazing ammo," "T.S.A. control," "supreme team," and "nose dive" meant cocaine or crack cocaine. "Jet blue," "French Montana," "Tina Turner up," and "dog food" referred to heroin. (See GX 170, 174, GX 179, GX 183) The phrase "money to blow" meant "he gets drugs." (GX 174)

The evidence also demonstrates that Johnson knew that drug trafficking was a critical source of revenue for the Gang. Former BHB members testified that their kitty dues – which were funneled to Johnson – were paid with drug proceeds. (Tr. 346, 349 (Adams); Tr. 1287-88 (Morton)) Moreover, the Gang extended its drug trafficking to Elmira because the Greyhound pedigree "needed to generate some income. The Greyhound pedigree in Harlem there wasn't really anything going on." Because drugs sold for a much higher price in Elmira than in New York City, the Gang saw an opportunity to "get some money up there." (Tr. 2985, 3001-02 (Rosario)) The goal of "get[ting] some money up there" was met, and the result was that the kitty dues for those in Elmira became "a little higher than for everybody else." (Tr. 349 (Adams))

Similarly, Michael Adams – whom Johnson sent to Elmira after the Fall 2012 Drive-By Shooting – testified that he saw Johnson in Elmira with Green, picking up money from Kaid in front of the Washington Street residence. (Tr. 331, 348, 610 (Adams)) Given Johnson's undisputed status as the BHB's founder and leader, the jury easily could have inferred that Johnson was a participant in the Gang's drug trafficking in Elmira.

And former BHB member Rayshaun Jones testified that Johnson said that the area around 241st Street and White Plains Road – which the testimony of Shabbir, Wilson, and Jones established was rife with drug dealers (e.g., Tr. 111 (Shabbir); 1328-29 (Wilson); 1646-47 (Jones)) – was a "gold mine" that he wanted to take over. (Tr. 1646-47 (Jones))

In sum, separate and apart from Daly's testimony, there was compelling evidence of Johnson's involvement in drug trafficking. But Daly's testimony was, in any event, fully credible.

As an initial matter, Daly's account of the Gang's Elmira drug trafficking operation was corroborated by the testimony of Adams and Rosario. All three men (1) identified the same individuals as participating in the Elmira operation; (2) specified the same time period for the Gang's operations there; (3) confirmed that the BHB operated out of Daly's home on Washington Street and out of a trailer in Elmira; (4) described at least weekly trips to New York City to obtain additional supplies of drugs; and (5) confirmed that the drugs sold by the Gang in Elmira included cocaine, crack cocaine, and heroin. (Tr. 332-34, 342, 345, 349 (Adams); 2602, 2598-59, 2606-07, 2624, 2699 (Daly); 2984-87, 2988, 2992 (Rosario)) And both Daly and Rosario testified about the Gang's use of Western Union to transmit drug proceeds. (Tr. 2630-33 (Daly); Tr. 2294-95 (Rosario))

Johnson argues that Daly was incredible as a matter of law because, inter alia, (1) he had been addicted to crack cocaine at the time, and had committed serious crimes, including embezzling funds from his police union in the early 2000s, and lying to police officers when he and Kaid were pulled over in March 2013; (2) he fabricated a highly incriminating story about his first meeting with Johnson in 2012, claiming that Johnson had provided him with crack cocaine; (3) he lied about cooperating with the Government in connection with a 2005 case, in which the Government had filed a Section 5K1.1 motion on his behalf; and (4) the physical description of Johnson he provided to law enforcement was not accurate, suggesting that the two had never met. (Johnson Br. (Dkt. No. 644) at 7; Johnson Reply Br. (Dkt. No. 661) at 15, 17-19)

As to Daly's description of Johnson, in a March 28, 2017 proffer session, Daly stated that Johnson "was 6 feet 1 inch tall, clean shaved on the head, sometimes wore glasses, medium to dark skin, and a muscular build." (Johnson DX EEEE; Tr. 3229) Although there was no evidence at trial that Johnson wears glasses, Daly's description was otherwise accurate.

Although Daly (1) <u>sua</u> <u>sponte</u> admitted to prosecutors before trial that he had lied – in an early proffer session – about his first meeting with Johnson (Tr. 2673-74, 2688 (Daly)); (2) had the same motive to curry favor with the Government as every other cooperator; and (3) was mistaken about the date of a conversation he had with Johnson six years before trial,[30] the "established safeguards" of the legal system "leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." <u>Hoffa v. United States</u>, 385 U.S. 293, 311 (1966). The matters cited by Johnson were the subject of extensive cross-examination, and Daly's prior lies and current motives were on full display for the jury (<u>see, e.g.</u>, Tr. 2717-18, 2723-2742, 2788-2813), which nonetheless chose to credit his testimony. Johnson has offered no argument or evidence that would justify disturbing that determination.

Johnson further argues that the Court should reject the jury's finding that Johnson participated in a narcotics conspiracy that involved at least 5 kilograms of cocaine, at least 280 grams of crack cocaine, and at least one kilogram of heroin. (Johnson Br. (Dkt. No. 644) at 6)

As discussed above, a reasonable jury could have found that Johnson engaged in the charged narcotics conspiracy, including the BHB's drug distribution activities in Elmira. "It

---

[30] Daly testified that he and Kaid were arrested together during a traffic stop, and that this arrest occurred in February 2013. (Tr. 2650-51 (Daly)) Daly further testified that "[m]any days later" – after he had been released – he was in a car with Johnson, B-Zo, and Mace, and that Johnson "was upset about" Kaid's arrest because he "was worried that [Kaid] was going to give up information. . . ." (Tr. 2653-54 (Daly)) Daly later testified that the arrest was in "February/March . . . of 2013." On cross-examination his memory was refreshed, and he agreed that the arrest took place on March 18, 2013. (Tr. 2678, 2692 (Daly)) Daly could not have overheard Johnson talking about Kaid's arrest "many days" after March 18, 2013, however, because Johnson was incarcerated at Rikers Island by March 24, 2013. (See GX 416 at 40-42; GX 906) While Johnson argues that Daly fabricated these statements by Johnson, a reasonable jury could have found that he merely misremembered the timing of events that had taken place six years before his testimony.

is well-settled that individual defendants are responsible for all reasonably foreseeable quantities of drugs distributed by a conspiracy of which they were members." United States v. Johnson, 633 F.3d 116, 118 (2d Cir. 2011). As set forth in the jury instructions, the jury was permitted to find that Johnson agreed to distribute or possess with intent to distribute drug types and quantities "that the conspiracy as a whole involved[,] so long as the type and quantity of controlled substances were either known to [Johnson] or reasonably foreseeable to him and within the scope of the criminal activity that he jointly undertook." (Tr. 3642 (Jury Charge))

The evidence offered at trial concerning the BHB's Elmira drug operation – standing alone – was sufficient to prove the drug types and quantity thresholds set forth in the Indictment. Daly testified that the Elmira operation lasted eleven months. (Tr. 2659 (Daly)) Adams and Rosario testified that the BHB members selling drugs in Elmira drove to New York City approximately twice a week for re-supplies of narcotics. (Tr. 342 (Adams) ("We would take trips to the city approximately every two to three days."); Tr. 2992, 3002 (Rosario) (re-supplies for cocaine and heroin took place twice a week)) According to Daly, in the first seven months of the Elmira operation, each re-supply amounted to as much as 400 grams of crack cocaine. Beginning in 2013, the re-supply amount for crack cocaine was consistently 100 grams. (Tr. 2660 (Daly)) According to Adams, each re-supply involved "[a]bout a brick" of cocaine – half of which would be cooked into crack – and "[n]o less than 200 bundles" of heroin. (Tr. 342-43 (Adams)) According to Rosario, the BHB members in Elmira received re-supplies of powder cocaine and heroin twice weekly: 100 bundles of heroin per re-supply, and between 100 grams and 200 grams of powder cocaine per re-supply. (Tr. 2992, 3002 (Rosario)) Daly testified that a "brick" of cocaine amounted to 100 grams; while a "bundle" of heroin amounted to one gram

(Tr. 2662 (Daly))  Rosario, by contrast, testified that a gram "makes two and a half bundles."
(Tr. 2999 (Rosario))

Viewing this testimony in the light most favorable to the Government, a reasonable jury could have concluded that the Elmira operation involved sales of at least (1) between 200 and 400 grams of powder cocaine per week; (2) between 100 and 200 grams of crack cocaine per week; and (3) between 80 and 200 grams of heroin per week, over an eleven month period.  Using the lower end of these estimates, Gang members in Elmira distributed 9.4 kilograms of powder cocaine; 4.7 kilograms of crack cocaine; and 3.76 kilograms of heroin.  The jury could have also concluded that all of these amounts were reasonably foreseeable to Johnson. Accordingly, the evidence is sufficient to demonstrate that Johnson participated in a narcotics conspiracy involving at least five kilograms of cocaine, at least 280 grams of crack cocaine, and at least one kilogram of heroin.

Johnson's motion for a judgment of acquittal or a new trial as to the narcotics conspiracy charge is denied, as is his challenge to the jury's findings as to drug type and quantity.

### 4. The Jury's Findings as to Brandishing and Discharge Are Invalid under *United States v. Davis*

In his opening brief, Johnson argues that the jury's findings as to Count Five – that he brandished and discharged a firearm during and in relation to the racketeering conspiracy charged in Count One – are inconsistent with its verdict as to Count Two, where the jury concluded that Johnson had committed assault in aid of racketeering, but had not committed attempted murder in aid of racketeering.  (Johnson Br. (Dkt. No. 644) at 9-10)  After Johnson's brief was filed, the Supreme Court decided United States v. Davis, 139 S. Ct. 2319 (June 24, 2019).  Johnson then filed a supplemental letter asserting that Davis invalidates the jury's

brandishing and discharge findings. (Johnson Supp. Ltr. (Dkt. No. 707)) For the reasons set forth below, the Court concludes that the jury's findings as to Johnson's brandishing and discharge of a firearm are not valid under Davis.

Title 18, U.S.C. § 924(c)(1)(A) provides that

. . . any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment for such crime of violence or drug trafficking crime –

(i)     be sentenced to a term of imprisonment of not less than 5 years;

(ii)    if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

(iii)   if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A).

Count Five of the Indictment charges:

From at least in or about 2005, up to and including in or about December 2016, in the Southern District of New York, LATIQUE JOHNSON . . . BRANDON GREEN . . . [and] DONNELL MURRAY . . . , the defendants, and others known and unknown, during and in relation to (a) a crime of violence for which they may be prosecuted in a court of the United States, namely, the racketeering conspiracy charged in Count One of this Indictment, and (b) a drug trafficking crime for which they may be prosecuted in a court of the United States, namely the narcotics conspiracy charged in Count Four of this Indictment, knowingly did use and carry firearms, and, in furtherance of such crime of violence and drug trafficking crimes, did possess firearms, and did aid and abet the use, carrying, and possession of firearms, which were brandished and discharged on multiple occasions.

(Indictment (Dkt. No. 418) ¶ 20)

Accordingly, in Count Five, the Government alleges that the predicate "crime of violence" is the racketeering conspiracy charged in Count One, and that the predicate "drug trafficking crime" is the narcotics conspiracy charged in Count Four.

Title 18, U.S.C. §924(c)(3) defines "crime of violence" as

an offense that is a felony and –

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). Subparagraph (A) is referred to as the "elements clause," while subparagraph (B) is referred to as the "residual clause." Davis, 139 S. Ct. at 2324.

As of the time of trial, it was the law of this Circuit that "[b]ecause racketeering offenses hinge on the predicate offenses comprising the pattern of racketeering activity, [courts] look to the predicate offenses to determine whether a crime of violence is charged." United States v. Ivezaj, 568 F.3d 88, 96 (2d Cir. 2009). Likewise, the Second Circuit had long held that "conspiracy is itself a crime of violence when its objectives are violent crimes or when its members intend to use violent methods to achieve its goals." United States v. Elder, 88 F.3d 127, 129 (2d Cir. 1996); see also United States v. Barrett, 903 F.3d 166, 175 (2d Cir. 2018) ("it has long been the law in this circuit that a conspiracy to commit a crime of violence is itself a crime of violence under 18 U.S.C. § 924(c)(3)"), cert. granted, judgment vacated, 139 S. Ct. 2774 (2019), and abrogated by Davis, 139 S. Ct. 2319. Accordingly, whether a racketeering conspiracy constituted a "crime of violence" depended upon the predicate offenses on which the racketeering conspiracy charge was premised. See United States v. Scott, 681 F. App'x 89, 95 (2d Cir. 2017) ("Where, as here, the jury finds two RICO predicates constituting crimes of violence have been proven, Ivezaj instructs us to treat the RICO offense as a crime of violence, and Elder instructs us to treat the conspiracy to commit that offense – that is, the RICO conspiracy charged here – as a crime of violence as well."); United States v. White, No. 17 CR. 611 (RWS), 2018 WL 4103490, at *4 (S.D.N.Y. Aug. 28, 2018) ("The Second Circuit has

repeatedly recognized that a racketeering conspiracy with violent predicate acts is a 'crime of violence.'"). And, at the time of trial, whether a predicate offense for a racketeering conspiracy charge constituted a "crime of violence" turned on application of the "residual clause."

Consistent with the "residual clause" of the statute, and the parties' requests to charge, this Court instructed the jury that "[a] crime constitutes a crime of violence . . . if the offense by its nature involves a substantial risk that physical force might be used against the person or property of another. 'Physical force' means force capable of causing physical pain or injury to a person or injury to property."[31] (Tr. 3657 (Jury Charge))

The jury found that the racketeering conspiracy was a "crime of violence." It also found that the predicate offenses to which Johnson had agreed included (1) attempted murder or conspiracy to commit murder; and (2) distribution, possession with intent to distribute, or conspiracy to distribute or possess with intent to distribute at least five kilograms of cocaine, 280 grams of crack cocaine, or one kilogram of heroin. (Verdict (Dkt. No. 570))

Three months after the jury rendered its verdict, the Supreme Court issued its decision in United States v. Davis. In Davis, the Court held that the residual clause of Section

_____

[31] In connection with other statutes using the phrase "crime of violence," the Supreme Court – pre-Davis – had embraced a "categorical approach" that "look[ed] only to the fact of conviction and the statutory definition" to determine whether an offense constitutes a "crime of violence." See Taylor v. United States, 495 U.S. 575, 602 (1990). In 2018, however, the Second Circuit held that, in the context of Section 924(c), "a conduct-specific identification of a predicate offense as a crime of violence" is permissible. In so concluding, the Second Circuit noted that this approach avoids Sixth Amendment issues: "The Sixth Amendment concern is avoided because the trial jury, in deciding whether a defendant is guilty of using a firearm 'during and in relation to any crime of violence,' can decide whether the charged predicate offense is a crime of violence. . . ." United States v. Barrett, 903 F.3d 166, 182 (2d Cir. 2018) (citation omitted), cert. granted, judgment vacated, 139 S. Ct. 2774 (2019), and abrogated by United States v. Davis, 139 S. Ct. 2319 (2019). Accordingly, the Government requested, and this Court agreed, that the jury be instructed as to the residual clause's definition of "crime of violence," and be directed to make a finding as to whether the charged racketeering conspiracy constitutes a "crime of violence." As discussed below, Davis renders that approach impermissible.

924(c) is unconstitutionally vague. <u>Davis</u>, 139 S. Ct. at 2336. The Court also rejected a "case-specific" approach to determining whether a charged offense constitutes a crime of violence, and ruled that instead the proper approach is categorical. <u>See</u> <u>Barrett</u>, 2019 WL 4121728, at *1 ("There is . . . no question . . . that, in <u>Davis</u>, the Supreme Court held that a crime could not be identified as a crime of violence under § 924(c) – even by a jury trial – on a case-specific basis. The decision must be made categorically." (internal citation omitted)).

The Government concedes that, in light of <u>Davis</u>, racketeering conspiracy can no longer constitute a crime of violence. (<u>See</u> Aug. 5, 2019 Govt. Ltr. (Dkt. No. 710) at 2 ("Following <u>Davis</u>, conspiracy to commit racketeering no longer qualifies as a 'crime of violence' because that charge does not have the use, attempted use, or threatened use of physical force as an element, and previously qualified as a 'crime of violence' only under the unconstitutional 'residual clause'. . . .").[32]

---

[32] The Government's concession is consistent with decisions in this District and elsewhere. <u>See, e.g.</u>, <u>Davis v. United States</u>, No. 18 CV 1308 (VB), 2019 WL 3429509, at *8 (S.D.N.Y. July 30, 2019) ("Under the reasoning of <u>United States v. Davis</u>, 139 S. Ct. 2319 (2019), as the government acknowledges, Davis's firearms conviction under Section 924(c) must be vacated. This is because a conspiracy to commit racketeering qualifies as a 'crime of violence' only under the so-called residual clause of that statute, 18 U.S.C. § 924(c)(3)(B), which the Supreme Court has now declared unconstitutionally vague. Since Davis's 924(c) conviction on Count Two was based on the racketeering conspiracy charged in Count One, and since racketeering conspiracy is no longer a crime of violence under the statute, the firearms conviction is invalid." (internal citation omitted)); <u>United States v. Jones</u>, No. 18-30256, 2019 WL 3774078, at *3 (5th Cir. Aug. 12, 2019) ("[W]e [have] held that Hobbs Act conspiracy was not a crime of violence because it did 'not necessarily require proof that a defendant used, attempted to use, or threatened to use force' – instead, 'conspiracy to commit an offense is merely an agreement to commit an offense.' The Supreme Court's <u>Davis</u> opinion left this reasoning intact. Similarly, RICO conspiracy only requires that (1) 'two or more people agreed to commit a substantive RICO offense'; and (2) 'the defendant knew of and agreed to the overall objective of the RICO offense.' Accordingly, RICO conspiracy is not a crime of violence." (internal citations omitted)); <u>United States v. Davis</u>, No. 13-50368, 2019 WL 3991883, at *2 (9th Cir. Aug. 23, 2019) ("[Defendant] attacks his conviction for possession of a firearm on the grounds that he was not convicted of a crime of violence. Given the Supreme Court's recent decision in <u>United States v. Davis</u>, – U.S. – , 139 S. Ct. 2319, 204 L.Ed.2d 757 (2019), we agree. <u>Davis</u> held that § 924(c)'s residual clause, 18

The Government argues, however, that Johnson's "conviction for brandishing and discharge [is] . . . still valid, even though the jury found that he brandished and discharged a firearm only in relation to the racketeering conspiracy." (Id.) The Government maintains that "the enhanced penalties apply regardless of whether the brandish or discharge is related to the drug trafficking crime or crime of violence." (Id. at 3)

According to the Government, Section 924(c) contains "no requirement that the firearm be brandished or discharged specifically during and in relation to a 'crime of violence' or a 'drug trafficking crime,' so long as that requirement is met with regard to the possession." The Government posits that the "brandish" and "discharge" subsections of the statute set forth enhanced penalties to be imposed if, in addition to using, carrying, or possessing a firearm during and in relation to, or in furtherance of, a crime of violence or drug trafficking crime, the firearm 'is brandished' or 'is discharged.'" (Id. at 2) According to the Government, "[w]here[, as here] . . . the jury convicted the defendant of firearm possession in furtherance of a drug trafficking crime, and where the jury then found that the firearm was brandished or discharged, the elements of § 924(c)(1)(A)(ii) and (iii) have been met." (Id. at 3)

The Government's authority for this novel proposition is Dean v. United States, 556 U.S. 568 (2009). In Dean, the Court addressed whether the discharge enhancement applied to a defendant whose gun discharged accidentally (harming no one) in the course of a bank robbery. In holding that the discharge enhancement applied, the Court emphasized that (1) "[t]he

---

U.S.C. § 924(c)(3)(B), is unconstitutionally vague. Here, [defendant] was convicted of violating § 924(c) for possessing or carrying a firearm in furtherance of a 'crime of violence' – namely, a RICO conspiracy. There is no real dispute that [defendant's] § 924(c) conviction depended upon the statute's now-unconstitutional residual clause." (footnote omitted)). Because racketeering conspiracy could only constitute a "crime of violence" by virtue of the residual clause that Davis found unconstitutionally vague, the racketeering conspiracy charged in Count One is not a "crime of violence."

text of [§ 924(c)(1)(A)(iii)] . . . does not require that the discharge be done knowingly or intentionally, or otherwise contain words of limitation"; (2) "Congress's use of the passive voice further indicates that subsection (iii) does not require proof of intent. The passive voice focuses on an event that occurs without respect to a specific actor, and therefore without respect to any actor's intent or culpability." Dean, 556 U.S. at 572. The Court also ruled that "there is no basis for reading 'in relation to' to extend all the way down to modify 'is discharged.' The better reading of the statute is that the adverbial phrases in the opening paragraph – 'in relation to' and 'in furtherance of' – modify their respective nearby verbs, and that neither phrase extends to the sentencing factors." Id. at 573-74. As to Dean's argument that such reasoning would "lead to absurd results," whereby the enhancement could apply "if the gun used during the crime were discharged weeks (or years) before or after the crime," id. at 574 (internal quotation marks and citation omitted), the Court explained that the Section 924(c)(1)(A) sentencing enhancements "involve . . . special features of the manner in which a basic crime" – namely, using or carrying a firearm during or in relating to, or possessing a firearm in furtherance of, a violent or drug trafficking crime – "was carried out." Id. (internal quotation marks and citation omitted). The "absurd results" Dean contemplated were merely "[f]anciful hypotheticals testing whether the discharge was a "special featur[e]" of how the "basic crime was carried out." Id.

 Dean provides no support for the Government's interpretation of the statute, because in that case the discharge concededly occurred in the midst of the bank robbery. The discharge was a "special feature" of the bank robbery that was committed. Here, the jury rejected the Government's argument that Johnson had brandished or discharged a firearm in connection with the narcotics conspiracy charged in Count Four. (See Verdict (Dkt. No. 570) at 9-10) Dean does not permit the Government to nullify the jury's verdict by arguing that – as

long as using, carrying, or possessing a firearm during and in relation to a drug trafficking crime is shown – a brandish or discharge unrelated to that use, carrying, or possession, or that drug trafficking offense, is sufficient to trigger the mandatory consecutive sentences set forth in Section 924(c)(1)(A)(ii) and (iii).[33]

As to Johnson, the jury's findings as to the brandishing and discharge allegations in Count Five are vacated, as is the jury's determination – as to Count One – that the charged racketeering conspiracy constitutes a "crime of violence."

### B.    Defendant Green's Motions

Defendant Green seeks a judgment of acquittal – or, in the alternative, a new trial – on Count Five of the Indictment.  On Count Five, the jury convicted Green of using, carrying, or possessing a firearm during and in relation to, or in furtherance of, the narcotics conspiracy charged in Count Four.[34]  Green argues that the Government did not establish a sufficient nexus between the six firearms recovered from his apartment and the charged narcotics conspiracy. (Green Br. (Dkt. No. 640) at 7-9)  Green further argues that – given the Government's failure to establish such a nexus – the Court's admission of these firearms was unduly prejudicial, and warrants a new trial.[35]  (Id. at 10)

---

[33]  Indeed, the statute's reference to "the firearm" in subsections (ii) and (iii) – a reference back to the firearm that the defendant used, carried, or possessed during and in relation to, or in furtherance of, a violent or drug trafficking crime – suggests that the firearm that was brandished or discharged is the same firearm that was used, carried, or possessed.

[34]  The jury found that the Government had not proven that Green had used, carried, or possessed a firearm during and in relation to, or in furtherance of, the racketeering conspiracy.  (Verdict (Dkt. No. 570) at 8)

[35]  In a throwaway paragraph at the end of his brief, Green "moves for [a] judgment of acquittal on all counts, or . . . for a new trial" on the ground that "[t]he conviction against [him] was based on evidence provided almost entirely by Mr. Adams. . . . There was little evidence directly connecting Mr. Green to any drug activity and no reliable evidence connecting him to gang activity."  (Green Br. (Dkt. No. 640) at 12)  As set forth above, there was substantial testimony – from multiple witnesses – establishing that Green was the BHB's primary drug supplier and that

56

Finally, Green argues that the jury's finding that the racketeering conspiracy of which he was convicted was a "crime of violence" is not supported by the record. (Id. at 11) For the reasons explained above, racketeering conspiracy no longer constitutes a "crime of violence." Accordingly, Green's motion to vacate the jury's finding on this point is granted.

### 1. The Government Established a Sufficient Nexus Between Green's Possession of Firearms and the Charged Narcotics Conspiracy

"Federal law criminalizes the mere possession of a firearm only if that possession is 'in furtherance' of a drug trafficking crime." United States v. Lewter, 402 F.3d 319, 321 (2d Cir. 2005). "Under [Second Circuit] precedent, 'the requirement . . . that the gun be possessed in furtherance of a drug crime may be satisfied by a showing of some nexus between the firearm and the drug selling operation." Id. at 322 (quoting United States v. Finley, 245 F.3d 199, 203 (2d Cir. 2001)). Accordingly, the Government may not "rely[] on the generalization that ' . . . drug dealers generally use guns to protect themselves and their drugs'" to satisfy the "in furtherance" requirement. United States v. Snow, 462 F.3d 55, 62 (2d Cir. 2006) (quoting United States v. Ceballos-Torres, 218 F.3d 409, 414-15 (5th Cir. 2000)).

The "ultimate question" in determining whether the Government has demonstrated the requisite nexus is "whether the firearm 'afforded some advantage (actual, potential, real or contingent) relevant to the vicissitudes of drug trafficking.'" Id. at 62 (quoting

---

he was intimately involved in the Gang's illegal activities. Green was also arrested with Puff – another BHB member – in 2010 with 29.5 grams of cocaine. (Tr. 2838, 2845, 2864, 2884 (Sisco); GX 141 (cocaine)) Finally, six firearms were recovered from his apartment in 2017. (Tr. 746, 755 (Kushi)) Firearms are "tools of the drug trade." United States v. Estrada, 430 F.3d 606, 613 (2d Cir. 2005) ("We have often recognized that firearms are tools of the drug trade that are commonly kept on the premises of major narcotics dealers."); United States v. Reyes, 353 F.3d 148, 154 (2d Cir. 2003) ("[W]e have often recognized that firearms . . . are 'tools of the [drug] trade' regularly found on narcotics traffickers."). Officers also recovered drug paraphernalia from Green's apartment, including glassine envelopes that are commonly used to package heroin. (GX 109, 110, 112; Tr. 750-55 (Kushi))

Lewter, 402 F.3d at 322). Courts consider a number of factors in conducting this analysis, including "'[1] the type of drug activity that is being conducted, [2] [the] accessibility of the firearm, [3] the type of the weapon, [4] whether the weapon is stolen, [5] the status of the possession (legitimate or illegal), [6] whether the gun is loaded, [7] proximity to drugs or drug profits, and [8] the time and circumstances under which the gun is found.'" Id. at 62 n.6 (quoting Ceballos-Torres, 218 F.3d at 414-15).

Here, these factors weigh strongly in favor of finding "some nexus" between the firearms recovered from Green's apartment and the narcotics trafficking conspiracy for which he was convicted. As to the "type of drug activity . . . conducted," the evidence established that Green was a primary drug supplier for the BHB, and that the BHB distributed drugs in New York City, upstate New York, and Pennsylvania. "The scope of the activity itself supports an inference that firearms would be used in furtherance of the operation." United States v. Chavez, No. S8 02 CR. 1301 (GEL), 2005 WL 774181, at *2 (S.D.N.Y. Apr. 6, 2005).

As to the "accessibility of the firearm[s]," the guns were found in an open handbag stored in Green's bedroom closet. They were thus readily accessible to Green. Indeed, when deputy U.S. Marshals arrived to arrest Green, he was standing only feet away from the closet containing the handguns. (Tr. 749, 792 (Kushi))

The third factor, the type of the firearm, also weighs in favor of finding a nexus. The six weapons recovered were all handguns. (See GX 186C, GX 186E) From photographs introduced into evidence, five of the guns appear to be semi-automatic, while the sixth firearm is a revolver. (See GX 186E) These guns were not "antiques mounted on the wall," nor did they appear to be for use in "target shooting or in hunting game." Ceballos-Torres, 218 F.3d at 415.

The fourth and fifth factors are neutral here, because the Government did not offer evidence that the firearms were stolen or that Green was not lawfully permitted to possess firearms.

The sixth factor – whether the guns were loaded – favors finding a nexus. It is apparent from the photographs admitted into evidence that the guns were loaded. (See GX 186E)

The seventh factor – whether the firearms were in proximity to drugs or drug proceeds – also favors finding a nexus. The guns were found in proximity to $2,000 in cash, which a reasonable jury could have found constituted drug proceeds.[36]

Finally, the circumstances in which the firearms were found strongly supports an inference that Green's possession of these guns was in furtherance of his drug trafficking. The marshals found six loaded handguns stashed together in an open handbag in Green's bedroom closet – a location that was readily accessible to Green. $2,000 in cash was found in the same bedroom, along with fake identification containing Green's photograph. (See GX 108; Tr. 761 (Kushi)) Drug paraphernalia – including a box of glassine envelopes – was stored in the kitchen downstairs. And Green had fled from New York City and taken up residence in the Bridgeport apartment shortly after the Government had obtained an indictment against Green and fellow Gang members, some of whom had been arrested. (Tr. 744-747 (Kushi); GX 1009; Tr. 2372-73) The evidence also indicates that – while in Bridgeport – Green had continued his drug trafficking.

---

[36] As discussed earlier, text messages extracted from Green's phones indicate that he was engaged in drug trafficking while in Bridgeport, and that he was without other sources of income. (GX 600A, 601A)

In sum, analysis of the factors cited by the Second Circuit demonstrates a strong nexus between Green's drug trafficking and his possession of the six handguns.

Where law enforcement officers recover firearms from a defendant who is also a participant in a drug conspiracy, courts determine whether the "in furtherance" requirement is satisfied by looking not only to the circumstances of the weapon's seizure but also to the evidence concerning the role of firearms in the drug conspiracy. See, e.g., Chavez, 2005 WL 774181, at *3 ("In this case . . . there was extensive evidence that the conspirators possessed any number of firearms in connection with their illegal activities. A government witness who was a member of the conspiracy maintained a stash house in New York from which three handguns were recovered. The witness's testimony established that these weapons were maintained for purposes of defending the drugs being distributed. . . ."); United States v. Eldridge, No. 1-09-CR-329, 2017 WL 3699312, at *9 (W.D.N.Y. Aug. 28, 2017) ("[T]here was also testimony by a number of witnesses that members of the enterprise carried guns for protection and used firearms in the course of carrying out various unlawful activities, including drug trafficking and the robbery of drug dealers.").

Here, there was extensive "evidence that the conspirators possessed any number of firearms," and "used firearms in the course of carrying out unlawful activities." Indeed, Adams, Rosario, and Daly all testified that firearms were kept in the 714 Washington Street residence, and that the purpose of storing firearms in that location was to protect drugs and drug proceeds. (Tr. 352 (Adams); Tr. 2618 (Daly); Tr. 2992 (Rosario))

Finally, there was additional evidence at trial linking Green's possession of firearms to his drug trafficking. For example, Adams testified that Green gave him drugs and a gun when he was released from prison. (Tr. 173 (Adams)) And, as noted above, Jones testified

that – in addition to supplying drugs to BHB members – Green was responsible for supplying guns to these same BHB members. (Tr. 1615 (Jones))

"[T]aking into account the totality of the[se] circumstances," a jury could "find beyond a reasonable doubt that the firearm[s] w[ere] possessed in a manner that helped to promote or advance the drug-trafficking crime." Chavez, 2005 WL 774181, at *2.[37] Accordingly, the firearms recovered inside Green's apartment were properly admitted at trial, and the evidence is sufficient to sustain Green's conviction on the Section 924(c) count. Green's motion for a judgment of acquittal or a new trial on Count Five is denied.

**2.    The Evidence is Sufficient to Demonstrate that Green
Agreed to Traffic in Crack Cocaine and Marijuana**

In connection with the racketeering conspiracy charge, the jury found that Green had engaged in a pattern of racketeering activity that including agreeing to distribute or possess with intent to distribute cocaine, crack cocaine, and heroin. As to the drug conspiracy charge, the jury found that Green had agreed to distribute or possess with intent to distribute cocaine, crack cocaine, heroin, and marijuana. (Verdict (Dkt. No. 570)) Green contends that "[w]hile there was some limited evidence that [he] had some involvement with cocaine, there was no

---

[37] To the extent Green suggests that the BHB's drug conspiracy had ended by the time of his arrest, he is mistaken. A conspiracy can continue even where, as here, members of the conspiracy are indicted. See United States v. Persico, 832 F.2d 705, 715 (2d Cir. 1987). Indeed, the evidence at trial demonstrates that the BHB – which was born in a state prison –"was quite capable of continuing operations despite the fact that some of its members were incarcerated." Id. Nor is there evidence that Green withdrew from the conspiracy. "Since conspiracy is a continuing offense, a defendant who has joined a conspiracy continues to violate the law 'through every moment of [the conspiracy's] existence.'" Smith v. United States, 568 U.S. 106, 111 (2013) (internal citation omitted) (quoting Hyde v. United States, 225 U.S. 347, 369 (1912)). As to withdrawal, a defendant bears the burden of demonstrating that he withdrew from a conspiracy. Id. at 112. A defendant arguing withdrawal must show "'affirmative action . . . to disavow or defeat the purpose' of the conspiracy." Id. at 113 (quoting Hyde, 225 U.S. at 369). There is no such "[a]ffirmative action" here.

evidence that he had any involvement with crack at all," and that the Government "did [not] offer any evidence that [he] ever had any involvement with marijuana." (Green Br. (Dkt. No. 640) at 12) Accordingly, Green argues that the jury's findings as to his involvement with crack cocaine and marijuana are not supported by the evidence.[38] (Id.) Green's argument is unavailing.

Green concedes that there was "evidence that [he] had some involvement with cocaine." (Green Br. (Dkt. No. 640) at 12) This evidence includes nearly thirty grams of cocaine seized by police from Green's person in 2010, in the Bronx (Tr. 2845, 2884 (Sisco); GX 141 (cocaine)), and testimony that Green distributed cocaine to Adams and Kaid for resale, including cocaine destined for the Gang's Elmira drug distribution operation. (Tr. 173, 346-47, 360-61, 367, 374 (Adams)) Testimony at trial also established that Gang members who purchased powder cocaine commonly "cooked" a portion of that powder cocaine into crack cocaine, which was then sold to crack users. Indeed, a significant percentage of the powder cocaine supplied to Gang members who were selling drugs in Elmira – including cocaine supplied by Green – was cooked into crack cocaine. (Tr. 340, 343 (Adams); Tr. 3003-05 (Rosario)) A reasonable jury could have concluded that it was reasonably foreseeable to Green that the powder cocaine he distributed would be cooked into crack and sold in that form.

As to marijuana, the text messages extracted from Green's cell phones provided a sufficient basis for the jury to find that Green was conspiring to distribute and possess with intent to distribute that drug (see, e.g., GX 601A at 4 (Green text message to "Rube" in which Green states that he "never got none of that loud u said u was gonna send"); see also Tr. 1721 (Jones)

---

[38] Green says nothing in his brief about the evidence concerning his involvement in heroin trafficking.

("loud" is a term for marijuana); Tr. 2196 (Moore) (same)), and was doing so as part of his Gang-related activities. The sale of marijuana was part of the BHB's drug distribution operation. (See Tr. 2988 (Rosario) (testifying that he sold "weed," among other drugs, in Elmira); Tr. 221-22 (Adams) (testifying about Johnson's distribution of marijuana in prison); Tr. 2929 (Rosario) (same); Tr. 1291 (Morton) (same); Tr. 1335 (Wilson) (testifying that BHB member Box Brim "used to sell weed on the block"))

The Court concludes that there was sufficient evidence at trial to demonstrate that Green had conspired to traffic in crack cocaine and marijuana.

### C.    Murray's Supplemental Motion

In an August 20, 2019 supplemental motion, Murray contends that his conviction on Count Five – the Section 924(c) count – cannot survive in light of United States v. Davis, and he asks that this charge be dismissed. (Murray Supp. Mot. (Dkt. No. 727)) The Government has not opposed Murray's request.

Murray's conviction on Count Five is premised on his alleged possession, use, brandishing, and discharge of a firearm in connection with the racketeering conspiracy charged in Count One. (Verdict (Dkt. No. 570)) As discussed above, racketeering conspiracy is not a "crime of violence" for purposes of Section 924(c), and that crime cannot serve as a predicate offense under Section 924(c). Accordingly, Murray's motion for a judgment of acquittal on Count Five is granted.

**CONCLUSION**

For the reasons stated above, the Court grants (1) Defendant Johnson's motion to vacate the jury's findings that he brandished and discharged a firearm in connection with a "crime of violence"; (2) Defendant Green's motion to vacate the jury's finding that Count One constitutes a "crime of violence"; and (3) Defendant Murray's motion for a judgment of acquittal on Count Five. Defendants' post-trial motions are otherwise denied. The Clerk of Court is directed to terminate the motions. (Dkt. Nos. 639, 642, 643, 727)

Dated: New York, New York
September 16, 2019

SO ORDERED.

Paul G. Gardephe
United States District Judge