To: Judge Paul G. Gardephe

U.S.D.J. S.D.N.Y

500 Pearl Street

New York, NY 10007

From: Brandon Green Reg. # 56400-054

M.D.C Brooklyn

P. O. Box 329002

Brooklyn, NY 11232

Re: 16 Cr. 281

Date: November 1, 2020

## ATTACHMENT TO ADDENDUM TO PSR OBJECTION

Sent here with is the Guide, which is referenced in Endnote 1 in Mr. Greens Addendum to his PSR Objections. Mr. Green asks this Court to please file this attachment as Exhibit "A" to the Addendum to the PSR Objections.

Thank You.

Sincerely,

Brandon Green

I. Introduction

I am submitting the following information to aid you in moving the Court here for a Judgment of Acquittal (JOA), and/or, for a new trial. I'll do my best to submit this information to you with my arguments as I feel they apply to the law here; however, please feel free to let me know if you feel the information should be presented in another way. Additionally, I've provided some case law to support some of my contentions, and hope that this is also helpful. Please let me know if there is more that you need from me to attack and amend the Rule 29 and Rule 33 pleadings here. With that said, here is the information that I have put together for you.

The prosecution clearly relied heavily on the knowingly false and perjured testimony of several cooperating witnesses (CWs) to support their fabricated case against Mr. Green and his co-defendants. Review of the record will establish that these CWs were not reliable, lied and misrepresented the facts throughout the entire trial. This was necessary for them to please the Government so that they could receive a more favorable sentence for their cooperation; however, the devil is in the details, and careful scrutiny of such here will reveal a case brought against Mr. Green that was based off of, inter alia, the perjured testimony of several CWs, and the official misconduct of several employees of government agencies (TTpg2776,2971,2813,2993-96,2999,3000-04); in addition to a failure of the Court's to intervene, or Mr. Green's lawyers to stand up and do what was right. In sum, the case against Mr. Green and the findings of the juries here was based off pure speculation, and, therefore, cannot pass the test of beyond a reasonable doubt.

For example, Patrick Daly's testimony proves "malicious prosecution":

(TTpg2776-79,2813)

Q. Did you have a conversation with them (gov) about whether you could identify Mr. Johnson in the courtroom?

A. No, not about Mr. Johnson, no.

A. One person did come back asked if I could identify anyone else (investigator Stefano 'Steve' Barcinni)

Q. They had brought that up the day before and they wanted to make sure I check-- did that. I was to look around as I entered, and I told them (Steve Investigator) the only person I could identify was La brim.

The government needed Mr. Daly to identify Mr. Green as being the supplier to the Elmira conspiracy to complete their fabricated case and achieve a conviction of Mr. Green on Count 4, which the government proves itself a liar on its own witnesses account.

## II. Conclusion

- Drug Conspiracy

2nd circuit quoted case: "Courts must rely on evidence that points specifically to a drug quantity for which the defendant is responsible"(U.S. v. Shonubi ,103 F.3d 1085,1090 (2d Cir. 1997).

Because a finding by the jury as to any drug quantities was based off of speculation, Mr. Green's conviction as to any such quantities should be vacated,  as procedurally unreasonable...evidence did not support drug quantity calculations, or at least a new trial on count 1,4 and 5.(U.S. v. Burks 18-1261__F..app'x__.2019 WL 4049857, August 28,2019)

- 924(c)

Under Davis, Mr. Green's 924 (c) convictions should be vacated.

-RICO Conspiracy (U.S. v. Jones) 2019

Because Mr. Green's 924 (c) conviction should be vacated under Davis, and, because RICO is not a crime of violence, Count 1 C should be dismissed, and, consequently, Count 1 should be dismissed due to a lack of required two (2) predicate acts.

- Drug Conspiracy Count 4

Because Count 1 is dismissed, Count 4 cannot stand because the underlying conduct for the offense is past the statute of limitations (e.g., my 2010 traffic stop that should not have been used anyway), the Elmira Drug Conspiracy, and due to lack of evidence.

### III. Testimony of Cooperating Witnesses

The first cooperating witness (CW) whose testimony I would like to address is that of Michael Adams. Adams was clearly the Government's star witness, or, as you will see, star fabricator of testimony. The Government relied on the coerced testimony of Adams, and moreover his testimony that they knew to be fabricated, to attempt to meet the elements of their case against Mr. Green. Mr. Green was charged with Racketeering conspiracy, conspiracy to commit murder, narcotics conspiracy, and possession/use of firearms in relation to the aforementioned federal crimes; and, it was the perjury and lies of Adams that were the primary foundation of the Government's case against Mr. Green in support of these offenses. Moreover, you will see from review of the transcripts that this testimony is coerced, fabricated, and cannot support a reliable finding beyond a reasonable doubt of guilt as to all the elements for the conduct for which Mr. Green is charged here. Let me show you what I mean by this.

-When Adams Allegedly Met Mr. Green

Adams claims to have met Mr. Green in 2011, when he came home from state prison (TTpg172,173 Line(s) "LL" 1); that he allegedly met Green at the Honeywell Complex, where he claims Green lived. (Id. LL 3-5). (It should be noted though that Mr. Green never lived in the Honeywell Complex, and review of his probation report, 2010-2016, and/or DMV records from this or any other time period will prove that he has never resided there). It should also be noted that Adams failed to identify the Honeywell complexes (TTpg363,690) or did not remember the address where he allegedly visited so frequently. It should also be noted Honeywell complexes are only two small brick buildings; this would not be hard to remember.

Adams claims that at this time, in 2011, he was first introduced to Mr. Green, by La Brim (Id. LL 6-9); he never states that Mr. Green was introduced as the "plug", "drug supplier" or "dealer" of any sort. He only alleges that Green was introduced as the "Hound Light"(pg172,173). Adams story makes no sense at all from his own testimony. First Adams claim he was introduced to Mr. Green upon his release by 'LA', then states he goes to see Mr. Green days after Mr. Johnson was released from prison. Never stating Mr. Johnson ordered him or told him what to give him exactly. The government relied on this testimony in order to try and attempt to convict Mr. Green of 924(c) and, OR bring some nexus to the firearms seized from the illegal search in Bridgeport, CT. Adams failed, and could not describe this gun:

(TTpg689,690 cross)

Q. Now Mr. Johnson, when he gets out, he comes to see you right away?

A. Correct.

Q. The night he got out? (from prison)

A. Correct.

Q. I think you testified before that you gave him (Mr. Johnson) $100?

A. Something around there

Q. And you gave him that money because he had just gotten out? (from prison)

A. Correct.

(Noted - not from alleged kitty fees supposedly owed to the godfather from his greyhound fraction)

Q. And then you testified that at some point you had a -- you went with Mr. Johnson to meet Mr. Green?

A. Days later.


As to the circumstances of the alleged introduction, Adams claims that when he first met Mr. Green, he was doing a "video in [his] building"(TTpg173 LL 5-6). Adams further alleges that "[w]e talked for a little while" and that "La told him that I (Adams) had just came home. He gave me a gun and some drugs." (Id. LL 5-8). However, Adams cannot accurately describe what this mysterious gun actually was or looked like:

Q. What did the gun look like?

A. It's a little black gun.  It was like -- it was a handgun.

(Id. LL 11-12). It should be noted the importance of these fabrications for the Government: Tying Mr. Green to drugs and guns was the main objective of their prosecution against Mr. Green; they needed these lies from Adams, which were more than likely coached, to meet the elements of the crimes they charged Mr. Green with.  Furthermore, the inability for Adams to accurately describe the alleged gun supports my contentions that such things were in fact fabricated: Adams was unable to accurately describe these details of this gun because he was lying; and, one cannot recall details of something that never happened. Moreover, had Adams had the gun that Green allegedly gave him, he would have been able to better describe it, like he did with the guns that he actually did possess in the past.

Q. What guns did you have?

A. A couple.

Q. Can you describe them?

A. The nine that we used in the shooting. I had a .40 that La gave me. "The gun that Light gave me". That's basically it.

(TTpg398-400). Furthermore, it should be noted that Adams failed to mention the gun he brought to the "POW WOW" with another alleged Greyhound member:

Q. Can you read the first text message at the top.

A. "With Handz meet you there. I'm on 125 walking. Got mayback."

Q. Who said that?

A. I did.

Q. Who are the texts messages between?

A. Me and Handz.

(TTpp397). It should be noted that this does not make much sense. Adams states that he was walking with Handz, and then goes on to say that the text messages he is sending are between him and Handz; ergo, they would have had to of been walking with each other and texting each other at the same time. If you are walking with someone, you would just talk to them, not be texting them, correct? This is an example of the devil-in-the-details. In telling his lie, Adams makes a crucial error here, one which evinces that his story, like most if not all others on the stand, is fabricated.

Adams then goes on to explain what "mayback" is; that it is in fact another gun he owned (which he failed to mention earlier):

Q. What does mayback mean?

A.  A gun.

(Id. LL 22-23). Adams attempts to keep his stories straight leads to even more inconsistencies:

Q. What happened as a result of this conversation?

A. He came and got the mayback.

Q. Where did you get the .38?

A. I never got it. He didn't get it from me.

(TT Pp 398). Clearly this makes no sense. First, Adams claims to be walking with the gun, and texting with the person that he is walking with (Handz); but, goes on to state he himself never got it (the gun), and that Handz did not get it (the same gun) from him in the same answer in response to what happened. How could he never get something he already had, not have it, but not give it to the person whom he implies it was going to? What does make sense if you read the trial transcripts pages 397 to 400, is that Adams possessed the gun, and is probably the person who gave it to Handz. Adams' contradictions regarding this fabrication do not stop here though:

Q. Can you read the text message at the bottom of the screen.

A. "I'm pulling up, bro. I'm on the move, trying to get seats put in my mayback." (emphasis on the "my").

Q. Who said that?

A. I did.

(TTpp400) (Emphasis Added). Adams again proves himself a liar by his own account of the events that transpired here. He claims to be trying to get seats put in (code word for bullets) his mayback (code word for the gun; the .38 he said that he had on him). This shows not only that he did in fact own another gun, but also establishes that he did in fact have it in his possession despite his claim earlier that he did not. Adams is not a reliable witness his credibility is tarnished due to his perjury and fabrications.

-The Elmira Drug Conspiracy; Count 1 D, E, and Count 4

The evidence at trial was insufficient to support a finding by the jury beyond a reasonable doubt that the drug conspiracies involved 5 kilograms or more of cocaine, 280 grams or more crack, and 1 kilogram or more of heroin and an unspecified amount of marijuana. It was the testimony of Adams that was used by the Government in an attempt to show that Mr. Green was involved with multiple kilograms of cocaine; and it is this testimony that I will focus on now to show you that it was clearly COERCED, fabricated, unreasonable, and, could have only left the jury to "speculate" as to any possible drug quantities; and speculation is not enough.( See United States v. Pauling, 256 F. Supp. 3d 329, 2017 U.S. Dist. LEXIS 89996).

In addition to the reliance of Adams testimony to convict Mr. Green for the 924(c) offense, his coerced and fabricated testimony was also heavily relied on by the Government to attempt to link Green to the Elmira drug conspiracy operation. The government needed his lies to support the drug conspiracy aspect of the Racketeering conspiracy in Count 1 D, E, and to tie Mr. Green to the drug conspiracy in Count 4. Here, as with the 924(c) testimony, Adams clearly can be seen to have been lying, and, to have

been coached in these lies (likely through numerous proffer sessions over the years, which you can see if you look into it). Moreover, such testimony was not reliable, and should not have been used to support a finding of guilt here beyond a reasonable doubt--it was spectacle at best. Adams, or any other CWs, never testified as to any specific drug weights. I will show this throughout this paper. Consequently, under, (U.S. v. Davis), (U.S. v. Jones)2019 or (U.S. v. Burks)2019; a judgment of acquittal should be granted here, and or, at least a new trial should be granted on all counts. The Government relied on the coerced testimony of Mr. Adams to support a 924(c) conviction of Mr. Green. But once again it failed, when it was left to the jury to speculate who, when and where these alleged drug transactions took place.

(TTpg173)

Q. What did you do with the cocaine? (60grams)

A. I gave it to another hound named Dilly.

Q. What did Dilly do with it?

A. He sold it. Every couple weeks he would give me money.

(Note - Which conspiracy will these drugs fall under being there is drugs under the RICO and drugs in a separate narcotics conspiracy? Being that he never testified to the location where these were given/and or sold at. Also noted there is no nexus to Mr. Green receiving any proceeds from any of this CRAP. (Noted) - Adams states (TTpg343): "No, I'm not too good with drugs." After being asked about specific drug amounts.

    Review of the highlighted portions of Adams' testimony below supports my contentions that any findings of guilt here as to Count 1, D, E,4 and Count 5 were based on speculation founded upon lies; this goes for the actual offenses, and, for any findings as to specific drug quantities for those offenses.

-Adams testimony

    Adams claims to have went up to Elmira per Mr. Johnson's request that he cool off (meaning lay low). Never did he state it was to engage in narcotics trafficking, or, drug selling of any kind (that would have defeated the purposes of laying low). Again, as shown earlier, Adams was proved to be lying throughout his testimony:

(TTpg598, LL 9-16).

Q. You are saying that Bigs attacked Ms. Ingram within those two weeks?

A. Yeah. That was the reason for going to Elmira.

Q. The reason you went to Elmira was that Bigs attacked Ms. Ingram.

A. Yes.

Q. Yeah?

A. Yes.

Also, it should be noted that Rosario stated that he went to Elmira after this same alleged shooting (TTpp2998); however, he never mentioned Adams being along for the ride or there in Elmira when he arrived.

When Adams testifies about Elmira, he lied and said that he would take trips to New York City every two to three days for a resupply, obtaining the amount of one kilogram of cocaine each time (TTpg340-343). This does not seem plausible considering his statements that the amount of drugs he would get would be stored on one's person, and, it contradicts the testimony of the other CWs.

Furthermore, Adams states that most of the Elmira customers were users (TTpp336), and, that he dealt primarily in one (1) gram transactions, selling each gram of cocaine at a price of $100.00 a gram. At this rate, each kilogram that Adams picked up, if sold every three days, he would have to sell on average 333 grams a day (1000 grams in a kilo / 24 hours = 333 grams per day). Moreover, if Adams stayed awake selling $100 grams for 24 hours a day he would be required to sell on average 14 grams an hour (333 grams / 24 hours = 13.8 grams per hour); and, this means he would on average be required to sell a gram every 4.3 minutes (60 minutes / 14 grams = 4.28 grams per minute). This just cannot be correct. Even if Adams split this up between 3 persons operating 8 hour shifts they still would have to sell on average 4.8 grams per minute; there would have to be a literal visual traffic jam leading to the trailer he claims to be selling all of this cocaine out of, and, though he said he had a lot of traffic, it was not the kind required to sell these large quantities of drugs in such a short period of time. Furthermore, Adams stated he was in Elmira selling this much cocaine for 3 months, so, this would work out to, according to his rates a purchase, him buying and selling approximately 30 kilograms of cocaine.

The above testimony by Adams would leave one to believe that he should be an "EXPERT" drug dealer to be pulling off such a large scale operation; so, I ask you to now consider why is it that he, when questioned by the Court, admits to not knowing how much a kilo weighs, and says that it is because he is "NOT TOO GOOD WITH DRUGS"? This just does not make any sense.

(TTpp343) The Court questioning Adams.

THE COURT: Now, with respect to the brick of cocaine that you described, do you know how much that weighed?

THE WITNESS: **NO. I'M NOT TOO GOOD WITH DRUGS.**

(TTpp344) (Emphasis Added). This just does not make any sense; especially considering Adams testimony is that the cocaine he was selling in Elmira was in fact weighed.

Q. How was the cocaine packaged that you were selling in Elmira?

A. It would be WEIGHED FIRST, and then it would be put in like a piece of plastic.

Q. I'm sorry. Can you raise the microphone, Mr. Adams.

A. IT WOULD BE WEIGHED, and then put in some plastic.

Q. You said "weighed". How would you weight the cocaine?

A. On a scale, a digital scale.

Michael Adams lies continues, claiming that he never weighed the crack cocaine but sold it at the same weight and price as the powder cocaine, this just does not make much sense:  add the note weighing crack:

(TTpg344)

Q: How much money did -- what was the sale price of cocaine?

A: Same as crack, $100 a gram.

(TTpg340)

Q: And what about the crack? How was the crack packaged for sale?

A: It was never packaged. We just used to break it off.

(TTpg340 LL 8-15) (Emphasis Added, Quotations in original). Adams claims to have been driving to New York City to get a kilo of cocaine every two to three days, however, he has no idea how much the alleged kilo weighed, despite his admission that he weighed all the cocaine sold in Elmira. What does this mean? It leads one to see that Adams is lying about purchasing kilos of cocaine in New York City from Mr. Green and another guy named Wheezy. And, not only does Adams fail to state a weight of these alleged kilos, he never once gives a price as to what he is allegedly paying for these "bricks" each time he gets one, nor does he describe how much he makes and where the proceeds go or who the drugs came from each trip: LIGHT or WHEEZY? Moreover, none of the alleged drug weights specifications (e.g., cost of kilo) here were ever testified to because Adams had to keep his fabrications to a minimum so as to not get caught up in his lies. It failed to work though.

I doubt that there is a drug dealer on this planet who purchases a kilo of cocaine without weighing it; and, this also implies that the person must know what the kilo first weighs--otherwise he could not possibly ensure that what he was buying was in fact a kilo (which weighs 1000 grams). Not only can we use this fact to prove that Adams was lying here, but, we also can demonstrate that his lack of knowledge as to the weight of the alleged drugs that he was purportedly getting from Mr. Green and others supports our contentions that the jury was left to only speculate as to the actual amounts of any drugs (assuming that they believed that the drugs actually existed). Adams himself not only admitted to not knowing the weight of the alleged kilo(s) of cocaine allegedly purchased from Mr. Green in New York City, he also testified to not packaging the crack, never weighing it (see TTpp340 LL 16-24 and page 343 where Mr. Adams stated: He's not too good with drugs).

Additionally, Adams testified that the amount of drugs held at his place in Elmira were small enough to keep on one's person:

Q. Where were the drugs stored in Elmira?

A. On person or in the couches.

Q. You said "on person"?

A. Yes.

Q. What do you mean by that?

A. Somebody be holding it, or it be stored inside of LITTLE stash boxes in the house in the couch.

(TTpg340 LL 25, TTpg341 LL 1-6) (Emphasis Added, Quotations in original). This does not sound like large quantities of drugs, and, again offers nothing more than speculation as to any specific quantities of drugs here.

There is no way for the jury to know beyond a reasonable doubt that the conspiracies here involved 5 kilograms or more cocaine, 280 grams or more crack, and 1 kilogram or more heroin; and unspecified amounts of marijuana therefore, a JOA should be granted as to their findings on the verdict form as to such amounts and or conspiracies.

Adams' reply here to the Court about the specifics of the weight of a kilo of cocaine does not sound like he has that much experience. Adams should have been an EXPERT witness in narcotics dealing with these AMOUNTS. This goes to show that his tales of picking up and selling a kilo every of couple of days is exactly that: a tall tale. Again, these fabrications were necessary for the Government to achieve the highest drug quantities possible for the purpose of the cocaine drug conspiracy convictions that they needed against Mr. Green and his co-defendants. The Government needed Adams to fabricate this story of massive amounts of cocaine so that the jury would check off such on the verdict form. (See Verdict Pp 4, and 6-7). The verdict form had as to the amounts of cocaine for Count 1 D, E, and Count 4, 5 kilograms or more cocaine, 280 grams or more crack, 1 kilogram or more heroin, and for Count 4, there was an additional finding of an unspecified amount of marijuana.

Moreover, there is no proof that Adams was a major drug dealer. No other CWs testified or corroborated in any way that Adams was selling large quantities of drugs. No one else stated that they purchased drugs from him personally, or even sold for him. The only real evidence of any involvement by Adams with drugs is not of large amounts for selling; it is his own admission that he, when arrested, was found to have a small amount of heroin on him that he claims was his for personal use:

(TTpg354).

Q. Why were you arrested?

A. I got pulled over while driving. They found some -- they found a couple of bags of dope in the car, and I had a warrant for parole.

(This shows why Mr. Johnson allegedly told him to go up to Elmira to "get low", to avoid parole capture)

Q. What did you tell the police about the heroin, if anything?

A. I told them I use it.

Once again Adam's story of the arrest makes no sense by his own admission:

Q. And who was with you?

A. Me, Top Dolla, kid named Top, another hound named Top, and the person whose car it was.

When challenging sufficiency, inferences must be drawn in the Governments' favor, but this must be reasonable, and an inference is not reasonable just because it is possible. The 2nd circuit stated, "they may not credit inferences within the realm of possibility when those inferences are unreasonable". TO BE REASONABLE AN INFERENCE MUST BE BASED ON KNOWN FACTS. The only reasonable inference, at best, that can be drawn from this is that Adams used and or possibly dealt in small amounts of heroin. Nothing about this supports his contentions that he was dealing in massive amounts of cocaine while he was in Elmira (that is where he was pulled over and arrested). That is because he was not. It was a lie. There is nothing else to support his contentions of this. I wish to challenge Mr. Adams entire account on credibility issues on drug identification, drug quantities, perjury and lack of knowledge to support these allegations. The only known FACT was that Mr. Adams (TTpg403) was a murderer, who robbed Mr. Camera (a store clerk)of his life and his money, so him, his brother(Stephen Adams) and codefendant Bettis could purchase GREYHOUND tickets to relocate down south. This is UNREASONABLE INFERENCE considering Adams alleged to have been selling 10 kilo grams of cocaine monthly (TTpg172,173,342,345,367,368) in Elmira, an allege gross amount of 3 MILLION US dollars: Adams would not have needed money.

The jury was left to purely speculate about Mr. Adams testimony regarding his alleged dealings with large quantities of (US .vs. Burks 18-1361 2019)(U.S. v. Shonubi 2nd Cir. 1917),(U.S. v. Pauling 2nd

Cir) cocaine and or large quantities of drugs in general while he was in Elmira(TTPg334-36,342) for that short period of time. No one involved in this trial was caught with nor seen to ever possess such large amounts; moreover, it is inconsistent with the testimony of Patrick Daly, Manuel Rosario and Mr. Morton here, and, contradicts Adams own admission (TTpg343) that he "is not too good with drugs" (Paraphrasing). Adams admits when questioned by the courts he was only in Elmira for a short period of time:

(TTpg345)

THE COURTS: During what period of time were you selling drugs in Elmira? From when to when.

THE WITNESS: 2012 to 2013

Q. Approximately how many weeks or months were you in Elmira?

A. Two - three months.

Patrick Daly (TTpg2814) admits he only saw Adams at his home "for a couple of days", and further states Manuel Rosario (TTpg2771,72) was also only at his home for no more than 2-3 weeks:

(Daly TTpg2771-72)

Q. And approximately how many times did you meet Top Dolla?

A. I believe he was there for two to three weeks, so almost in a daily basis.

THE COURT: Excuse me. You saw him on a daily basis for that two to three week period or you saw him on a daily basis for a longer period?

THE WITNESS: For that two to three-week period.

The Government went on to question Adams about his involvement in the driving to New York to pick up the drugs to take back to Elmira to sell. This testimony was coached and fabricated like all the rest given by Adams.(TTpg345,367,368) Here, the Government coached Adams to testify that he would drive to New York to get drugs from Mr. Green; at least that is how they wanted to paint the picture for the jury. However, like his lies earlier, careful review of the details will show the inconsistencies and

contradictions on his own account and all the other government cooperators: It will prove that what Adams said was a lie.

I will now present you with Adams trial testimony as to these lies.

Q. Now, did YOU ever take the trips to New York to get drugs?

A. Yes.

Q. Who did YOU pick up the drugs from?

A. Two people.

Q. Who?

A. One was Light and somebody from Lincoln named Wheezy.

(TT Pp345,367,368). Adams then goes on to clearly contradict himself, showing that he is again lying on the stand:

Q. Did you ever have a conversation with O-Dog about where he was getting his drugs from?

A. Yes.

Q. What did he say?

A. Light and Wheezy.

Q. Was Wheezy a member of Blood Hound Brim?

A. I don't know. I NEVER DEALT WITH HIM.

(TTpg345,367,368) (Emphasis Added). Unable to keep up with his lies, Adams, after first stating that he would get his drugs from Light and Wheezy (pg345), goes on to then state that he "NEVER DEALT WITH HIM" (him being Wheezy)! How could any reasonable inferences be made from Adams' clear fabrications on any account? Even if this were some truth to it, then what reasonable jury could determine each time Adams picked up resupplies, were provided all by Mr. Green himself? It had to be speculated that those narcotic transactions were distributed by Mr. Green or Wheezy? (U.S. v. Pauling 2nd Cir.). Cooperator Manuel Rosario contradicted Mr. Adams testimony when he told the jury exactly who this WHEEZY person is:

(Manuel Rosario TTpg2991-3002)

A. Wheezy that was the hound that was from "Harlem," he was part of the GREYHOUND pedigree and we was getting the coke from him.

(TTpg3091)

Q. So it's fair to say that Elmira and Syracuse, in terms of who was selling the drugs up there, was a GREYHOUND operation?

A. Yes

(Key Point - It should be noted "Harlem" is the greyhound pedigree. "220" is the Bronx Pedigree meaning two different subset within the gang.) Can this possibly lead to multi conspiracy?

Adams coerced story of lies continues to go on, and it is evident that it is a lie when he can't identify the trailer in Elmira that he allegedly purchased, and was selling kilos of cocaine out of every two to three days. Again, the Government here needed Adams to be able to identify the trailer in Elmira. (TTpg2624-25) Patrick Daly, a native of Elmira himself, failed to identify the trailer and location as being the one used in the drug conspiracy to prove their case which they fabricated against Mr. Green; however, their attempts here failed, as Adams was clearly unable to identify, during trial , the trailer in Elmira:

Q. Mr. Adams, in this photograph, can you point out where the trailer is in Elmira that you purchased? I'm sorry. You know what? I think the touch screen is not working can you describe which one it is?

THE COURT: What color is it?

THE WITNESS (Adams): It's green and white.

(TTpg350,51). Ms. Feinstein, the AUSA, then, realizing that Adams got it wrong, begins to lead the witness (Adams) into getting it right.

Q. Green and white? Is that what you said?

A. Yeah.

Q. Where in the photograph is it?

A. The first one.

Q. On the right or left?

A. The right.

Q. From my perspective, it appears to be sort of brown and white.

A. Brown and white.


(TTpg2624-25) Patrick Daly also got the location and the color of this trailer wrong and the AUSA once again leads him to switch his answer.

(TTPg336,337,351), Adams than states he left the Washington Avenue house to move into this trailer because it was too much traffic, then to be proving his story just does not make any sense at all:


(Adams TTpg351)

A. Why did you move to the trailer?

Q. Too many customers going in and out

Q. What were you doing in the trailer?

A. Same thing, selling drugs.


(TTpg350,51). I think that Adams should have been able to clearly identify the trailer that he is alleged to have purchased and, to have been purportedly operating such a large scale drug operation out of; unless, this is not what really happened. It was all a bunch of lies to wrongfully prosecute and convict Mr. Green! What this does establish, like so many times before, is that Adams is not a reliable witness. The jury should not have given any weight to his testimony here.

Adams further goes on to speculate to the jury about the alleged drug transactions in New York City. Adams stated that he would go to New York with O-Dog to pick up drugs (TTpg346,47); that these drugs were in a bag (TTpg347); but, that he did not know exactly what was in the bag until later. Adams stated he dealt with me third party (TTpg174,207,360,361), which once again proves himself a liar on his own account. (Adams TTpg360,363):


(TTpg347)

Q. Do you know what was in the bag?

A. No

A. I used to do third party stuff for Light. Like, somebody I know that wanted some drugs, I used to take them to light or I would go get it myself from him (him-Mr. Green)myself.


Mr. Adams entire testimony was problematic and made no sense at all, first stating he would get drugs personally from Mr. Green, and then stated he would send customers directly to Mr. Green for

purchase. Also, stating Mr. Green gave O-dog in his hands (Saeed Kaid) a bag with drugs in it. This story is seemly at odds, HIGHLY contradicting, coercive and not a reasonable inference. Basically Mr. Adams stated Mr. Green is not a drug dealer or a drug supplier of any sort, admitting under oath never seeing Mr. Green make any hand-to-hands drug transactions at all.

(TTpg363)

A. Did you ever see "Light doing hand-to-hand" sales of drugs?

Q. No

(TTpg347)

Q. Do you know what was in the bag?

A. I mean not right there, but eventually yeah.

(TTpg346,47). Anything could have been in that bag at the time O-Dog picked it up. He could have later put something else in it, leaving anyone else to believe that the drugs had in fact been in there the entire time. If someone sees me walk out of the grocery store with a bag, and, when I get home I take a gun out of the bag, it does not mean that the cashier sold me a gun. It only takes a second to put something in a bag, and, unless Adams eyes were on that bag from the time it was picked up until the time it was emptied, there is no saying who put what in it: It is just a bunch of speculation, and not a reasonable inference and count 1,4,5 cannot stand

-Testimony of Rosario

Rosario not only calls Mr. Adams a liar, he also contradicts Michael Adams, and Patrick Daly's account of events that allegedly took place up in Elmira:

Q. Why did you did you decide to go to Elmira?

A. The Greyhound Pedigree in "Harlem", there wasn't anything really going on and in 2012 O-Dog found the town of Elmira through another hound Paper and I decided to go up there.

(TTpg2985).

A. That's Paperboy that was "under the Greyhound from upstate New York"?

(TTpg2911). Rosario not only told the jury why they went up to Elmira: to sell drugs; but, also stated where the idea came from and whose sole operations of both Elmira and Syracuse belonged to?? The Greyhounds O-Dog/Paperboy??

Q. I think you said that it was O-Dog who gave Paperboy a chance to sell the drugs up in Syracuse?

A. Yes.

Q. So it's fair to say that Elmira and Syracuse in terms of who was selling the drugs up there, WAS A "GREYHOUND" OPERATIONS?

A. YES.

(Keynote) - This leaves an inference that this was "GREYHOUND's own conspiracy, in which Mr. Green was not involved. With alleged testimony from Adam's, Mr. Green was a part of the "220/Bronx" pedigree. (TTpg2991,99,3002) (Emphasis Added).

Now when asked about who supplied the drugs for Elmira, Rosario said that it was Wheezy who supplied the cocaine, and alleged that Mr. Green supplied the heroin. One of the problems with this is that this contradicts Adams testimony who claimed that Wheezy and Mr. Green both supplied him with the cocaine for the Elmira operation. At odds with what Patrick Daly's (TTpg660) statement: "the gang did not like getting cocaine".

Q. Who was the drugs coming from in Elmira?

A. Coke Wheezy, Heroin Light.

(TTpg3002)

A. Wheezy that was the hound that was from 'Harlem', he was part of the "Greyhound Pedigree" and we was getting coke from him.

(Keynote) - A reasonable inference shows Wheezy could have been the supplier of the Elmira conspiracy. Alleged testimony supports he's a Greyhound member. Alleged testimony Mr. Green is a 220/Bronx member which the record is unsupportive of both Pedigree's working and joining together. - Can this lead to Multi - conspiracies?

Rosario testified that it was him who went nearly every time to pick up the drugs with O-Dog (see TTpg3003). Never mentioning Mr. Adams was present along these trips. Rosario and Daly both stated that they didn't regularly sell heroin (TTpg2607, 2994, 2995):

(TTpg2993)

THE COURTS: Could you give us a sense of how often you picked up Heroin for resale in Elmira. How often did that happen?

THE WITNESS (Rosario): TWICE.

(TTpg2993) (Emphasis Added). Rosario stated that the first time they picked up the heroin, it had a Rolex crown on it (TTpg2998), and, the second time they purchased it he could not recall what was on it (Id.). However, from the evidence in the discovery, from when he was arrested in Elmira with glassines, they had the stamp "Blue Dream" on it. It should be noted cooperator THOMAS MORTON (TTpg885) admitted he was O-DOG's (Saeed Kaid) heroin supplier.

Rosario's account of the events when he allegedly picked up the drugs in New York City do not add up. The first time Rosario was accompanied by O-Dog (Saeed Kaid). They drove to the Bronx to see Mr. Green. O-Dog and Light (M. Green) got into separate cars, and Rosario admitted he was not present with them when the alleged transaction took place. Rosario did not actually see anything. (see TTpg2993-95).

The second time Rosario alleged to have went to pick up heroin from New York City, he first states that he went there with a $2,000.00 money order (TTpg2994.95); then, he switches his story by stating that O-Dog sent him a $2,000.00 Western Union (See Government Summary Exhibit of Western Union Charts: This transaction is NOT there) to purchase the heroin. Cooperator Patrick Daly (TTpg2631-33) stated a Western Union wire transfer over $1,000 requires identification. (TTpg2994-2997) Furthermore, Rosario testified that he went to the Bronx to allegedly conduct this transaction with Mr. Green, but goes on to say that when he got there, it was not Mr. Green who gave him the heroin. It was a man he never before met in his entire life that he made the purchase from.

The AUSA then led Manuel Rosario to say that he purchased the heroin from the same exact location as the first purchase(followed by an object and SUSTAIN); and they had him fabricate this story in an effort to tie the transactions to Mr. Green and the 'Honeywell Complex' where they tried to make it appear to the jury that Mr. Green lived(check federal probation record or DMV records Mr. Green never resided here). In fact, Officer Sisco was caught lying to the jury (and tied Mr. Green once again to the Honeywell complexes, which proved no NEXUS) in his attempts to misrepresent the facts to the jury about where he pulled over the vehicle that it was said Mr. Green was in. This should be noted Rosario never identified the Honeywell complexes. (TTpg363,690) Michael Adams never identified the picture or address of the Honeywell complexes, nor did Patrick Daly.

- Rosario's Testimony Only Left the Jury to Speculate as To Any Actual Drug Quantities Here

Just like the fabricated testimony of Adams, Rosario also never testified as to any specific drug quantities so as to allow the jury to find Mr. Green guilty of dealing with any specific amounts of drugs here; consequently, under U.S. v. Burks, the findings of the jurors as to specific drug quantities on the verdict form must be overturned because such findings were based on pure speculation at best.

When being questioned about what would happen to the drugs before they were sold, Rosario never mentions that they were weighed, nor, does he ever testify to measuring any of the alleged drugs that he claims to have got with O-Dog in their trips to New York City where he claims WHEEZY provided O-Dog with drugs. The same goes for the heroin that he allegedly bought from some mysterious man he never before seen in his life; that is, he never mentions weighing these drugs, nor, states what they were weighed. Just mentioning that this alleged transaction occurred in a lobby building, never stating it was the Honeywell complexes until the government lead him to say it was the same location(following behind leading OBJECTION AND SUSTAIN).Which he still never identified the Honeywell complex.

Q. What if anything would you do with the heroin before selling it to your customers?

A. We DIDN'T DO ANYTHING. It was already bagged. It was already "CUT".

(TTpg2999) (Emphasis Added). Moreover, the fact that he states these drugs were 'CUT' also provides an inability for the jury to establish beyond a reasonable doubt just how much if any drug was actually there. Clearly, no one provided evidence to establish beyond a reasonable doubt the weight of the drugs here. And, it was not just Rosario, but also Thomas Morton and Patrick Daly whom all testified as to the heroin they obtained (purchased) being cut already before they purchased it, or, that they diluted the drugs themselves to make it "stretch / weigh more", allowing them to make more profits off of the extra weight. (TTpg875,2665,2998,99,).

The only reference as to any possible weights given by Rosario adds up to around 40 grams; and that is without taking into consideration that no one knows just how much of that would be cut, not heroin: Rosario stated that each gram would make two and a half bundles. Rosario calculations for that 200 bundle purchase would only take the amount to forty grams of heroin. However, Rosario stated that the heroin he purchased was already cut, so, a reasonable juror being provided with this information would still

- Daly's Testimony

The next testimony that I would like to highlight is that of Daly. Daly was the former police officer, turned admitted drug user and dealer, turned Cooperating Witness. Daly was caught lying to the Government in court about already having made a cooperation agreement with other federal prosecutors in relation to a case in a different jurisdiction; and, it was clear that he was a well-seasoned cooperator who knew how to make his testimony please the government--he had done it so many times before, both as a police officer, and, as a cooperating witness on many occasions.

I will be highlighting portions of Daly's testimony which in general you may find useful, and, when I will point to how specifically such testimony can be of help to Mr. Green. First, I want to point out that Daly contradicts everyone else who said that Mr. Green was the heroin supplier:

Q. And the heroin supplier was a Dominican guy?

A. That's correct.

Q. He came to your house with his wife?

A. Yes, that's correct.

(Daly stated these things both on direct and cross) (TTpg2814 LL 10-25). Moreover, he testified that heroin only came to Elmira a 2-3 times. (TTpg2607,2630,2813)

(TTpg2606-07)

Q. Mr. Daly what type of drugs did you observe being brought into YOUR apartment once or two times a week?

A. Predominantly crack cocaine, occasionally powder cocaine.

Q. Did you also SAY Heroin? - (Lawyer failed to object)

A. Yes, sir. That wasn't often.

Daly also provided testimony to help establish that the heroin being sold in Elmira was cut; which supports my contention that any finding by a jury as to the weight of the heroin absent a lab test must have been pure speculation:

Q. Have you seen a coffee grinder used?

A. Grind up heroin, grind up cut.

(TTpg2665).

THE COURTS: 'Grind up the cut,' did you say?

THE WITNESS (DALY): The cut.

Q. What is cut?

A. Cut is a material that you're going to say stretch, but to get more material and weaken the drug.

THE COURTS: What's used to dilute the drug, is that what you said?

THE WITNESS (Daly): It's used to dilute the drugs yes sir, and ADD MORE WEIGHT TO IT."

(TTpg856,2665,2999) It should be noted that Morton and Rosario both testified to the cut being used on the heroin sold.

(TTpg2665) (Emphasis Added). Again, there is no way to know what the exact weight of the drugs were based off of this testimony; nor is there any way to determine how much of what was sold was actually drug, and what was cut.

Now, as it relates specifically to the cocaine, Daly contradicts Rosario & Adams' testimony by saying that he only saw powder cocaine come into Elmira 2-3 times, and went on to say that they (referring to BHB) did not like getting it (referring to cocaine). (see TTpg2660). Furthermore, Daly was not even for sure himself as to the weight of those batches of cocaine that he said did come into Elmira:

Q. What was the range of the weight of those three batches?

A. 100 to POSSIBLY 300, I don't remember exactly watching them scale that stuff out.

Patrick Daly further admits to not remembering also how much CRACK cocaine he distributed himself also:

(TTpg2628)

THE COURTS: Can you quantify for us in some fashion?

THE WITNESS: Of the crack cocaine, at lease 2-300 grams for myself.

Q. Not how much you were taking (consumed) yourself, so how much did YOU SELL to other people?

A. I'd say approximately 200 grams. "I NEVER KEPT COUNT OF IT".

(TTpg2660-61) (Emphasis Added). Daly testified that the cocaine only came to Elmira 2-3 times, and, that when it did, he did not watch them scale (weigh) it out; that it could have "POSSIBLY" weighed 100 to 300 grams each batch. This is not the kind of evidence that a jury can rely on to convict Mr. Green beyond a reasonable doubt as to any specific drug quantities here. Really, as for Daly's testimony, none of it points to Mr. Green as having any involvement. Even if you wanted to just say that at best, still there is no weights that can be reasonably established from this testimony. Consequently, a judgment of acquittal should be granted here, or, at the very least a new trial.

Also, it is worth noting that Daly did not testify as to knowing Mr. Green, but he also he did not identify Green throughout the entire trial. That is because Mr. Green was not involved with this drug conspiracy. Now that is a reasonable inference that can be gathered by the testimony here, that Mr. Green was not involved in this conspiracy at all.

* Daly admits to not watching them scale it himself, so, there is no way he could know to be able to testify as to the weight of the cocaine. He had no direct knowledge of this.

* A criminal conviction cannot be based on possibilities. Patrick Daly also contradicts Michael Adams testimony never naming him being in the Washington house when they took precautions (TTpg2620-23). Patrick Daly (TTpg2814 LL 14-17) further stating Michael Adams (Measy) was only in his house a couple of days:

A. Measy only spent no more than a couple of days when he came up (Elmira), and they got a trailer.

(TTpg2771-72) Patrick Daly stating further he also only saw Manuel Rosario for 2-3 weeks period the entire time. Patrick Daly stated (TTpg2618) He made sure these alleged guns in Elmira were unloaded. It should be noted, (TTpg2624-25) that Mr. Daly did not know the location or color of this alleged trailer the gang operated out of, until the AUSA once again saves the day and allows him to change his answer.

Patrick Daly contradicts the governments "summary charts and Manuel Rosario's" western union transaction:

(TTpg2631-33)

THE COURTS: When you went into these western union locations, did you have to show any identification in order to do a wire transfer?

THE WITNESS: Never, unless you transfer over $1,000, $999.00 and under, they don't check..

(TTpg2630) Patrick Daly admits to only seeing crack cocaine transported occasionally. Further contradicting Adams and Rosario about the cocaine trips:

(TTpg2660)

Q. Let's talk about powder cocaine, how many times did you see a batch of powder cocaine brought to Elmira?

A. I only seen powder cocaine three times specifically. They didn't like getting it.

Patrick Daly's testimony continues to conflict with the other CW's about the location of where they were allegedly selling these narcotics at:

(TTpg2611)

Q. Mr. Daly where in Elmira did you observe the drugs being sold?

A. They were sold out of the apartment. They'd also go to other apartments and sell/those were apartments they called "trap houses and multiple people would sell out of there". Not just that group of people.

(TTpg2618)

Q: How many guns did you see inside your house?

A: Two. Two that belonged to that group that stayed in the apartment.

(Keynote) With respect to this testimony this shows multiple groups/conspiracies pertaining to the Elmira Narcotics. Example:

(TTpg2639)

Q: How have you interacted with David Drake in the past?

A: I've done drugs with him. He manufactures drugs occasionally. He sells drugs.

Note - (TTpg2660) Patrick Daly stated "no one trusts no one".

- Testimony of Morton

Morton stated all the guys in upstate NY worked for HIM. Morton also stated he dealt with Puff a few times. Acknowledging this alleged relationship developed while Mr. Green was in federal prison (2004-2010):

(TTpg885 LL 6-9)

THE COURTS: "Yes. During what period of time were you buying heroin from Puff(Michael Evans)?

THE WITNESS: So that would be from anywhere from 09-2011.

THE COURTS: Did you ever have a conversation with Puff in which he told you where he got the heroin from?

THE WITNESS: NO. (TT Pp 856 LL 1-2).

Morton basically stated that he heard it through the grapevine where Puff got his heroin from (TTpg856 LL 13-16): "The word I got is Light been somewhere and he ended up meeting the connect; the drugs comes from him and Light sells them and Puff sells them. "Never stating he was aware that Puff got his heroin from Mr. Green until the ASUA led Mr. Morton to this. Stating he learned this information from other gang members, BHB members and Showtime (David Cherry), once again admitting Puff and Showtime knew each other and were in fact friends.

(See TTpg856 LL 23-250). Furthermore, Morton stated that he had NUMEROUS sources of where he got his heroin, crack and cocaine from (see TTpg880 LL 1-6), stating: I get it from different places. And, also on direct:

Q. Let's turn next to Heroin where were you getting the Heroin you were selling?

A. From DIFFERENT PEOPLE as well.

(TTpg82 LL 21-25,2999,2663-65) (Emphasis Added). Morton also stated that for every gram of heroin he would put a gram of CUT, "quinine and bonito" to make it stretch and to make more money. This brings about the same issues with the testimony of the other CWs, it does not bring forth sufficient evidence for a jury to convict Mr. Green beyond a reasonable doubt as to specific drug quantities. See

United States v. Burks,18-1361 WL 4049857(August 28,2019), United States v. Shonubi, 2nd Circuit (1997)103 F.3d 1085,1090.

(TTpg880-82) Morton additionally stated that he got his heroin from whoever had the best at the time or whoever had it then and there is who he would get it from, out of numerous suppliers. Morton also stated on cross:

(TTpg1158)

A. Seeing that I'm charged with keys of cocaine, or you're being charged with a key of heroin and 5 keys of crack cocaine, like I DIDN'T POSSESS THAT. I NEVER HAD THAT MUCH STUFF.

(TTpg1158, LL 6-20) (Emphasis Added). And, Morton went on to state:

A. So, that's what I meant about "THE CASE IS A BUNCH OF LIES".

(TTpg1158) (Emphasis Added). This supports many of my contentions here; especially as it relates to the CWs testimony being coached and fabricated. Like I said with Adams' testimony, there is no way he was engaged is the large scale cocaine operation that he claimed to be running in Elmira, it just isn't plausible. That's because it was and is a BUNCH OF LIES. And that is a reasonable fact support by the evidence, to include the testimony of Morton.

Morton stated that HE supplied Don P (Donnell Murray) with heroin (TT Pp 873) as well as O-Dog (Saeed Kaid) (TTpg1016). And, when questioned about his heroin dealings, states:

Q. Do you remember when you first met O-Dog?

A. Between 08-2011.

Q. Did you ever see O-Dog with drugs?

A. Yes.

Q. What was the circumstances?

A. I was giving him drugs to sell FOR ME.

(TTpg1016) (Emphasis Added). Expound....

Morton stated he was first introduced to Mr. Green at Showtime's (David Cherry) house as the Hound Boy; he did not say that Green was introduced to be a plug or drug dealer or supplier of any kind. On direct, Morton stated that Showtime was the Godfather the WHOLE time that he was in the gang.

(See TTpg819 LL 18-19). However, the government led him to switch his answer, at which time he said that the first time that he met Mr. Green (Light) was the Godfather. This could not be true if he met Mr. Green (Light) at David Cherry's home and stated Mr. Cherry was the godfather until Mr. Morton left the gang.

-CW - Rayshaun Jones (Cash)

I want to highlight some things about the testimony of Jones. First, if Mr. Green was in Club Heat when he claims he was also there, Mr. Green never spoke to nor interacted with him the entire night. In fact, review of the surveillance footage shown at trial, he never interacted with Mr. Green at all, despite the contentions made otherwise at trial. (TTpg1593-94,2522,2527-28). Keep in mind also that Jones was not able to I.D. Mr. Green in the playbook. When he first took the witness stand, he was asked to identify anybody in the courtroom he did crimes with; however, Jones never identified Green at this time. It was not until the AUSA singled Mr. Green out and took Green's picture off the black board and showed it to Jones, on RE-DIRECT before Jones was able to identify Mr. Green. Clearly such an identification was tainted, coerced, and unreliable to say the least.

As far as putting Mr. Green into any position in BHB, Jones testified that he heard from La that Light was the Low. This uncorroborated hearsay cannot be enough to establish such. (TTpg1876) Moreover, Jones stated: I know many facts - but La sending "Measy"(Michael Adams) on a string is a FALSE fact. Jones story conflicted with Adams about where Mr. Green resided. (TTpg1779).

(TTpg1876) Jones cannot be held reliable, and his testimony at trial is not evidence that Mr. Green did anything, nor that Mr. Green was involved or a member of BHB. When Jones states on re-direct:  admitting doing ROBBERIES with another "Light"(TTpg2019,2025-26).

(TTpg1953-54.1984) Jones told the jury he supplied GUNS and security to BHB, purchasing these firearms from a SANITATION worker. It should be noted JONES stated this both on direct and cross examination. (TTpg1866) Jones admits he never paid kitty dues or was any collected at the first meeting he attended.

-Testimony of (Doogie) Kenneth Moore

Doogie testified that he had a fight while in GEO (General Population in prison) with a couple of Jewish guys. He said that he swung and only hit one, but, it was brought out that he lied, and in fact injured both of these individuals; they both had to go to the hospital. (see TTpg2192).

Doogie admitted to pleading guilty to a narcotics conspiracy; that this was related to selling marijuana. (TTpg2194). He testified that he was selling marijuana from 2008 up until the time he was

incarcerated for the feds. (Id.). And, as to the marijuana, he stated that he was getting it "originally" from some Jamaicans, in Mount Vernon on Eight and First inside a fish market, but, that that later changed. Doogie then went on to testify that he was next getting the marijuana from his "Big Homie" when he was "Red Side Guerilla Brim". (TTpg2195-2196).The jury verdict on the Marijuana count should be overturned, or and JOA should be ordered.

As to meeting Mr. Green, Doogie states:

(TTpg2253)

Q. You met Mr. Green one time, correct?

A. Yes.

Q. One meeting, first and only in person meeting was at a pow-wow, correct?

A. Yes.

Q. But you testified about two pow-wows. The pow-wow in the laundry room and then later pow-wow. Which pow-wow did you meet Mr. Green at?

A. The one in the laundry room.

Q. Where was that Landry room?

A. I mean, can you--which one is Mr. Green. I'm not sure.

Q. Say that again sir?

A. I'm not aware of which one is Mr. Green.

Q. You don't know who Brandon Green is?

A. NO.

THE COURTS: You never heard the name Brandon Green before?

THE WITNESS (Doogie): NOT OUTSIDE THIS COURTROOM, NO.

(TTpg2253-55) (Emphasis Added). Doogie's testimony shows that he had no idea who Mr. Green was, and, cast doubt on, inter alia, whether the person he allegedly met at the pow-wow was even Mr. Green--keep in mind that it was a known fact that there were several different persons with the (TTpg2522,2527,2528) alias "Light", some of which were spelled the same, and some differently.

Mr. Moore did not have a clue who Mr. Green was, apart from co-defendant Mr. Murray:

(TTpg2255)

Q. Which other defendant did you have him (Mr. Green) mistaken for?

A. Don P (Mr. Murray)

Q. So as of a few minutes ago, you weren't sure who Mr. Green was as opposed to Mr. Murray?

A. Correct

(TTpg2205,2213,2215,2225) Mr. Moore made a big mistake here contradicting himself proving to be a liar, when questioned by Mr.Konoski earlier his testimony, had a clear understanding exactly who Mr. Murray(Don P) was:

(TTpp2215)

Q. But yet you're still telling this jury right here that Donnell Murray was the acting godfather at that time?

A. Correct

(TTpg2214)

Q. Now, after you said no to who you testified about was the acting godfather, right, you're telling this jury "Donnell Murray, Don P", was the acting godfather at that point in time?

A. Correct.

A REASONABLE INFERENCE here is that Mr. Moore did not know who Mr. Green nor Mr. Murray due to his incoherent testimony. He was coerced into this storyline but did not know the ACTORS {defendants}. Mr. Moore coercion did not stop here about Mr. Green:

(TTpg2244)

Q. And I think you testified on direct examination that your pedigree was threatened with being faded. Am I right?

A. Correct

Q. It was Light who you testified threatened that, right?

A. No, lady Moolah.

(TTpg2246)

Q. And you were asked to punish Scramz for lying, right?

A. I wasn't really asked, but I offered. I kind of offered.

Q. You offered?

A. Yeah.

(TTpg2169-71) Mr. Moore's lies grew and became evident it was coercion on the Government's part. First, Mr. Moore stated Mr. Green held a POW wow with his 7-year-old son by his side, "collecting kitty dues", to further stating Mr. Green never actually received any money at all from this alleged Pow-Wow. It should be noted, Mr. Green did not have any kids at that time:

(TTpg2170)

Q. What was Light doing during the pow-wow?

A. He was collecting kitty from each lineup.

Q. Did you contribute to the kitty that day?

A. No

Mr. Moore further stating that NO kitty dues was ever giving to Mr. Green at all that day:

(TTpg2171)

Q. He just gave each lineup a deadline for them to give the money

A. When you say "each lineup" are you referring to other pedigrees?

A. Yes

Every Government witness testified to meeting Mr. Green from 2011 on up. There is no nexus between Mr. Green and the August 3, 2010 traffic stop - that Officer Sisco was involved in and testified to at trial - and any of the narcotic conspiracies or other charges here; notwithstanding the fact that this traffic stop never should have been allowed in trial. Take a look at the disposition and the attempts at the Government to hide such, and you will clearly see that Mr. Green's prior attorney threw Mr. Green under the bus when he stipulated to allowing this traffic stop at trial. Such was an admission of guilt over Mr. Green's objections and without Mr. Green's consent, and I feel is an issue of such grave constitutional concern that it is one that should be brought to the Court's attention now, along with a request for a new trial on such grounds. Even if the judge does not grant it, at least such issue is preserved for appeal.

Also, Officer Sisco's arrest report shows where it says gang affiliation for Mr. Green, and there it states "NONE." This additionally supports my contentions that this traffic stop should not have been introduced at trial here; it had nothing to do with these federal charges and there was clearly no nexus to this arrest and any of the narcotic conspiracies, but was just another piece of material used by the Government in their attempts to make Mr. Green appear to the jury to be someone that he is not. Moreover, Mr. Green should at least be given a new trial; one where such information is not allowed to be presented to the jury.

Now, I want to bring to your attention that Officer Sisco lied to the jury when he said he arrested Mr. Green on Mohegan Ave and 180th Street, the cross street that is connected to the Honeywell Complexes. Officer Sisco's own arrest report shows that he was lying about the arrest location. It states that Mr. Green was arrested on Monterey Ave, which is a few miles away from the Honeywell Complexes.  The Government needed him to lie on the stand about this though, it was critical to their case against Mr. Green: many of the CWs lied and stated that Mr. Green lived in and sold drugs out of the Honeywell Complexes; this was all part of the Governments fabricated case here.

-TRAFFIC STOP BY OFFICER LYING SISCO

Like I said, this information never should have been allowed at trial. The Government tried to hide this information from Mr. Green and his own lawyer said that Jesus Christ himself could come down and would not find this disposition. Well, Mr. Green did in fact recover this disposition with the help from Ms. Arceneaux. She located this document for him  having a lot of trouble trying to find it and it was because they tried to hide it: They had Mr. Green's name misspelled so that he would not be able to locate it during trial.

I know that some of this is better suited for ineffective assistance of counsel via 2255, but, I want to run some of it by you now in the event you can attack any of these issues now, or, if they may be helpful to you. Mr. Green asked his lawyer on several occasions to not allow this traffic stop in trial, to move to suppress this information; however, his requests were ignored. We must raise these issues; as his constitutional rights have been violated.

NOTED- There was never any nexus with this arrest with any of these NARCOTIC conspiracies.